```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3      UNITED STATES OF AMERICA,

 4                     Plaintiff,          Case No. 11-20129
                                           Case No. 11-20066
 5         -v-

 6      SCOTT WILLIAM SUTHERLAND, D-1,
        PATRICK MICHAEL MCKEOUN, D-4,
 7      JEFF GARVIN SMITH, D-5/D-1,
        PAUL ANTHONY DARRAH, D-6/D-2,
 8      CARY DALE VANDIVER, D-7/D-5,
        VINCENT WITORT, D-8,
 9      DAVID RANDY DROZDOWSKI, D-17,

10                     Defendants.
        _____/
11
                          JURY TRIAL, VOLUME XXV
12
                   BEFORE THE HONORABLE ROBERT H. CLELAND
13                      United States District Judge
                   Theodore Levin United States Courthouse
14                      231 West Lafayette Boulevard
                             Detroit, Michigan
15                       Monday, December 8, 2014
        APPEARANCES:
16
        FOR THE PLAINTIFF:    SAIMA MOHSIN
17                            ERIC STRAUS
                              U.S. Attorney's Office
18                            211 W. Fort Street, Suite 2000
                              Detroit, MI  48226
19
                              JEROME MAIATICO
20                            United States Department of Justice
                              1301 New York Avenue, NW
21                            Washington, DC 20005

22      FOR THE DEFENDANT:    CRAIG A. DALY
                              (Sutherland, D-1)
23                            615 Ford Building
                              Suite 820
24                            Detroit, MI 48226

25
```

```
 1   APPEARANCES:          (Continued)

 2   FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                           (McKeoun, D-4)
 3                         1616 Ford Building
                           Detroit, MI 48226
 4
                           JEROME SABBOTA
 5                         (Smith, D-5/D-1)
                           26862 Woodward Avenue
 6                         Suite 200
                           Royal Oak, MI 48067
 7

 8                         PATRICIA A. MACERONI
                           (Darrah, D-6/D-2)
 9                         26611 Woodward Avenue
                           Huntington Woods, MI 48070
10
                           MARK A. SATAWA
11                         (Vandiver, D-7/D-5)
                           3000 Town Center, Suite 1800
12                         Southfield, MI 48075

13                         KIMBERLY W. STOUT
                           (Witort, D-8)
14                         370 East Maple Road, Third Floor
                           Birmingham, MI 48009
15
                           BYRON H. PITTS
16                         535 Griswold, Suite 1630
                           Detroit, MI 48226-4218
17
                           PHILLIP D. COMORSKI
18                         535 Griswold
                           2632 Buhl Building
19                         Detroit, MI 48226

20                         RYAN H. MACHASIC
                           (Drozdowski, D-17)
21                         134 Market Street
                           Mount Clemens, MI 48043
22
              To Obtain a Certified Transcript Contact:
23                     Christin E. Russell
                RMR, FCRR, CRR, CSR - (248) 420-2720
24         Proceedings produced by mechanical stenography.
         Transcript produced by computer-aided Transcription.
25
```

```
 1

 2                              I N D E X

 3    JURY TRIAL, VOLUME XXV                              PAGE

 4    WITNESSES FOR THE GOVERNMENT:
      WILLIAM GIBES
 5      DIRECT EXAMINATION BY MS. MOHSIN                     9
        CROSS-EXAMINATION BY MR. PITTS                      55
 6      CROSS-EXAMINATION BY MR. SABBOTA                    59
        REDIRECT EXAMINATION BY MS. MOHSIN                  61
 7
      CHARLES HIGGINS
 8      DIRECT EXAMINATION BY MS. MOHSIN                    64
        CROSS-EXAMINATION BY MS. STOUT                     201
 9      REDIRECT EXAMINATION BY MS. MOHSIN                 244
        RECROSS-EXAMINATION BY MS. STOUT                   254
10
      KENNETH DEAN JOHNSON
11      DIRECT EXAMINATION BY MR. STRAUS                   257

12
                             E X H I B I T S
13
      Government's Exhibits:                              Page
14    Exhibit 11-1                                          15
      Exhibit 11-35                                         30
15    Exhibit 11-56                                         34
      Exhibits 11-4 - 11-22                                 38
16    Exhibit 11-263                                        54
      Exhibits 28, 29, 32                                  173
17    Exhibits 11-81 through 11-99                         191
      Exhibits 11-101 through 11-119                       191
18    Exhibits 11-144, 146, 150, 153, 155                 193
      Exhibits 11-37, 69, 44 through 51                    201
19

20

21

22

23

24

25    CERTIFICATE OF REPORTERS                            242
```

```
 1   Detroit, Michigan
 2   December 8, 2014
 3   9:00 a.m.
 4               *              *              *
 5           (Call to Order of the Court; all parties present.)
 6           THE CLERK:  Calling Case 11-20129 and 11-20066, United
 7   States of America vs. Scott Sutherland, et al.
 8           THE COURT:  Good morning, Counsel.  The Court
 9   recognizes the presence of all defendants and all attorneys.
10   The jury is waiting.  It's nine a.m., and we're prepared for
11   the final week or weeks of Government presentation, as I
12   understand it.  There are matters, I am informed also to take
13   up before we proceed with the jury.
14           MS. MOHSIN:  Very briefly, your Honor.  It's a
15   housekeeping issue.  Last week, early last week, I believe, on
16   Tuesday, I did notify defense counsel that we've sort of
17   slashed witnesses.  We expect that we're going to be done
18   earlier than the break that we -- we had talked about
19   previously.  But we took the opportunity last week, the
20   Government did, to assess the case and assess the witnesses.
21           So I did put them on notice that to the extent that
22   there are any defense witnesses, that they should be prepared
23   for next week.  We may go into early next week with one or two
24   more witnesses, perhaps.  You know, but in an excess of
25   caution, we thought it would be appropriate to let them know
```

1    that to the extent there may be days of court time, jury time,

2    that they ought to have witnesses ready.

3         We have not received any witness list.  We did receive

4    information from Ms. Stout last night that there may be

5    witnesses that they want us to produce that we haven't called.

6    It would be helpful to know who those witnesses are, so that if

7    we have to bring them here, whether they are incarcerated or

8    they are out of state, that we can do that expeditiously and

9    not waste any more of the jury's time.

10        So I just wanted the Court to be aware of it.  We did

11   let them know early last week of the circumstance about the

12   possibility of us finishing early.

13        THE COURT:  Very good.

14        We also need to schedule in, or incorporate within the

15   intended schedule opportunities for Rule 29 presentation.  I am

16   going to need to make findings, certain *Vincent* and *Enright*

17   findings, of course.  And there may be other things in wrapping

18   up that we're going to need non-jury time for.  Everyone

19   understands, I'm sure, the need for that.

20        Also, I am going to want to ask counsel to

21   collaborate, all of you, to try to map out as best you can an

22   intended or expected schedule for final argument, length of

23   time, order of presentation, and a map that is not going to be

24   handcuffing anybody necessarily, but something that we're going

25   to be able to, to discuss and to lay out days of work.  And

1    that's probably going to be in the first week in January, based

2    on what I'm hearing here this morning.  So let's bear that in

3    mind as well, please.

4         So what else do we have before we bring the jury out

5    for the next witness?

6         MS. STOUT:  Thank you, your Honor.

7         Quickly, Ms. Mohsin is correct.  But what I'm going to

8    ask of this Court is that we be allowed to begin our case first

9    day of January if, in fact, they rest next week and we are able

10   to finish Rule 29, jury instructions, and everything else.

11        If we could perhaps call a witness or two of theirs

12   that they are not calling.  But the problem is we don't know

13   that complete list for the next two weeks yet who they are not

14   calling, because there may be witnesses from that list that we

15   choose.  Doug Smith, for instance, may be one of them.  That's

16   an example.  So we're kind of unsure of how to proceed.

17        And my witnesses, I know if we're going to call

18   anybody, it's going to be from California because that's where

19   my client is from.  We have to fly them in.  So I would like

20   the Court to consider that in the scheduling process.

21        THE COURT:  I'm going to give you, I'm going to give

22   you something right off the cuff.  I'm very dubious about

23   blanking out additional days in advance of the two weeks that

24   we already have scheduled.  I'm doubtful about that.  But go

25   ahead.

```
 1              MS. STOUT:  Okay.  I just wanted to indicate to you
 2   that I, I don't know who they have up next week, so I don't
 3   know who --
 4              THE COURT:  And I will, I will --
 5              MS. STOUT:  Thank you.
 6              THE COURT:  I will encourage Government counsel to be
 7   just as, just as fully forthcoming about that in an effort to
 8   solidify the schedule.
 9              MS. MOHSIN:  We have.  Beginning on Tuesday,
10   Wednesday, Thursday, I provided notice of the witnesses we were
11   calling both this week and into next week.  And then I followed
12   up with witnesses that we were not planning to call with an
13   e-mail that provided that information.
14              I have made requests --
15              THE COURT:  Okay.
16              MS. MOHSIN:  -- to find out who they intend to call,
17   so that if we're not going to call them and we have made a
18   decision, either now or at a later date, that we can have that
19   witness available.
20              THE COURT:  Would you favor, would you favor the Court
21   with a copy of the e-mails you sent?
22              MS. MOHSIN:  Certainly.
23              THE COURT:  Thank you.  And I'll be able to have that
24   on the bench for discussion purposes.
25              MS. MOHSIN:  Yes, your Honor.
```

1          THE COURT:  Thank you.  Anything else before we bring
2   the jury in?

3          Seeing nothing else.  All right, then let's call the
4   jury in and greet them this morning, please.  Do you have your
5   first witness here?

6          MS. MOHSIN:  We do.

7          THE COURT:  Okay.

8      (Jury in, 9:06 a.m.)

9          THE COURT:  Good morning.  All right.  Be seated,
10  please.  Again, all attorneys and parties are present.  The
11  jury is assembled.  And the lawyers are probably going to
12  wonder what the uniform of the day is.  It's, it's just in the
13  spirit -- it's not the uniform of the day; it's the spirit of
14  the season.  It's a little Santa Claus button that's been
15  distributed to the jury.  I thank them for our copy and maybe
16  some of the attorneys would have children or grandchildren that
17  might appreciate those, if extra copies are available.

18         All right.  So your next witness then, Ms. Mohsin, is?

19         MS. MOHSIN:  It is Deputy William Gibes of the Pima
20  County Sheriff's Department.

21     (Witness is sworn.)

22         THE COURT:  Right up here in the witness box, sir, and
23  be seated.  Pull the chair up so that it's allowing you to get
24  close to the microphone.

25         And I'm going to tell you one thing that I am going to

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

9

```
 1   do with this, with the experience we've had with witnesses

 2   here.  I'm getting a new microphone that is, that's not for the

 3   witness box, that is not pinned down into just one location.

 4   It's going to be more, much more portable possibly than

 5   wireless.  That's been a bit of a headache for everyone, I

 6   know, attorneys on every side of the case and for the jurors.

 7             Okay.  Go ahead, please, Ms. Mohsin.

 8                          WILLIAM GIBES

 9      called as a witness at 9:08 a.m., testified as follows:

10                       DIRECT EXAMINATION

11   BY MS. MOHSIN:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  Sir, can you please state your full name, spell your last

15   name, tell the members of the jury by whom you are employed?

16   A.  My name is William Paul Gibes.  My last name is spelled

17   G-I-B-E-S.  And I am employed as a deputy sheriff with the Pima

18   County Sheriff's Department in Arizona.

19   Q.  Sir, how long have you been a deputy sheriff with the Pima

20   County Sheriff's Department?

21   A.  Since 1995.

22   Q.  And prior to being a deputy sheriff, what did you do for a

23   living?

24   A.  I was a correction officer for the Pima County Sheriff's

25   Department.
```

1   Q.   For approximately how long?

2   A.   Since 1989.

3   Q.   Now, when you say that you are a deputy sheriff for the

4   Pima County Sheriff's Department, what type of work do you do?

5   In other words, are you someone in uniform or someone who does

6   something different than that?

7   A.   I have been a patrol officer my entire career, in uniform.

8   Q.   Is that a patrol officer in a marked vehicle?

9   A.   Yes, it is.

10  Q.   And it clearly designates that it's a police vehicle?

11  A.   Yes.

12  Q.   And do you wear a uniform, sir?

13  A.   Yes, I do.

14  Q.   Now, during the course of your career, were you assigned to

15  one locale within Arizona or multiple locales?

16  A.   Multiple locations.

17  Q.   And is this in a particular area of Arizona where Pima

18  County is located?

19  A.   It's the southern third of the state.

20  Q.   And when you say "the southern third of the state," does

21  that share a border, an international border with Canada -- I'm

22  sorry, with Mexico?

23  A.   Yes, it does.

24  Q.   And so when you say that, that you've been assigned to

25  multiple different locales, were any of those locales closer to

```
 1   the border between the United States and Mexico?

 2   A.  Yes, there was.

 3   Q.  And I want to direct your attention now to approximately

 4   April of 2003.  Were you employed as a deputy sheriff at that

 5   time?

 6   A.  Yes, I was.

 7   Q.  And what was your assignment then?

 8   A.  I was assigned as a patrol deputy for the Green Valley

 9   district.

10   Q.  Now, the Green Valley district is within Pima County?

11   A.  Yes, it is.

12   Q.  And could you describe what that district looks like, as

13   far as the borders of it, north, south, east, west?

14   A.  The north border would be the Tohono O'odham Indian

15   Reservation.  The south border, in part, goes all the way down

16   to the border of Mexico, near the border town of Sasabe,

17   Arizona.  The western border would be the Baboquivari mountain

18   range, which also borders the Tohono O'odham Indian

19   Reservation.  And the eastern border would be the east side of

20   the Santa Rita mountains.

21   Q.  Now, the area that you've just described, the Green Valley

22   district, is that the area that you were responsible for

23   patrolling?

24   A.  Yes, it is.

25   Q.  And about how long were you involved in patrolling that
```

12

1    particular area?

2    A.   Approximately five years.

3    Q.   And where are you currently assigned?

4    A.   I am assigned in the San Xavier district.

5    Q.   Is that north of the Green Valley district?

6    A.   Yes, it is.

7    Q.   So I want to direct your attention now to the Green Valley

8    district, where you were in April, or approximately April of

9    2003.  What is the population like in that particular area that

10   you've described, the Green Valley area?

11   A.   It's mainly a retirement community, 55 or over.

12   Q.   And is that in the locale of Green Valley itself?

13   A.   Yes.

14   Q.   Now, when you start talking about Santa Rita mountains,

15   which you described were on the eastern part of your patrolling

16   district, how well populated is that particular area?

17   A.   It's very sparsely populated with small ranches.

18   Q.   And are these small ranches, you know, few and far between,

19   so to speak?

20   A.   Yes, they are.

21   Q.   And what is the, the terrain?

22   A.   In the Santa Rita mountains, it's very rocky, hilly

23   terrain.

24   Q.   And has it been a called a desert at any time?

25   A.   Yes, it has.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

13

1   Q.  And is there a particular area within that desert or that

2   locale within the Santa Rita mountains that you are familiar

3   with called Box Canyon?

4   A.  Yes, I am.

5   Q.  And can you tell the jury a little bit about what Box

6   Canyon looks like?

7   A.  Box Canyon has extremely steep cliffs.  The roadway leading

8   through Box Canyon is a dirt mining road that is maintained on

9   a, not a regular basis, but sparsely maintained.  There are no

10  side roads leading off into the mountainous area or terrain.

11  So the only way to navigate through Box Canyon is on the

12  designated road from east to west.

13  Q.  And you indicated that this is not a particularly regularly

14  maintained road.  Is this a paved road or some other road?

15  A.  No.  It is a dirt road.

16  Q.  It's a dirt road?

17  A.  Yes.

18  Q.  Now, the area that you've described within Box Canyon, how

19  does one access that area from a freeway?

20  A.  From the nearest freeway would be Interstate 19, which runs

21  from Tucson down to the Nogales port of entry.  You would have

22  to get off on -- in the Green Valley area, Whitehouse Canyon

23  Road, which runs to the east, and that road eventually will

24  split into two -- into a "Y."  You take it to the left, it will

25  turn into Box Canyon Road.

1   Q.  So you indicated that it connects Tucson with Nogales.  Is

2   Nogales the border between the United States and Mexico?

3   A.  Yes.

4   Q.  And when you say that you turn off of that interstate or

5   that freeway onto White Canyon Road, approximately how far of a

6   distance from the freeway is Box Canyon Road?

7   A.  It could be approximately 20 miles.  It's a very windy

8   road.

9   Q.  And when you get into the Box Canyon Road itself, how

10  populated is that particular area?

11  A.  Box Canyon is actually in a national forest, and there is

12  no -- there are no residents that I'm aware of up there.

13  Q.  And are there residences outside of the Box Canyon itself?

14  A.  Yes, very few small ranches.

15  Q.  Very few small ranches.

16          Now, as part of your duties as a patrol deputy in this

17  Green Valley district, were you responsible for patrolling this

18  particular area?

19  A.  Yes, I was.

20  Q.  And in light of the fact that there were not a lot of

21  people there, what was the purpose of your patrolling the area?

22  A.  The area is used for a corridor of drug and human

23  smuggling.  At that time, I was currently working a midnight

24  shift and we had to find a lot of our own work.  There wasn't a

25  whole a lot of traffic to be looked at.  So we would pick

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN                          15

1   different areas throughout the night or during our shift to

2   search for drugs or human-smuggling operations.  And this was

3   one of the area that we had found drugs and human smuggling

4   occurring in.

5   Q.  And so is this an area that was regularly assigned to you

6   to patrol?

7   A.  Yes.

8   Q.  Now, you indicated that it's between Tucson and Mexico.

9   How far, roughly, from the Mexican border is that turnoff on

10  that interstate?

11  A.  Approximately 20 miles, 25 miles.

12  Q.  And I want to direct your attention now to proposed

13  Government's Exhibit 11-1.

14          MS. MOHSIN:  Your Honor, I believe there's no

15  objection to Government's proposed Exhibit 11-1.  And for that

16  reason, the Government would move to admit it at this time.

17          THE COURT:  That appears to be a map?

18          MS. MOHSIN:  It is a map, your Honor.

19          THE COURT:  Without objection, it is received.

20      (Exhibit 11-1 received, 9:16 a.m.)

21  BY MS. MOHSIN:

22  Q.  Deputy Gibes, before I publish Government's Exhibit 11-1,

23  are you familiar with the Devils Diciples Motorcycle Club?

24  A.  Yes, I am.

25  Q.  In April of 2003, were you familiar with that motorcycle

1   club?

2   A.   Yes, I was.

3   Q.   In the course of your duties as a deputy sheriff, had you

4   ever encountered individuals from that club?

5   A.   Not in the Green Valley area, no.

6   Q.   Just had you ever encountered Devils Diciples members?

7   A.   I've seen them riding in town.  I've never actually

8   encountered them in my work.

9   Q.   All right.  Did you have any understanding of where their

10  clubhouse was located, if any?

11  A.   Yes, I did.

12  Q.   And was that in Tucson itself?

13  A.   Yes, it is.

14  Q.   Now, prior to testifying here today, did you have a chance

15  to look at a map?

16  A.   Yes.

17  Q.   I'm going to show you what's been admitted as Government's

18  Exhibit 11-1.  Sir, do you recognize that?

19  A.   Yes, I do.

20  Q.   Using the laser pointer in front of you, you've just got to

21  not put it in your eye, point out where the interstate is.

22  A.   This is Interstate 19 going north and south.  (Pointing).

23  Q.   And is Tucson referenced on this map?

24  A.   Yes.  It's right in here.  (Pointing).

25  Q.   And is this Green Valley district also referenced on this

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1   map?

2   A.   Yes.  Green Valley would be right in this area here.

3   (Pointing).

4   Q.   Now, there's an indication on the map that indicates Green

5   Valley, 8401 East Box Canyon Road.  Is that approximately the

6   area that you had previously described --

7   A.   Yes.

8   Q.   -- of the Box Canyon Road?

9   A.   Yes.

10  Q.   All right.  And where is the national forest there?

11  A.   Everything in green in this mountainous area would be

12  national forest.

13  Q.   All right.  Thank you.

14         Now, I want to direct your attention to approximately

15  April 27th through April 28th of 2003.  Were you working in

16  Green Valley at that time?

17  A.   Yes, I was.

18  Q.   And were you working a midnight shift on that occasion?

19  A.   Yes, I was.

20  Q.   So when you say that you were working a midnight shift,

21  would that have started on the 27th and ended on the 28th?

22  A.   That's correct.

23  Q.   What were your hours of work?

24  A.   Ten p.m. to six a.m.

25  Q.   So ten p.m. on the 27th, to six a.m. on the 28th?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1   A.   That's correct.

2   Q.   Did there come a time where you were led to that location

3   that we just showed on the map, on Box Canyon Road?

4   A.   Yes.

5   Q.   Could you describe for the jury the circumstances that led

6   to your being called to that location?

7   A.   We were dispatched to a call in that location of a motor

8   vehicle accident.  And we were advised that subjects had walked

9   away from the accident and made contact with one of the

10  ranchers, small ranches in the area.  And we were to respond to

11  his location to assist in the accident scene.

12  Q.   Now, on that date, you're a uniformed deputy sheriff; is

13  that an accurate statement?

14  A.   Yes.

15  Q.   Were you in a marked police vehicle?

16  A.   Yes, I was.

17  Q.   And when you say "we," were you working alone in your

18  vehicle?

19  A.   My vehicle, I was working alone.  There were two other

20  deputies working in that district at that time.

21  Q.   And those two other deputies were there, were they also

22  working alone in their vehicles; in other words, one deputy per

23  vehicle?

24  A.   Yes.

25  Q.   So were you the first person to arrive at the location?

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

1    A.   No, I was not.

2    Q.   What, what approximately was that location?

3    A.   I'm sorry?

4    Q.   Where were you told to respond to?

5    A.   The 8400 block of Box Canyon Road.

6    Q.   And is that just outside of the national forest?

7    A.   Yes.

8    Q.   And when you arrive there, do you remember approximately

9    what time and date you would have arrived at that location?

10   A.   It would have been just prior to eleven p.m. on the 27th.

11   Q.   Now, this is April of a year.  What, what kind of daylight

12   hours were, were common around that time of year in Arizona, in

13   that part of Arizona, I should say?

14   A.   I would say probably around 6:30, around sunrise, 6:30,

15   sunset around seven, seven p.m.

16   Q.   So when you arrive there close to 11 p.m. on April 27th,

17   has the sun set?

18   A.   Yes.

19   Q.   And how well lit is that particular area?

20   A.   There is no lighting.

21   Q.   And so when you arrive there, is there already a deputy

22   that's responded?

23   A.   Yes.

24   Q.   Who is that person?

25   A.   Deputy Gifford.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

20

1   Q.  And is that Deputy Gifford, what's his first name?

2   A.  Doug.  Douglas.

3   Q.  And was that someone you had worked with in the past?

4   A.  Yes.

5   Q.  When you arrived there, what did you see?

6   A.  Deputy Gifford was standing outside of an ambulance.  I

7   walked up to Deputy Gifford and he advised me the subjects were

8   already in the ambulance.  He also told me at that time that

9   this does not appear to be just an accident.

10          MR. PITTS:  Objection to the hearsay, your Honor.

11          MS. MOHSIN:  It's not offered for the truth, your

12  Honor.

13          THE COURT:  It's not offered for the truth, it's not

14  hearsay.  It's background information only.  The jury will

15  accept it as such, or analyze it as such.

16          Proceed.

17          THE WITNESS:  He told me that, I'm sorry, that he did

18  not believe this was not -- or this was just an accident scene.

19  There was other circumstances.

20  BY MS. MOHSIN:

21  Q.  Now, you indicated that the subjects were in an ambulance.

22  Did you see an ambulance?

23  A.  Yes, I did.

24  Q.  And did you go inside the ambulance?

25  A.  No, I did not.

1  Q.  What, what was your understanding about who and how many

2  subjects there were?

3  A.  I was advised there were two subjects inside the ambulance.

4  Q.  And this was information provided to you by Deputy Gifford?

5  A.  Yes.

6  Q.  And after you received that information, you indicated that

7  he said he didn't think it was just an accident.

8  A.  That's correct.

9  Q.  So what information did he provide you and what did you do

10  with that information?

11  A.  He advised me that he believed the subjects were part of a

12  Devils Diciples motorcycle gang and he believed they had been

13  beaten and not been in an accident.

14  Q.  And so based upon that information, did he tell you whether

15  he believed or had reason to understand there may be more

16  victims?

17  A.  Yes.  He told me there may possibly be at least two other

18  victims somewhere in this area.

19  Q.  Now, at the time that you encountered Deputy Gifford, was

20  there any other person or persons present, other than the two

21  individuals that he had described in the ambulance, and of

22  course, the ambulance?

23  A.  No.

24  Q.  And what happened next?  Did the ambulance leave?  Did it

25  stay?  What happened with the ambulance?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

22

1    A.   The ambulance was prepping to be -- to leave with the

2    subjects.  And Deputy Gifford actually went in search for other

3    victims, and I waited until the ambulance actually left the

4    scene.

5    Q.   Do you have any understanding, based upon the radio

6    communications that were occurring, how long Deputy Gifford had

7    been on the scene?

8    A.   Based on the radio log, probably around 30 to 40 minutes,

9    probably before me.

10   Q.   So you arrived there closer to eleven?

11   A.   Yes.

12   Q.   So would it be fair to say that based on your

13   understanding, he had been there perhaps 20 after ten?

14   A.   That's about the time he was dispatched.  And I'm not sure

15   where he started from when he went en route to the call.

16   Q.   So he was dispatched, from the radio communications --

17   A.   Correct.

18   Q.   -- at 10:20 p.m.?

19   A.   Mh-hmm.

20   Q.   Now, you indicated that the ambulance remained there

21   preparing to leave and Deputy Gifford moved on?

22   A.   Yes.  He went further east down the Box Canyon Road.

23   Q.   So what you described earlier is that the Box Canyon Road

24   travels from really White Canyon Road and a freeway in an

25   east/west direction?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN                    23

1    A.  That's correct.

2    Q.  And he traveled further away from the highway; is that

3    correct?

4    A.  Yes.

5    Q.  And then what did you do?

6    A.  After the ambulance -- well, as the ambulance was leaving,

7    Deputy Gifford advised me that he had found another subject.

8    Q.  And where did Deputy Gifford -- where was he when he told

9    you this; do you know?

10   A.  He was approximately a quarter mile east of our location,

11   where the ambulance was leaving.

12   Q.  And is that traveling in the direction of that national

13   forest?

14   A.  Yes.

15   Q.  And did you -- what did you do next?

16   A.  I responded to his location to assist him.

17   Q.  How long after he told you he had found another victim was

18   it before you were able to respond to that location?

19   A.  Minutes.

20   Q.  And were you in your vehicle?

21   A.  Yes, I was.

22   Q.  Now, you said that you traveled approximately a quarter of

23   a mile east; is that a fair statement?

24   A.  Yes.

25   Q.  What do you do when you get to where Deputy Gifford is?

1   A.  I get out of my vehicle.  At that time, I saw the subject

2   was sitting in the back seat of Deputy Gifford's patrol

3   vehicle.  And Deputy Gifford was speaking with the subject.

4   Q.  And did you have an opportunity to speak with the subject

5   as well?

6   A.  I did not speak with him.  I, I stood by while he was

7   speaking with Deputy Gifford.

8   Q.  And were you able to listen to what was going on?

9   A.  Yes.

10  Q.  And at this point, did you have an understanding of where

11  this subject had come from?

12  A.  Yes.

13  Q.  What was that understanding?

14  A.  The roadway at this location on one side is a steep cliff;

15  the other side is a ravine.  He had crawled up from that ravine

16  towards the roadway --

17          MR. PITTS:  Objection.

18          MR. SABBOTA:  Your Honor, I'm going to object.  This

19  is hearsay.

20          MR. PITTS:  And there's no foundation.

21          THE COURT:  It is offered for background, presumably,

22  for what the deputy did next?

23          MS. MOHSIN:  Yes, it is, your Honor.

24          THE COURT:  The jury will receive it as such.  It's

25  not hearsay and it's not -- therefore, briefly, ladies and

1    gentlemen of the jury, a statement such as this indicating that

2    the individual had climbed up a ravine and so forth is offered

3    simply to show what the deputy knew or thought he knew in

4    preparation for what it was he did next, and what he observed

5    and so forth.  It's not offered to prove that anybody climbed

6    up the face of a ravine.  That's not, that's not the purpose of

7    this kind of statement and, therefore, it's not hearsay.

8            If it were being offered in an attempt to prove the

9    fact or the asserted fact that somebody climbed up the face of

10   a ravine, it probably would be hearsay.  But it's not, because

11   it's just background in this instance.

12           MS. MOHSIN:  It is.

13           THE COURT:  Please proceed.

14           MS. MOHSIN:  Yes, your Honor.

15   BY MS. MOHSIN:

16   Q.  Deputy Gibes, your understanding was that he had climbed up

17   that ravine; is that an accurate statement?

18   A.  Yes.

19   Q.  Now, I want you to describe for the jury what this

20   individual looked like when you first observed him.

21   A.  He had a bloody face.  His hair was disarray.  He had dried

22   blood in his -- on his face and in his hair.  His clothes were

23   dirty and tattered.  And I don't recall seeing the injuries to

24   his face, but he appeared to be in a state of disarray, his

25   clothing and his face and hair.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

26

1   Q.  Now, when you arrived at this location, was Deputy Gifford

2   engaged in this conversation with this individual?

3   A.  Yes.

4   Q.  Did there come a time that, based upon the communications

5   that you were listening to, that you went down that ravine?

6   A.  Yes.

7   Q.  Can you tell the jury what happened then?  What did you do?

8   A.  After I was told that he, that he -- or I had learned that

9   he had come up from the ravine, I walked to the edge of the

10  ravine and looked down.  And I could see an object that didn't

11  fit the surrounding ground.  It was black in color.  And I went

12  down to investigate what it was I was looking at down there.

13  Q.  And did you, in fact, go down there?

14  A.  Yes, I did.

15  Q.  And can you describe the, the steepness, if any, of where

16  this ravine, like what it looked like and how steep it was?

17  A.  At this point, it's extremely steep.  I would guess a

18  60-degree downward incline, rocky, with cactus and other

19  shrubbery growing out of the sides of the hill.

20  Q.  Now, you indicated that there was some object that did not

21  appear to be -- to belong, so to speak?

22  A.  That's correct.

23  Q.  How were you looking at this object?

24  A.  From the roadway looking straight down, I could see it

25  while I illuminated it with my flashlight.  And what I was

1  seeing is a brown background of the desert dirt, some boulders

2  or rocks which were greyish in color.  And right in the middle

3  of that is a solid black object.

4  Q.  Now, how was the climb down to this object?  Was it

5  difficult?  Was it easy?

6  A.  It was not easy.  You had to watch your step, taking --

7  while you were going down so you would not fall and trip.

8  Q.  Now, when you went down there, how long, approximately, did

9  it take you to get down to this particular location where the

10  black object was?

11  A.  Probably 35 or 30 minutes -- 30 seconds to a minute.

12  Q.  Thirty seconds to a minute?

13  A.  Yes.

14  Q.  When you got down there, what did you see?

15  A.  I found the black item was a holster for a -- a leather

16  holster for a pistol.

17  Q.  Now, at this point, did there come a time when you found --

18  withdrawn.

19       Did you conduct a search of that area at that time, or

20  at some later time?

21  A.  At that time.

22  Q.  And was there anyone at the location there at the time that

23  was taking photographs?

24  A.  Not at that time, as I was discovering this.

25  Q.  So when you were discovering it, were you just looking?

1    A.   Yes.

2    Q.   So what did you do next?

3    A.   I started looking around, in a circular pattern from the

4    holster and found several other items and evidence which I

5    believed belonged to this case.

6    Q.   Now, you had indicated earlier that you had observed this

7    individual inside of the vehicle.

8    A.   Yes.

9    Q.   Did you see anything on his hands when you had observed him

10   in the vehicle?

11   A.   Yes.  It appears he had what I described as a cable tie

12   tied around his wrist.

13   Q.   A cable tie, something that -- like a binding of some kind?

14   A.   Yes.  It's a plastic tie, zip-tie that's used to hold

15   cables or wires together.

16   Q.   Now, did there come a time where someone came to assist you

17   from the, from the Pima County Sheriff's Department for the

18   purposes of evidence recovery?

19   A.   Yes.

20   Q.   Can you tell the jury about that before we move on to

21   another topic.

22   A.   Okay.  I requested a -- or I believe that Deputy Gifford

23   requested a forensic technician to respond based on what our

24   findings were.  An employee, one of our forensic technicians, a

25   Steve Berenbaum, responded to collect evidence as photographs

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

29

1    and any other assistance he could give us.

2    Q.  And were you present when those photographs were taken by

3    Berenbaum?

4    A.  Yes, I was.

5    Q.  And did you have an opportunity to look at any of the

6    pictures that were later developed, or I don't know what the

7    word would be for digital photos, but --

8    A.  Yes.

9    Q.  -- produced?  Yes.

10          And were those, in fact, items that you had observed

11   down in, in that particular ravine?

12   A.  Yes, they are.

13   Q.  Now, the items that you had seen and that had been

14   photographed, did you recover them or seize them as evidence?

15   A.  Yes, I did.

16   Q.  And what did you do with those items?

17   A.  They were placed into an evidence locker in the Green

18   Valley district and eventually placed into the property and

19   evidence control building for the Pima County Sheriff's

20   Department.

21   Q.  Now, after this evidence is found, and after this

22   individual is, is located, did you participate in a search for

23   other individuals, or become aware that a search was required?

24   A.  Yes, I was.

25   Q.  And can you tell the jury a little bit about that?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1   A.  We were advised that there was one, possibly two other

2   victims still out in the field.  And so while Deputy Gifford

3   was handling this victim, myself and a third deputy, Juan

4   Carlos Navarro, also began searching for the fourth or fifth

5   victim in the area.

6         Juan Carlos was west of us on Box Canyon Road and I

7   continued east on Box Canyon Road until I reached the summit of

8   the mountain range.  At that point, it was approximately two

9   miles.  I did not find any evidence or other people so I turned

10  around and came back towards where Deputy Gifford was located.

11  Q.  And at this point, Deputy Gifford, was he still speaking

12  with the individual that he had found in that ravine?

13  A.  Yes, he was.

14  Q.  And did you become aware of whether or not any medical

15  assistance had been sought for this individual?

16  A.  Yes.  There was an ambulance en route to transport him.

17  Q.  Now, I want to show you proposed Government's Exhibit

18  11-35.

19        MS. MOHSIN:  Your Honor, based upon agreement by

20  counsel, we would move for the admission of 11-35, a

21  photograph.

22        THE COURT:  11-35, without objection, is received.

23     (Exhibit 11-35 received, 9:34 a.m.)

24        MS. MOHSIN:  Okay.  Would you please publish 11-35?

25  BY MS. MOHSIN:

1  Q.  Deputy Gibes, I would ask you to take a look at

2  Government's Exhibit 11-35 and tell me if you recognize this

3  picture.

4  A.  Yes, I do.

5  Q.  And what do you recognize this picture to be?

6  A.  This is the subject that was sitting in the back of Deputy

7  Gifford's patrol vehicle that he had located on Box Canyon

8  Road.

9  Q.  All right.  Thank you.

10         Now, after you returned from the summit of that

11 particular mountain, what did you do next?

12 A.  While I was heading back down towards where Deputy Gifford

13 was located, I was advised by Deputy Navarro that he had found

14 a fourth person walking on the road west of our location.

15 Q.  And so what did you do in response to learning that a

16 fourth victim had been found?

17 A.  I responded to assist Deputy Navarro.

18 Q.  And when you say you responded, are you driving at this

19 point?

20 A.  Yes, I am.

21 Q.  And can you give the jury a sense of time here?  How much

22 time has elapsed?  Is it minutes?  Is it hours?

23 A.  Between?

24 Q.  Between the time that you were at the summit and when this

25 fourth victim is found.  In other words, not the time it took

1   you, but how much time has elapsed since you first arrived.

2   A.  Just minutes, probably five or ten minutes, maybe.

3   Q.  How long have you been in the Box Canyon responding to this

4   incident at this point?  Do you have a sense of that?

5   A.  At this point, probably an hour and a half to two hours.

6   Q.  All right.  So roughly in the area of one a.m. --

7   A.  Yes.

8   Q.  -- perhaps?  Twelve to one a.m.?

9   A.  That's correct.

10  Q.  Now, when you see this, when you respond to Deputy Navarro,

11  you indicated he was west of where the last individual depicted

12  in 11-35 was located?

13  A.  That's correct.

14  Q.  Did you go to that location?

15  A.  Yes.

16  Q.  And what did you see when you arrived?

17  A.  Upon my arrival, there was -- the ambulance that was

18  requested for the subject that Deputy Gifford was handling was

19  driving up the road.  The subject that Deputy Navarro was with

20  was lying on the ground.  He was shaking like he was having a

21  seizure.  He was unresponsive.  He wouldn't talk.

22        At that time, that ambulance crew actually stopped at

23  our -- this location to assist with this victim because he was

24  worse off than the -- or the subject that Deputy Gifford was

25  dealing with.

1  Q.  And so the ambulance that you just described had, in fact,
2  been responding to the third victim that had been found; is
3  that a fair statement?
4  A.  That's correct.
5  Q.  And it was diverted to assist the fourth victim; is that
6  correct?
7  A.  Yes.
8  Q.  And when you said that he was not responding, was he in
9  some state of unconsciousness?
10  A.  Yes.
11  Q.  What did the ambulance do at that point; do you know?
12  A.  They prepped him to be transported.  "Prepping" would mean
13  taking clothes off that they could take off of him, putting him
14  on a backboard, and which time they transported him further
15  down the mountain to an area where he was going to be airlifted
16  to a hospital.
17  Q.  Now, you mentioned that he would be airlifted to a
18  hospital.  Do you have an understanding of where the closest
19  hospital was to this location, 8401 East Box Canyon Road?
20  A.  The closest locational hospital is approximately 30 to 40
21  miles away in Tucson.
22  Q.  And was that the University Medical Center?
23  A.  That's not the closest one.  That's a trama -- they have a
24  trauma center.  So that's the closest trauma center.
25  Q.  And where is the trauma center at the University Medical

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1   Center?

2   A.  In the emergency room.

3   Q.  And where is that hospital located?  Is it 30 to 40 miles

4   away or even further?

5   A.  It's approximately 40 miles away.

6   Q.  So that would be not the closest but certainly the closest

7   trauma?

8   A.  Correct.

9   Q.  Did you have an opportunity to observe the individual that

10  was found, the fourth individual that was found?

11  A.  When he -- before he was transported, yes.

12  Q.  And could you determine or could you see -- other than the

13  seizure and his non-responsiveness or unconsciousness, were you

14  able to see any visible injuries on him?

15  A.  He appeared to have some head injuries.

16  Q.  And --

17  A.  He had some blood on his head.

18  Q.  I'm going to direct your attention now to proposed Exhibit

19  11-56.

20      MS. MOHSIN:  Your Honor, without objection from the

21  defense, the Government would move for the admission of 11-56.

22  It's a photograph.

23      THE COURT:  Without objection, it is received.

24      (Exhibit 11-56 received, 9:39 a.m.)

25      MS. MOHSIN:  Would you please publish 11-56?

1    BY MS. MOHSIN:

2    Q.  Could you tell me if you recognize Government's Exhibit

3    11-56?

4    A.  Yes, I do.

5    Q.  And what do you recognize that to be?

6    A.  This is the subject, the fourth victim we had located that

7    was lying on the ground where Deputy Navarro was at.

8    Q.  All right.  Thank you.

9         After the fourth victim was found, did you have any

10   information or belief that there may be, in fact, a fifth

11   victim?

12   A.  Yes.

13   Q.  And what was the basis of that information or belief?

14   A.  It was based on the conversation between Deputy Gifford and

15   the third victim.

16   Q.  Okay.  And what did you do with that information?

17   A.  We, we decided we would have to continue our search, take

18   every step we could take to ensure that there was a -- was or

19   was not a fifth victim.

20        This starts with a request for the Sheriff's

21   Department's fixed-wing aircraft that has an infrared scanning

22   system on it that allows us to see in the night.  It was

23   requested, and flew down to our area approximately with ten

24   minutes of, ten minutes from the request.

25        Very quickly, the aircraft determined that his night

1   vision was not suitable for this type of search.  Because of

2   the mountain range, he had to fly at an extremely high

3   altitude.

4          Our next step would be to request the Department of

5   Public Safety or Highway Patrol's helicopter, which also has

6   that same infrared night vision on it.

7          MR. PITTS:  I would object to what "we're" doing.  I

8   think we're interested in what this good officer -- the steps

9   he took.

10         THE COURT:  Overruled.  Overruled.

11         THE WITNESS:  We waited for the Ranger helicopter to

12   arrive on scene.  It has to launch.  It's not flying all the

13   time.

14         Approximately 30, 40 minutes later, it arrived on

15   scene and conducted a search of the Box Canyon area for a fifth

16   subject.  It searched for approximately 30 or 40 minutes

17   without any heat signatures being found, leading us to believe

18   there was no other victims in the field at this time.

19   BY MS. MOHSIN:

20   Q.  Now, what are you, Deputy Navarro, and Deputy Gifford doing

21   while the air support is searching for a fifth victim?

22   A.  We staged together, or we sit in a static location

23   together.  If the aircraft finds a target, a heat signature,

24   then he can direct us into that location and we can check it

25   out.  If it turned out to be nothing, we go back to a staging

1    area as to not confuse the spotter on board the helicopter.

2    Q.  Did you conduct any search for this victim by driving or

3    walking?

4    A.  No, I did not.

5    Q.  And why not?

6    A.  We were advised by the Ranger helicopter that their night

7    vision was effective in the area and they could not locate any

8    heat signatures in the area.

9    Q.  Was there anything about the terrain that made it

10   particularly difficult from your point of view to conduct any

11   sort of search and rescue?

12   A.  A vehicle search would not be accomplished other than on

13   the Box Canyon Road due to the terrain and the lack of forestry

14   roads.  It's not an off road -- even though I was driving a

15   four-wheel-drive, I could not drive my vehicle off road at this

16   location.

17   Q.  I want to direct your attention now to a series of

18   photographs.  Proposed Government's Exhibits 11-6, 7, all the

19   way -- I'm sorry, 11-6 through 22.  And I would like to amend

20   that.  It's going to be 11-4 through 11-22.

21          MS. STOUT:  No objection.

22          MS. MOHSIN:  Your Honor, with agreement from counsel,

23   the Government would move for the admission of proposed

24   exhibits 11-4 through 11-22 inclusive.

25          THE COURT:  All of that is correctly stated?

1           MR. SABBOTA:  No objection.

2           THE COURT:  I hear no objection.  I see no objection.

3    And each exhibit is received.

4       (Exhibits 11-4 - 11-22 received, 9:44 a.m.)

5           MS. MOHSIN:  Yes, your Honor.  I'm going to publish

6    now proposed Exhibit 11-4.

7    BY MS. MOHSIN:

8    Q.  Could you please describe what's depicted in 11-4?

9    A.  Yes.  This is a photograph of the Box Canyon Road and the

10   area that we were currently working in on this night.

11   Q.  Now, I want to ask you a question about the weather in

12   April of 2003.  I'm sure it's different than the weather in

13   Detroit.  Can you describe for the jury what the weather is

14   like in this region during that time period, day versus night

15   as well?

16   A.  In April, it's very mild.  Probably high 70's, low 80's

17   during the day, and probably mid 50's to mid 60's at night.

18   Q.  Directing your attention now to the right side of that

19   particular photo, is that the type of road that leads into and

20   around the Box Canyon?

21   A.  This is actually Box Canyon Road, this road here.  It runs

22   all the way through the mountains.

23   Q.  Directing your attention to 11-5.  Can you describe what's

24   depicted in this photo?

25   A.  Yes.  This is actually the same road, just a zoomed-in

1   picture of it, showing the terrain and the angle that we were

2   dealing with from the ravine that night.

3   Q.  And how wide is the road itself?  Is it, is it easy for two

4   cars to pass comfortably?

5   A.  Two cars can pass not comfortably.  It's approximately 20

6   feet wide.

7   Q.  Directing your attention now to 11-6.  Have you seen that

8   before?

9   A.  Yes, I have.

10  Q.  Can you tell the jury what that is?

11  A.  This is a photo card that is taken before photographs were

12  taken of evidence at a crime scene.

13  Q.  And do you recognize the technician that's referenced

14  there?

15  A.  Yes.  This is, this is forensic technician Berenbaum's

16  card.

17  Q.  Directing your attention now to 11-7.  Are you familiar

18  with this?

19  A.  Yes, I am.

20  Q.  Could you tell the jury what's depicted?

21  A.  This is a picture standing on Box Canyon Road looking down

22  towards the location that the third victim was -- where he was

23  located crawling out of.

24  Q.  Is this photograph taken contemporaneously with the events

25  that unfolded in those hours on the 27th and 28th?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

40

1   A.   Yes.

2   Q.   And I want to direct your attention to 11-7.  I'm sorry, 8.

3        Can you describe what's depicted in this photo?

4   A.   This is the same, at the same location.  The camera was

5   just turned clockwise slightly and taken, a second picture was

6   taken.

7   Q.   Directing your attention to 11-9.  Can you describe what's

8   depicted in this photo?

9   A.   This is the black gun -- leather gun holster I had seen and

10  eventually recovered.

11  Q.   Now, there are a number of rocks that are depicted in this

12  photo; is that a fair statement?

13  A.   Yes.

14  Q.   I want to direct your attention now to some of those rocks.

15  Was there any other item of evidence -- evidentiary value

16  that's depicted in this particular photograph that you can

17  point out for the jury?

18  A.   Yes, I could.  Just above the gun holster right here is a

19  section of duct tape that had blood and hair on it.  These

20  boulders up here have blood, dried blood, on them as well.

21  Q.   All right.  And is some of that blood depicted there?

22  A.   Yes.

23  Q.   Now, that duct tape, is it photographed later?  Are we

24  going to show that photo later?

25  A.   Yes.

1  Q.  Directing your attention now to 11-10.  Can you describe

2  what is depicted in this particular photo again?

3  A.  Yeah.  This is -- at the lower corner is the gun holster.

4  Right above it is the duct tape.  Up in this area are the

5  boulders with the blood on it.

6  Q.  Directing your attention to 11-11.  Please describe what's

7  depicted.

8  A.  This is a closer shot of this last picture of the duct tape

9  with the blood on it.  This is the boulders with the dried

10 blood on it.  (Pointing).  And in this corner here is what

11 appears to be vomit with blood in it.

12 Q.  Now, the boulders that are depicted, are those unique to

13 this particular ravine or are these similar to other parts of

14 the Box Canyon?

15 A.  This is like the granite-type rock, and it's seen

16 throughout this area.  I should also point out that also right

17 in this area here, there is a pair of brass knuckles that was

18 recovered.

19 Q.  Okay.  11-12.  Can you describe that, please?

20 A.  This is a close-up picture of the boulders that's showing

21 dried blood on this area here, on the ridge of this boulder

22 here, and down in the lower position of this rock.

23 Q.  And is there some more on the right side of the screen as

24 well?

25 A.  Yes, there is, right down on this rock here.  (Pointing).

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1  Q.  Okay.  11-13?

2  A.  This is a close-up picture of that ridge rock that shows

3  the blood running up this ridge and also along this ridge of

4  this rock here.

5  Q.  11-14?

6  A.  This is a close-up picture of the main boulder that shows a

7  large portion of dried blood.  It shows dried blood on this,

8  two places, of this stone, also on the lower portion of this

9  stone here, and a small drop back in here.  And --

10  Q.  Deputy -- I'm sorry.  Deputy Gibes, these photos again, all

11  of them were taken contemporaneously when you searched that

12  area and called an evidence technician in?

13  A.  Yes.

14  Q.  11-15?

15  A.  This is a close-up picture of the gun holster and the -- it

16  shows in reference how far the duct tape with the hair and

17  blood was located on it, or near how close to it, it was.

18  Q.  11-16?

19  A.  This is a close-up picture of the duct tape with dried

20  blood and hair on it.

21  Q.  11-17?

22  A.  This is a close-up picture of the brass knuckles and what

23  appears to be vomit with blood in it.

24  Q.  Okay.  And then 11-18?

25  A.  This is a close-up picture of what appears to be vomit with

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

1    blood in it.

2    Q.   11-19?

3    A.   This is a picture of a leather strap that was tied into a

4    double loop that was located approximately 10 feet away from

5    all the other objects that I had located.  It didn't, didn't --

6    there was no reason for it to be there.  It was made out of

7    what appears to be the same type of leather I had found on the

8    leather gun holster.  Therefore, I collected it, had it

9    photographed and collected it.

10   Q.   Now, I want to direct your attention to 11-21.

11   A.   This is --

12   Q.   Can you -- go ahead.

13   A.   This is a photograph of the road from while we're standing

14   on the roadway.  Right in this location here, there was a small

15   rock, which I described in my report as the size of a baseball

16   that was covered in dried blood.

17   Q.   Okay.  And were there other sort of drops of blood leading

18   from that to another direction?

19   A.   Yes, there was.  They were in that area leading towards

20   the, towards the wash.

21   Q.   All right.  And now I want to direct your attention to

22   11-22.

23   A.   This is a close-up picture of that rock that had the dried

24   blood on it.

25   Q.   And this is, again, on the roadway that we just saw in the

1    previous image?

2    A.   Yes.

3    Q.   And finally, 11-20?

4    A.   This is a folding knife that was located just approximately

5    3 feet down the embankment from where that rock with the blood

6    was located at.

7    Q.   So that was not found with the other items but closer to

8    the roadway; is that a fair statement?

9    A.   That's correct.

10   Q.   Now, while -- after these items are seized and

11   photographed, you indicated that they were put into evidence?

12   A.   Yes.

13   Q.   Prior to testifying here today, did you actually look at

14   those items again?

15   A.   Yes, I did.

16   Q.   Not just the photographs?

17   A.   Correct.

18   Q.   And I want to direct your attention to what happens next.

19   There is, there is four victims that have been found, a fifth

20   that has not been found; is that a fair statement?

21   A.   Yes.

22   Q.   After the fourth victim was taken to a location by

23   helicopter to a hospital, what happened to the third victim?

24   A.   The third victim waited with Deputy Gifford for that third

25   ambulance to return to transport him after taking the fourth

```
 1   victim down the hill.
 2   Q.  And did you see those victims again?
 3   A.  No, I did not.
 4   Q.  And when you were done searching for a fifth victim that
 5   day, do you know about what time it was when you guys wrapped
 6   up?
 7   A.  Approximately three o'clock.  Three a.m.
 8   Q.  And what did you do at three a.m. at that point?  Had you
 9   found a fifth victim?
10   A.  No, we did not.
11   Q.  What did you do then at that point?
12   A.  At that time, we decided our field operation was complete
13   for this investigation and we went for a meal break.
14   Q.  Now, at three a.m., I don't know what you would call it,
15   dinner or lunch, or where do you go at three a.m. in that area
16   to have a meal break?
17   A.  We went to a local casino, Indian tribal casino, due to the
18   fact it was only thing open in the area 24 hours a day.
19   Q.  And where is that casino located?
20   A.  It's located approximately 5 miles north of the Green
21   Valley area.
22   Q.  Now, when you leave, is it still dark out?
23   A.  Yes.
24   Q.  Are there additional items that were left behind that were
25   photographed later?
```

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

46

1   A.  Yes, there was.

2   Q.  What were those items?

3   A.  They were clothing from the fourth victim that had been cut

4   off by the ambulance crew before transporting him down the

5   hill.

6   Q.  And so the clothing that had been cut off of that fourth

7   victim, do you have an understanding of why that clothing was

8   cut off?

9   A.  My understanding is that trauma patients are prepped in the

10  field as much as possible, and one of those steps is to remove

11  as many clothing -- pieces of articles of clothing so that once

12  they are brought into the trauma center, doctors can

13  immediately start working on them.

14  Q.  So the clothing that was cut off, was that -- or was that

15  what was left behind in Box Canyon?

16  A.  Yes.

17  Q.  Did you collect that evidence?

18  A.  No, I did not.

19  Q.  But did you see the clothing and the items before it was

20  later collected?

21  A.  I did not see it before it was collected.  I did not know

22  it had been left there.

23  Q.  Okay.  I want to direct your attention now to your break,

24  your meal break.  You indicated that you left at about three

25  a.m., and at some point, you had a meal break.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

47

```
 1              Who were you going on a meal break with?

 2   A.  The other two deputies I work with, Deputy Gifford and

 3   Deputy Navarro.

 4   Q.  And you indicated that you went to a casino.  How far away

 5   from the Box Canyon was your station house?

 6   A.  Approximately 20 miles by driving.

 7   Q.  And was that station house close to interstate I-19?

 8   A.  Yes, it is.

 9   Q.  And how far away was the casino then from the, the Box

10   Canyon area?

11   A.  Probably 25 miles, I would guess.  It's about 5 miles north

12   of our office.

13   Q.  Now, is this the only casino in the area?

14   A.  There's four casinos in the Tucson regional area.

15   Q.  Okay.  Is this one of those four?

16   A.  Yes, it is.

17   Q.  And are there other casinos that are closer to Tucson than

18   this particular casino?

19   A.  The other three are closer to Tucson.

20   Q.  And so how far was this casino from Tucson, would you say?

21   A.  Approximately 15 miles.

22   Q.  And it was south of Tucson?

23   A.  Yes.

24   Q.  Did this particular location have 24-hour restaurant

25   service or meal service?
```

1    A.   Yes.

2    Q.   So when you arrived at this casino to eat, how long were

3    you there?

4    A.   Thirty to 40 minutes.

5    Q.   And it was you and Deputy Navarro and Deputy Gifford?

6    A.   Yes.

7    Q.   What happened after you were finished eating?

8    A.   While we were leaving the casino, we were walking through

9    the parking lot towards our vehicles, and we were passed by two

10   subjects with full beards.  And we -- basically, what caught

11   our eye is the subjects were wearing Devils Diciples clothing

12   as they passed us.  One was wearing a T-shirt, one was wearing

13   a baseball cap, both marked with Devils Diciples' markings on

14   them.

15   Q.   Now, you indicated that you had left the Box Canyon area at

16   about three a.m.; is that a fair statement?

17   A.   Yes.

18   Q.   That would have been on April 28th of 2003?

19   A.   That's correct.

20   Q.   Approximately what time would you say you encountered these

21   two individuals with the Devils Diciples clothing?

22   A.   Approximately four a.m., maybe a little bit after four a.m.

23   Q.   And you indicated that you encountered them in the parking

24   lot.  Was that the parking lot of the casino?

25   A.   Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

49

1    Q.   And you indicated you were walking out.  Were these

2    individuals also walking out?

3    A.   They were walking into the casino.

4    Q.   And what were you wearing at the time?

5    A.   We were all three wearing our uniforms.

6    Q.   And were your patrol cars, your marked police patrol cars

7    also parked in that parking lot?

8    A.   Yes, they were.

9    Q.   Can you describe their demeanor, these two individuals,

10   when they walked past you?

11   A.   There was no reaction at all.  They passed us as if we were

12   not even there.

13   Q.   Now, did it catch your attention?

14   A.   Yes, it did.

15   Q.   And were you the only one whose attention it caught from

16   your interactions with your fellow deputies?

17   A.   No.  We all three stopped in our tracks.

18   Q.   And when you stopped in your tracks, why, why did you stop

19   in your tracks?

20   A.   Because the subjects appeared to have affiliation with the

21   Devils Diciples motorcycle gang, and we had just handled a

22   major call that included members of that club within the last

23   hour or two we finished.

24   Q.   Now, at that time, had you had any interactions with Devils

25   Diciples members in the Green Valley district?

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

1   A.  No, I have not.

2   Q.  And at that time, were there any events similar to or as

3   significant as what occurred on Box Canyon Road that night, in

4   your five years, in that area?

5   A.  No.

6   Q.  So when you saw these two individuals, did you and your

7   fellow deputies make a decision?

8   A.  Yes, we did.

9   Q.  What decision was that?

10  A.  That we were going to follow them back into the casino and

11  attempt to gain photographs of these subjects.

12  Q.  Now, how would you do that?

13  A.  By contacting the security personnel at the casino.

14  Q.  Were you aware that photographs might be available?

15  A.  Yes.

16  Q.  What was the basis of that awareness?

17  A.  They have 24-hour surveillance cameras and also have the

18  capability of taking still photographs of, of location,

19  different locations in the casino.

20  Q.  Now, did you do that?

21  A.  Yes.

22  Q.  Did you go back in?

23  A.  Yes, we did.

24  Q.  Now, were you able to observe whether these two individuals

25  were also going for a meal or do you know if they went in some

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

51

1    other direction?

2    A.   They walked into the gaming area where the slot machines

3    are located.

4    Q.   And what -- when you went back into the building, did you

5    go to the security area?

6    A.   Yes, we did.

7    Q.   What did you do when you got there?

8    A.   We advised them what we were looking for and what we

9    wanted.  And they were very courteous and able to provide us

10   with what we asked for, which were still photographs of the two

11   subjects we saw walk in, and they were able to review video to

12   allow us to know what vehicle the subjects drove to the casino

13   in.

14   Q.   So did you watch the video with the security guys looking

15   for the two individuals you had seen?

16   A.   Yes.

17   Q.   And did there come a time where you or your fellow deputies

18   identified the individuals that you had seen?

19   A.   Yes.

20   Q.   And were photographs, in fact, or stills of those videos

21   taken?

22   A.   Yes, they were.

23   Q.   And were they taken in real time, in other words, as you

24   were observing these individuals inside the casino?

25   A.   That's correct.

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN

52

1  Q.  And were copies or printouts or something provided to

2  you --

3  A.  Yes.

4  Q.  -- of the individuals that you had seen?

5  A.  Yes.

6  Q.  And did they have a date and time stamp?

7  A.  Yes, they did.

8  Q.  And was that an accurate date and time stamp based upon

9  your experience that evening?

10  A.  Yes, it was.

11  Q.  Did you also have information provided to you about a

12  vehicle?

13  A.  Yes.

14  Q.  What did you do with that information?

15  A.  That information was given to Deputy Gifford, and he

16  actually did a once, a once check and a motor vehicle check on

17  the license plate on the vehicle.

18  Q.  Did you actually go to look at the vehicle?

19  A.  Yes, we did.

20  Q.  And did you go as well?

21  A.  Yes.

22  Q.  And what did you see when you saw the vehicle?  Describe

23  it.

24  A.  We saw a red pickup truck with a New Mexico license plate

25  on it.  I looked in the bed of the vehicle and I saw what I

1    described as ramps that can be used to attach to the back of a

2    vehicle and allow a motorcycle to drive up into the bed of the

3    vehicle.

4    Q.  Now, after these photographs were taken from the security

5    personnel at this casino, were they provided to you and your

6    fellow deputies?

7    A.  Yes.

8    Q.  And were they logged into evidence?

9    A.  Yes, they were.

10   Q.  And have you had an opportunity to look at them before you

11   testified here today?

12   A.  Yes, I did.

13   Q.  Did you recognize the images that you saw?

14   A.  Yes, I did.

15   Q.  I want to direct your attention to proposed Government's

16   Exhibit 11-263.  I'm going to ask you to describe this.  Do you

17   recognize those photos?

18   A.  Yes, I do.

19   Q.  And if you look at the back, do you recognize that

20   document?

21   A.  Yes.

22   Q.  All right.

23          MS. MOHSIN:  Your Honor, the Government would move for

24   the admission of 11-263 at this time.

25          THE COURT:  Questions or objections?

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - DIRECT BY MS. MOHSIN                    54

```
 1              MR. SABBOTA:  I'm sorry.  No objection, your Honor.

 2              THE COURT:  Thank you.  I hear that and I see no

 3    additional objection.  It is received.

 4        (Exhibit 11-263 received, 10:02 a.m.)

 5    BY MS. MOHSIN:

 6    Q.  Deputy Gibes, using your laser -- well, maybe not needing

 7    your laser pointer, can you describe what's in the first

 8    photograph?

 9    A.  This was one of the subjects we had seen in the parking lot

10    that was wearing a Devils Diciples baseball cap.

11    Q.  Does this particular picture have that cap depicted in it?

12    A.  Yes, it does.

13    Q.  Does it have a date and time stamp?

14    A.  Yes, it does.

15    Q.  What is that date and time stamp?

16    A.  April 28, 2003, at 4:14 a.m.

17    Q.  Directing your attention to the lower half of this

18    particular picture, can you describe what's, well, depicted in

19    this picture?

20    A.  This is the second subject that we had seen in the parking

21    lot walking into the casino.

22    Q.  And does it have the same date and time?

23    A.  Yes, it does.

24    Q.  Is there a close-up or a clearer picture as well of that

25    second subject?
```

1   A.  Yes, there is.

2   Q.  Is this that image that I've just put on the display here?

3   A.  That is correct.

4   Q.  Does it have a different date and time stamp?

5   A.  It is the same date, and time is 0425.

6   Q.  Okay.

7   A.  Or 4:25 a.m.

8   Q.  Now, after you obtained these photographs and looked at the

9   vehicle, did you have any other interaction with these

10   individuals again?

11   A.  No, I did not.

12        MS. MOHSIN:  And I have no further questions for you.

13   Thank you very much.

14        THE COURT:  All right.  Questions by counsel?

15        MR. PITTS:  Just a few, your Honor.

16        THE COURT:  All right, sir.  Go ahead, Mr. Pitts.

17        MR. PITTS:  May it please the Court.

18                    CROSS-EXAMINATION

19   BY MR. PITTS:

20   Q.  Would it be -- is it Deputy Gibes?

21   A.  Yes.

22   Q.  Okay.  Deputy Gibes, how are you this morning?

23   A.  Very good.

24   Q.  Okay.  Listen, I'm going to ask you just a few questions

25   about your observations on or about April 27th of '03.  Okay?

1           Okay.  You testified that you went into an area that

2    you've identified as Box Canyon, correct?

3    A.  That's correct.

4    Q.  And that's sort of routine patrol, that's your beat; fair

5    statement to make?

6    A.  Yes.

7    Q.  Okay.  And you made observations of various individuals in

8    certain what appear to be conditions of distress; fair

9    statement?

10   A.  That's correct.

11   Q.  Okay.  Just kind of as you've testified previously, many of

12   them were covered in blood, correct?

13   A.  Two of them, two that I saw.

14   Q.  Well, fair enough.  The two that you saw were covered in

15   blood, correct?

16   A.  Yes.

17   Q.  And so much blood that there was -- you looked down, would

18   it be called a ravine or something like -- you saw --

19   A.  Yes.

20   Q.  -- some rocks at the bottom of a ravine, correct?

21   A.  That's correct.

22   Q.  Okay.  And at the bottom of the ravine, even the rocks were

23   covered with blood; fair statement to make?

24   A.  Yes.

25   Q.  So whatever happened to this young -- to these two

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - CROSS BY MR. PITTS

57

 1    individuals that you saw, it's a fair statement to make that it

 2    was -- whatever, whatever incident occurred, it certainly was a

 3    bloody incident; fair statement to make?

 4    A.  It appeared that way.

 5    Q.  It appeared to you, to the best of your knowledge.

 6              After you made your observations and took your

 7    photographs and left that area, you eventually went to go get

 8    something to eat, correct?

 9    A.  That's correct.

10    Q.  And you went to an all-night casino?

11    A.  Yes.

12    Q.  Okay.  And you went to the all-night casino with some of

13    your colleagues; fair statement to make?

14    A.  Yes.

15    Q.  Okay.  And as you're getting ready to exit the casino, you

16    made some observations, correct?

17    A.  Yes.

18    Q.  Okay.  And let me just ask you, the observations that you

19    made as it relates to April 27th of '03, you documented in a

20    police report, correct?

21    A.  Yes, I did.

22    Q.  And you've reviewed that police report as being accurate

23    and complete?

24    A.  Yes.

25    Q.  And it's a fair statement to make you can't put everything

1  that you saw into the police report, but certainly you put down

2  what's important, correct?

3  A.   That's correct.

4  Q.   Okay.  And as you're exiting the Casino of the Sun casino

5  hotel, you observe two individuals, correct?

6  A.   Correct.

7  Q.   And these individuals -- and your observations of these two

8  individuals indicate to you that they are wearing Devils

9  Diciples paraphernalia, correct?

10  A.   Yes.

11  Q.   You get a good look at them.  You see one is wearing -- is

12  it a shirt?

13  A.   A T-shirt.

14  Q.   And one of them is wearing a hat, correct?

15  A.   Yes.

16  Q.   And that caught your attention because you thought -- that

17  caught your attention; fair statement to make?

18  A.   Yes.

19  Q.   Okay.  Caught your attention so much that you decided to

20  keep your eye on these individuals, correct?

21  A.   Yes.

22  Q.   Instead of leaving, you kind of doubled on back and

23  continued to observe them; fair statement?

24  A.   I'm sorry?

25  Q.   You were getting ready to leave the casino, correct?

1   A.   That's correct.

2   Q.   Instead of leaving the casino, you doubled back and

3   continued your observations of these two men in the Diciples

4   paraphernalia, correct?

5   A.   We didn't follow them back into the casino.  We waited for

6   them to go into the casino before we re-entered to make contact

7   with the security.

8   Q.   Okay.  Fair enough.  But you kept your eye on them?

9   A.   Yes.

10  Q.   Fair statement?

11         Okay.  And certainly you didn't see any of these men

12  covered in blood, did you?

13  A.   No.

14  Q.   You didn't see any of these men appear to have bruises or

15  marks on their hands, as if they've been in some kind of

16  altercation, did you?

17  A.   No.

18         MR. PITTS:  With the Court's permission?  Nothing

19  further.  Thank you.

20         MR. SABBOTA:  Can I ask him a couple questions,

21  please?

22         THE COURT:  Mr. Sabbota, go ahead.

23         MR. SABBOTA:  Thank you.

24                     CROSS-EXAMINATION

25  BY MR. SABBOTA:

JURY TRIAL, VOLUME XXV - 12/8/2014
WILLIAM GIBES - CROSS BY MR. SABBOTA
60

1   Q.  Good morning, sir.

2   A.  Good morning.

3   Q.  Your role in this really is you respond to an area known as

4   the Box Canyon?

5   A.  Correct.

6   Q.  And you find various people at the Box Canyon that you need

7   to call for medical assistance?

8   A.  That's correct.

9   Q.  Now, you don't know how these people got there?

10  A.  No.  That's correct.

11  Q.  And you don't know what caused those injuries?

12  A.  At that time, no, we did not.

13  Q.  And you didn't see anybody injure these individuals?

14  A.  I'm sorry?

15  Q.  You didn't see anybody injure these individuals?

16  A.  No, I did not.

17  Q.  And you don't know why these people were injured at all, do

18  you?

19  A.  That's correct.

20  Q.  Because what you can really tell us is what you saw and

21  what you, yourself, found?

22  A.  Correct.

23  Q.  And that's what you can rely on?

24  A.  Yes.

25  Q.  And what happens is while you're doing your careful search,

1   you find a holster.

2   A.  Yes.

3   Q.  Did you find a gun on anybody?

4   A.  No, I did not.

5   Q.  And it was a holster that would go for a, a pistol or a

6   side arm; am I right?

7   A.  That's correct.

8   Q.  And then you also found a pair of brass knuckles?

9   A.  Yes.

10  Q.  Now, a pair of brass knuckles is generally an offensive

11  weapon, based on your experience?

12  A.  Yes.

13  Q.  Most people don't carry brass knuckles?

14  A.  That's correct.

15  Q.  And those brass knuckles were found near one of the

16  individuals that required medical assistance?

17  A.  That's correct.

18          MR. SABBOTA:  No further questions.

19          THE COURT:  Any others?

20          Any redirect?

21                     REDIRECT EXAMINATION

22  BY MS. MOHSIN:

23  Q.  Deputy Gibes, you were called to respond to a car accident?

24  A.  Yes.

25  Q.  Did you find a car?

1   A.   No.

2   Q.   You didn't find a gun?

3   A.   No, we did not.

4          MR. PITTS:   I would object to the leading, your Honor.

5          THE COURT:   Overruled.

6   BY MS. MOHSIN:

7   Q.   You indicated that you didn't see any bruises or marks on

8   the hands of the two individuals who were depicted in the

9   photo, yes?

10  A.   That's correct.

11  Q.   Did you have any physical contact with these individuals?

12  A.   No, we did not.

13  Q.   What is the closest that you came to them after you

14  observed them passing by?

15  A.   As they passed us, they were the closest to us.  They got

16  probably within 8 to 10 feet of us, and then we never got a

17  very -- we never got close to them again.  All the observation

18  was done over a camera.

19  Q.   And was that the black and white photo camera that we saw

20  or was it a color image?

21  A.   It was black and white.

22  Q.   So the video surveillance image was black and white, as

23  well?

24  A.   The video surveillance is actually colored.

25  Q.   But the image that was produced was black and white?

1    A.  Correct.

2    Q.  Did you have an opportunity to look at their hands?

3    A.  No, I did not.

4    Q.  So you don't know if they had any bruises or --

5             MR. PITTS:  Objection.

6    BY MS. MOHSIN:

7    Q.  -- or anything?

8             MR. PITTS:  It's a leading question.

9             THE COURT:  That, I agree.

10   BY MS. MOHSIN:

11   Q.  Did you have an opportunity to look at their hands?

12   A.  No, I did not.

13   Q.  Did you have an opportunity to examine, to determine

14   whether there were bruises or any other marks on their hands?

15   A.  No, I would -- did not.

16   Q.  Do you know whether they had marks on their hands or not?

17   A.  No, I do not.

18   Q.  By the way, you indicated that one of them was wearing a

19   Devils Diciples hat, and that was depicted in the photo.  Which

20   individual of the two was wearing the shirt?

21   A.  There was a heavier set subject that was wearing a shirt,

22   the T-shirt.  The subject wearing the baseball hat, that was

23   how we associated him.  The other subject who was not wearing a

24   baseball hat was wearing a Devils Diciples T-shirt.

25   Q.  So the second photograph that was shown to you, and the

```
 1    third photograph; is that accurate?

 2    A.  That's correct.

 3          MS. MOHSIN:  Thank you.

 4          THE COURT:  And the Court has no questions.  So you

 5    may step down, sir.

 6          THE WITNESS:  Thank you.

 7      (Witness excused, 10:11 a.m.)

 8          THE COURT:  Next?

 9          MS. MOHSIN:  Your Honor, I've asked for my witness to

10    be brought.  I'm going to see if he's here.

11          THE COURT:  Okay.

12          MS. MOHSIN:  Your Honor, the Government would call

13    Charles Higgins.

14      (Witness is sworn.)

15          THE COURT:  Have a seat up here.

16          All right.  Ms. Mohsin?

17          MS. MOHSIN:  Thank you, your Honor.

18                        CHARLES HIGGINS

19      called as a witness at 10:12 a.m., testified as follows:

20                        DIRECT EXAMINATION

21    BY MS. MOHSIN:

22    Q.  Good morning.

23    A.  Good morning.

24    Q.  I'm going to ask you to keep your voice up.  Maybe just sit

25    up a little straighter so that you can be, be heard.
```

1  A.  All right.

2  Q.  Can you please state your full name and spell your last

3  name for the jury.

4  A.  Charles R. Higgins.  H-I-G-G-I-N-S.

5  Q.  I'm going to ask you to scoot a little bit forward if you

6  can.  It's hard to hear you, sir.

7  A.  All right.

8  Q.  Mr. Higgins, do you ever go by a name other than Charles

9  Higgins, a nickname of any kind?

10  A.  Yes.

11  Q.  What was that?

12  A.  "Riggs."

13  Q.  Riggs?  How tall are you, sir?

14  A.  6'8".

15  Q.  And did you go by a name such as "Big Riggs" as well?

16  A.  Yeah.  That was the original name.

17  Q.  All right.  Also "Riggs"?

18  A.  Yeah.

19  Q.  How old are you, sir?

20  A.  Fifty-seven.

21  Q.  What's the highest educational level that you achieved?

22  A.  Third year of college.

23  Q.  And what was the study that you pursued in college?

24  A.  Electronics.

25  Q.  All right.  Can you tell the jury a little bit about your

 1   background as far as employment is concerned?

 2   A.  Currently, or am I --

 3   Q.  Let's start with currently.  What do you do, sir?

 4   A.  I'm a mechanic right now, full-time.

 5   Q.  And what type of mechanic are you?

 6   A.  Automotive.

 7   Q.  And you say full-time?

 8   A.  Yes.

 9   Q.  How long have you been working as a mechanic?

10   A.  Ten or 11 years.

11         MR. SABBOTA:  Excuse me, Judge.  Could you ask him to

12   please speak up a little bit?

13         THE WITNESS:  Ten or 11 years.

14         MR. SABBOTA:  Thank you, sir.

15         THE WITNESS:  You're welcome.

16         THE COURT:  That's about as close as I think he's

17   going to be able to get to the microphone.  So just speak

18   firmly and you'll be heard, sir.

19         THE WITNESS:  All right.

20         THE COURT:  Go ahead, Ms. Mohsin.

21         MS. MOHSIN:  Yes, your Honor.

22   BY MS. MOHSIN:

23   Q.  Now, I want to direct your attention to motorcycle clubs.

24   Have you ever been a member of a motorcycle club?

25   A.  Yes, I have.

1   Q.   And have you been the member of one motorcycle club or more

2   than one motorcycle club?

3   A.   Two motorcycle clubs.

4   Q.   Which was the first motorcycle club that you were a member

5   of?

6   A.   The Boozefighters.

7   Q.   Booze, B-O-O-Z-E, Boozefighters?

8   A.   Yes.

9   Q.   And was that in Arizona?

10  A.   Yes.

11  Q.   How long were you a member of that club?

12  A.   Seven years.

13  Q.   And about when would that have been?  In the '70s?  '80s?

14  '90s?

15  A.   In the '80s, yeah.

16  Q.   In the '80s?

17       Did there come a time where you became a member of

18  another motorcycle club?

19  A.   Yes.

20  Q.   What motorcycle club was that?

21  A.   Devils Diciples.

22  Q.   And approximately when did you become a full patched member

23  of the Devils Diciples, roughly?

24  A.   I believe it was '83.  Or '93, I mean.

25  Q.   1993?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  Now --

3    A.  About that time.

4    Q.  Around that time?

5    A.  Mh-hmm.

6    Q.  Sir, have you ever had any history of using any sort of

7    illegal drugs, like cocaine or meth?

8    A.  I have used all of them.  Yes.

9    Q.  And I want to direct your attention now to the time that

10   you were a member of the Devils Diciples.

11        You indicated that you had become a member in about

12   1993.  Did you ever have a relationship with the Devils

13   Diciples before that?  In other words, did you prospect?

14   A.  Yes.

15   Q.  And about how long did you prospect?

16   A.  About one year.

17   Q.  What chapter did you become a member of?

18   A.  Arizona.

19   Q.  Now, does Arizona have one chapter or multiple chapters of

20   Devils Diciples?

21   A.  At that time, they just had one.

22   Q.  And was that in southern Arizona?

23   A.  Yes.

24   Q.  Did they have a clubhouse?

25   A.  Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.   Where was that clubhouse?

2   A.   On Benson Highway in Tucson.

3   Q.   Benson Highway, you said?

4   A.   Mh-hm.

5   Q.   Was this a clubhouse as in a structure with some land

6   around it, that type of location?

7   A.   Yes.

8   Q.   How much land was around that clubhouse?

9   A.   About 3 acres.

10  Q.   And is Benson Highway a -- what kind of a location is

11  Benson Highway?  Is it a commercial area?  Residential area?

12  A.   I would say primarily residential.

13  Q.   All right.  Who was your sponsor?

14  A.   Bogart.

15  Q.   Bogart?

16  A.   Mh-hm.

17  Q.   Did you know his real name?

18  A.   Oh, boy.  Yes, I did, but I don't recall it.

19  Q.   You don't recall it now.

20          When you were a sponsor and when you became a member,

21  did you have to be schooled on how to become a Devils Diciples?

22  A.   I would say yes.

23  Q.   Were you provided with any sort of bylaws?

24  A.   Yes.

25  Q.   Did you have a motorcycle?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.  Yes.

2   Q.  What type of motorcycle did you have?

3   A.  A '73 Harley FXE.

4   Q.  Okay.  When you first became a member of the Devils

5   Diciples, who was the president of your chapter?

6   A.  Cuz.

7   Q.  Cuz?  C-U-Z?

8   A.  Mh-hm.

9   Q.  Who were some of the other individuals that were members of

10   the chapter when you joined?  You mentioned Bogart and Cuz.

11   A.  Mexican John, Molasses, Sleepy.  I'm probably missing some,

12   but that's what comes off the top of my head.

13   Q.  Did you know an individual by the name of "Mac Tonight"?

14   A.  Yes.  He was also a member.

15   Q.  Did you know an individual that went by the nickname of

16   Doc?

17   A.  Yes.

18   Q.  Was he a member?

19   A.  Yes, he was.

20   Q.  Did you know an individual by the name of Wizard?

21   A.  Yes.

22   Q.  Was he a member at that time?

23   A.  No, he was not.

24   Q.  Was he a member later?

25   A.  Yes.

1  Q.  All right.  I want to direct your attention now to the

2  national leadership at that time.  I'm talking roughly 1993

3  when you joined.  Did you know who the national leaders were at

4  that time?  Can you recall it?

5  A.  Yes.

6  Q.  Who were they?

7  A.  Fat Dog was the national boss the whole time I was in the

8  club.

9  Q.  All right.  So in 1993, Fat Dog was the national boss.

10  A.  Yeah.

11  Q.  Who were some of the other officers?  Do you remember?

12  A.  No.

13  Q.  Did you know any of the warlords at that time?

14  A.  (No response.)

15  Q.  The national warlords.

16  A.  In '93?

17  Q.  Yup.

18  A.  I think so.  I think Sonny was the national warlord.

19  Q.  Sonny?

20  A.  Yes.

21  Q.  And did you know anyone by the name of Pauli?

22  A.  Yes.

23  Q.  How did you know that individual?

24  A.  I had met him at a funeral here in Detroit.

25  Q.  At some later time from when you became a member?

1    A.  Not, not long afterwards.

2    Q.  And was he a member at that time of the Devils Diciples?

3    A.  Yes.

4    Q.  Was he some sort of a national -- did he have any sort of a

5    title?

6    A.  I did -- I don't know that at that time.

7    Q.  All right.  I want to direct your attention to an

8    individual named Little John.  Are you familiar with that

9    individual?

10   A.  Yes.

11   Q.  How are you familiar with Little John?

12   A.  He was the boss of Hollywood.

13   Q.  Okay.  And say Hollywood.  Is that a chapter of the Devils

14   Diciples?

15   A.  In southern California.

16   Q.  In southern California?

17   A.  Mh-hm.

18   Q.  Were you familiar with an individual that went by the name

19   of Holiday?

20   A.  Yes.

21   Q.  How are you familiar with that individual?

22   A.  I had met him.  And he -- I don't know if Fontana had an

23   active chapter then, but I believe at one time he was the boss

24   of that.

25   Q.  And when you say "Fontana," are you talking about

1   California?

2   A.   Yes.

3   Q.   And you're talking about Devils Diciples?

4   A.   Yes.

5   Q.   Was Holiday a member of the Devils Diciples when you

6   joined?

7   A.   Yes.

8   Q.   All right.  Now, you had mentioned that you became a member

9   and that there were some other members.  Cuz was the president.

10  Who was the treasurer at that time; do you know?

11  A.   Yes.  Mexican John.

12  Q.   Who was it?  Mexican John?

13  A.   Mh-hm.

14  Q.   Was he a treasurer for a long period of time?

15  A.   Yes.

16  Q.   Did there come a time where you had any positions of

17  authority within the southern Arizona chapter of the Devils

18  Diciples?

19  A.   In the time that I was in there, I think I did everything

20  except road captain and vice president.

21  Q.   So you had served as president; is that an accurate

22  statement?

23  A.   Yes.

24  Q.   And you had served as a warlord?

25  A.   Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  And you served as an enforcer?

2   A.  Yes.

3   Q.  And treasurer?

4   A.  Never.

5   Q.  Never treasurer?  Vice president?

6   A.  Never.

7   Q.  All right.  So those were the positions that you had held

8   over time; is that a fair statement?

9   A.  Yes.

10  Q.  How long were you the president of that chapter?

11  A.  It was probably four or five different times.  We, we

12  changed leadership very often in Arizona.  I think the longest,

13  maybe a year.

14  Q.  So you were president at different periods of time

15  beginning in 1993; is that a fair statement?

16  A.  No.  It was a few years before I became president.

17  Q.  All right.  So sometime after you joined, a few years

18  later, you served as president on perhaps five different

19  occasions?

20  A.  Yes.

21  Q.  Is that a fair statement?

22          But not consecutively?

23  A.  No.

24  Q.  All right.  When you said that you changed leadership all

25  the time, how did you go about doing that?

1  A.  We just had elections.

2  Q.  All right.  And did you have them often in the southern

3  Arizona chapter?

4  A.  Fairly often, yeah.

5  Q.  How many national elections did you participate in?

6  A.  None.

7  Q.  You never participated in any national elections?

8  A.  There weren't any, to my knowledge.

9  Q.  All right.  And I want to direct your attention now to the

10  term "nomad."  Are you familiar with nomads?

11  A.  Mh-hm.

12  Q.  Who are nomads?

13  A.  They are members that don't belong to any one chapter.

14  Q.  Did you have any nomads in southern Arizona?

15  A.  Yes.

16  Q.  Who were some of the nomads that you had in southern

17  Arizona?

18  A.  Most of the time, String Bean, and then in later times,

19  Smoky and Grog.

20  Q.  Smoky, Grog, and String Bean?

21  A.  Mh-hm.

22  Q.  You knew these individuals?

23  A.  Yes.

24  Q.  They were all nomads?

25  A.  Yes.

1   Q.  Did you guys hold regular church meetings?

2   A.  Yes.

3   Q.  Did you guys pay dues?

4   A.  Yes, we did.

5   Q.  Did you ever participate in any national runs?

6   A.  (No response.)

7   Q.  Did you ever go to any national runs?

8   A.  Yes.

9   Q.  Where did you go to national runs?  What chapters?

10  A.  Here, Alabama, Arizona, and one or two funerals.

11  Q.  So you had been to clubhouses for the Devils Diciples in a

12  number of different places?

13  A.  Yes.

14  Q.  Is that an accurate statement?

15  A.  Yes.

16  Q.  And did those include Michigan?

17  A.  Yes.

18  Q.  Alabama?

19  A.  Yes.

20  Q.  Did you go to any in Ohio?

21  A.  No.

22  Q.  Indiana?

23  A.  Yes.

24  Q.  California?

25  A.  Yes.

77

1  Q.  And did you hold national runs in the southern Arizona

2  chapter?

3  A.  Yes.  Thanksgiving.

4  Q.  Was that an annual run?

5  A.  Yes.

6  Q.  Now, is there a national cemetery for the Devils Diciples?

7  A.  Yes.

8  Q.  Where is that located?

9  A.  Chandler, which is south of Phoenix, north of Tucson.

10 Q.  Is that in proximity or close proximity to your chapter in

11 southern Arizona that you were a member of?

12 A.  It's about an hour away.

13 Q.  Okay.  Did your chapter ever purchase any cemetery plots

14 for the club for club members to be buried in?

15 A.  Yes.

16 Q.  All right.  Did your chapter maintain any gambling

17 machines, slot machines, or poker machines?

18 A.  Sometimes.

19 Q.  And when you say "sometimes," on some occasions but not on

20 others?

21 A.  Yeah.  We didn't own them.

22 Q.  Someone else owned them?

23 A.  Yeah.

24 Q.  Was that a member of the Devils Diciples?

25 A.  No.

1  Q.  Did you have some sort of financial agreement with the

2  individual?

3  A.  We split the liability and whatever profit there was.

4  Q.  And what was that split?

5  A.  50/50.

6  Q.  And what was the purpose of that money?  Did it go into

7  someone's pocket or was it for some other purpose?

8  A.  No.  I mean, it was just went to the treasury, if there was

9  any.

10  Q.  It went to the treasury, meaning of the chapter?

11  A.  Yes.

12  Q.  All right.  Now, what was your understanding about leaving

13  the club, if someone left the club?  Could you leave the Devils

14  Diciples?  Could you stop being a member?

15  A.  Yes.

16  Q.  And could you leave in good or bad standing?

17  A.  I don't understand that question.

18  Q.  Did you have to have permission before you could leave the

19  club?

20  A.  I think it was something that had to be voted on.

21  Q.  Were there consequences for people who left the club in

22  less than, than -- without permission, so to speak?

23  A.  I don't think I ever knew that happening.

24  Q.  So anyone could join and leave at any time?

25  A.  No.  I think you had to have five years' membership.

1  Q.  What would happen if you left before that five years, if

2  anything?

3  A.  Well, I imagine you would be walking with no motorcycle,

4  but I don't -- I don't think that ever happened.

5  Q.  Now, when you say "walking with no motorcycle," can you

6  explain that?

7  A.  Well, you gave the motorcycle up when you joined, you know,

8  so it belonged to the club.

9  Q.  And so did that include a motorcycle that you had obtained

10  yourself?

11  A.  (No response.)

12  Q.  In other words, paid for yourself?

13  A.  Yes.

14  Q.  All right.  Now, I want to direct your attention to an

15  individual by the name of Sleepy.  You mentioned that Sleepy

16  was a member of the Devils Diciples southern Arizona chapter

17  when you joined?

18  A.  Yes.

19  Q.  Did you know him?

20  A.  Yes, I did.

21  Q.  Did you have any sort of relationship with him, friendship?

22  A.  Yes.

23  Q.  Did there come a time where you owed him some money?

24  A.  A couple times, probably.

25  Q.  All right.  And did there come a time where you did him any

1    favors or did things for him?

2    A.   Certainly.

3    Q.   Did there come a time where you were involved in the

4    transportation of methamphetamine for Sleepy?

5    A.   Yes.

6    Q.   Can you tell the jury a little bit about that?

7    A.   I believe I did that twice for Sleepy.

8    Q.   And when you say you did that twice, was that --

9    A.   I brought methamphetamine to Detroit from Tucson for him.

10   Q.   For Sleepy?

11   A.   Mh-hm.

12   Q.   And who did you give it to?

13   A.   Once to Mike, Iron Mike, and then once, could have been any

14   of three people --

15   Q.   So --

16   A.   -- that were in there.

17   Q.   -- you said once for Iron Mike?

18   A.   Mh-hm.

19   Q.   Is that another member of the Devils Diciples?

20   A.   Yes.

21   Q.   Did you know what chapter he was a member of?

22   A.   Right here, Detroit.

23   Q.   You have to keep your voice up.

24   A.   Detroit.

25   Q.   Detroit.  And you delivered that meth to him directly?

1   A.  Yes.

2   Q.  Did you know how much meth that was?

3   A.  Actually, I couldn't tell you exactly, you know, but

4   probably about a pound.

5   Q.  About a pound of meth?

6           And do you remember approximately when that would have

7   been?

8   A.  Mid '90s.

9   Q.  All right.  Now, you said that there was another time that

10  you transported meth.  Approximately how much meth did you

11  transport?

12  A.  Five ounces maybe, something like that.

13  Q.  And you said it could have been any one of a number of

14  people.  Can you explain what that means?

15  A.  Well, I just brought it somewhere, and there were three

16  people there.

17  Q.  And did you hand it to them or you left it for them

18  somewhere?

19  A.  No.  It was -- I just delivered it there.

20  Q.  And who were those three people?

21  A.  Detroit Red, Pollack and Iron Mike.

22  Q.  And so when you say you left it there, was it hidden

23  somewhere or did you hand it to someone?

24  A.  Yeah.  I just brought it in.  It was in a, like a bank bag.

25  Q.  All right.  And what did you do with it?

1   A.  I gave it to him and I left.

2   Q.  Now, did there come a time where you were involved on your

3   own in drug trafficking?

4   A.  Yes.

5   Q.  And did that go on in the '90s?

6   A.  The late '90s, maybe.

7   Q.  All right.  And did you have interactions with individuals

8   within the club or with other individuals?

9   A.  (No response.)

10  Q.  In other words, you were trafficking with members from the

11  Devils Diciples or other individuals?

12  A.  Both.

13  Q.  Non-members?

14  A.  Both.

15  Q.  Both?

16          Now, did any of the money that was used or made from

17  these drug-trafficking transactions, was any of that money used

18  in furtherance of the club for the purposes of the club?

19  A.  Yes.  All of it was used to try to keep -- maintain

20  possession of the clubhouse.

21  Q.  Now, the clubhouse that you're talking about, is that the

22  one on Benson Highway in Tucson?

23  A.  Yes.

24  Q.  Was that a property that was owned or mortgaged by anyone?

25  A.  I was never able to see the actual paperwork on that.  It

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

83

1   was, it was supposedly owned by Cuz and his girlfriend's

2   relative.

3   Q.  And so at the time when you were a member of the Tucson

4   chapter, you understood that Cuz was the owner of the property?

5   A.  Near the end of it, he should have been the sole owner of

6   it, yes.

7   Q.  And did you and your fellow Tucson, southern Arizona

8   members make payments toward the mortgage on that property?

9   A.  Yes.

10  Q.  Who did you make the payments to?

11  A.  Cuz.

12  Q.  And were any of the payments that were made the proceeds of

13  drug-trafficking activity?

14  A.  Yes, sometimes.

15  Q.  All right.  I want to direct your attention now to an

16  individual named Two Dogs.  Are you familiar with an individual

17  by the name of Two Dogs?

18  A.  Yes.

19  Q.  How are you familiar with Two Dogs?

20  A.  He was a member of our chapter.

21  Q.  And approximately when did he become a member of your

22  chapter?

23  A.  He became a member about a week before Little Dog died.  I

24  can't give you a date on that.

25  Q.  So Little Dog was a member of Devils Diciples?

1    A.   Yes.

2    Q.   Out of what chapter?

3    A.   Alabama.

4    Q.   And Little Dog died; is that right?

5    A.   Yes.

6    Q.   And at some point before that, a week or so, is when Two

7    Dogs became a patched member?

8    A.   Yes.

9    Q.   All right.  Who was Two Dogs's sponsor; do you know?

10   A.   I believe Doc.  I'm not positive of that.

11   Q.   Was Two Dogs involved in the distribution of

12   methamphetamine?

13   A.   I think twice.

14   Q.   All right.  So he, he was involved?

15   A.   Yes.

16   Q.   Were you aware of at least two occasions?

17   A.   Yes.

18   Q.   I want to direct your attention to one of those occasions.

19   Did there come a time where Two Dogs came to Michigan with

20   meth?

21   A.   Yes.

22   Q.   Can you tell the jury what the circumstances were leading

23   up to him coming to Michigan with meth?

24   A.   I'm not clear on what you want -- what you want from me on

25   that.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

85

1    Q.  All right.  Was he a member at the time?

2    A.  Yes.

3    Q.  And did he have a quantity of meth?

4    A.  Yes.

5    Q.  And was he supposed to come to Michigan with that meth?

6    A.  Yes.

7    Q.  What was the purpose of him bringing the meth to Michigan?

8    A.  We needed money for the clubhouse.

9    Q.  And how much meth was he supposed to distribute in

10   Michigan?

11   A.  Four ounces.

12   Q.  I'm sorry?

13   A.  Four ounces.

14   Q.  And did you have any expectation of how much money he was

15   supposed to obtain for that four ounces?

16   A.  He should have $900 above the expenses.

17          MR. SABBOTA:  Your Honor, I'm going to object unless a

18   foundation was laid that he was with this individual.

19          THE COURT:  I don't know, I don't think that's an

20   essential element of the foundation.  I'm understanding the

21   witness is speaking from personal --

22          THE WITNESS:  Yeah, I was not present.

23          THE COURT:  -- knowledge?

24          I'm understanding that, but the question should

25   clarify perhaps.

```
 1              MS. MOHSIN:  Yes, your Honor.
 2   BY MS. MOHSIN:
 3   Q.  Did you know that Two Dogs was coming to Michigan with
 4   meth?
 5   A.  Yes.
 6   Q.  How did you know that?
 7   A.  I suppose I guess the easiest way to say it is I put up a
 8   car to get it.
 9   Q.  So when you say you put up a car, what does that mean?
10   A.  Well, that's what was covering.  We did not have the money
11   to buy it.
12   Q.  So the meth you didn't have the money to purchase?
13   A.  Right.
14   Q.  So was it fronted to you?
15   A.  Well, it was covered by a title on a car.
16   Q.  What type of car was it?
17   A.  Yeah.  Early '70s Firebird.
18   Q.  A Firebird?
19   A.  Mh-hm.
20   Q.  And did you give that vehicle and its title -- withdrawn.
21              Did you give that vehicle or its title to someone in
22   exchange for 4 ounces or so of meth?
23   A.  On the second trip, he didn't come back with any money, so,
24   yes, I ended up giving up the car.
25   Q.  And that's what I'm getting to.
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

87

1          So on one of these occasions, did you obtain a

2    quantity of meth, you or Two Dogs, obtain a quantity of meth?

3    A.   Yes.

4    Q.   For the purpose of bringing it to Michigan?

5    A.   Mh-hm.

6    Q.   And your car was the collateral?

7    A.   Right.

8    Q.   And so did you know that Two Dogs was coming to Michigan

9    with meth?

10   A.   Yes.

11   Q.   And did you know he was coming to Michigan with 4 ounces of

12   meth?

13   A.   Yes.

14   Q.   And did you have an expectation that he would return with

15   money?

16   A.   Yes.  That was the plan.

17   Q.   And what was the -- what was your intent with respect to

18   that money?  What were you going to do with it?

19   A.   Give it to Cuz to put towards the clubhouse.

20   Q.   And when you say "put towards the clubhouse," to pay the

21   mortgage?

22   A.   Yes.

23   Q.   So did Two Dogs go to Michigan with the meth?

24   A.   Twice.

25   Q.   All right.  Did he come back with money?

1   A.  Once.

2   Q.  And on the one occasion he came back with money, how much

3   did he come back with?

4   A.  Somewhere about $3,300, something like that.

5   Q.  And what did you do with the -- or what did he do with that

6   money; if you know?

7   A.  We paid the person we got it from, and paid on the

8   mortgage.

9   Q.  All right.  So you paid the money that was owed to the

10  person who supplied you with the meth.

11  A.  Right.

12  Q.  And then you paid the mortgage?

13  A.  Yes.

14  Q.  What happened on the second occasion?

15  A.  He came back with no money.

16  Q.  All right.  And did he come back with something else?

17  A.  Two pistols.

18  Q.  And these were two pistols that he came back with.  Did he

19  tell you where he got them?

20          MR. SABBOTA:  Objection.  That would be hearsay, your

21  Honor.

22          MS. MOHSIN:  I think this is 801(d)(2)(E), your Honor.

23          THE COURT:  It seems to me 801(d)(2)(E) and therefore

24  not hearsay.

25          Go ahead.

1    BY MS. MOHSIN:

2    Q.  Did he tell you where he got them?

3    A.  Not directly.  They came from Detroit, I know that.

4    Q.  Well, what were the circumstances?  What did you understand

5    these pistols to represent, if anything?

6    A.  I don't know exactly what they represented.  He claimed

7    that, that he was accosted by federal agents and that they had

8    taken his money.  And it's like, well, you had these pistols

9    with you; they didn't take them?  And that's what he said, yes.

10   Q.  Did, did this event cause problems for you, Two Dogs, or

11   the Tucson chapter?

12   A.  Well, they put an end to the drug business.

13   Q.  Okay.  Why is that?

14   A.  Well, I had no more cars to give up.

15   Q.  So the Firebird or --

16   A.  It was gone from that, yes.

17   Q.  You had surrendered that title?

18   A.  Mh-hm.

19   Q.  Because you couldn't pay the debt.

20   A.  Right.

21   Q.  And what about these two firearms?  Was there some concern

22   by any members of the Devils Diciples outside of the Tucson

23   chapter that was expressed to you about them?

24   A.  Yes, I think there was.  But they weren't the guns that

25   were in question after, you know.

```
1   Q.  So what was the concern about these two guns?

2   A.  I don't know.

3   Q.  Did anyone express concerns to you about these two guns?

4   A.  Yes.  They were concerned about where they came from, and

5   when, when they -- I produced the guns and they looked at them.

6   I didn't know where they were from.  They were not --

7   Q.  You're talking about "they" --

8   A.  Yes.

9   Q.  -- can you be specific about who you are talking about?

10  A.  Yeah.  That would have been I think Holiday and Little

11  John.  We had a meeting in Tucson.

12  Q.  When you say you think?

13  A.  I know for sure Holiday was there.  I don't -- I'm not

14  clear on Little John.

15  Q.  All right.  So there was a meeting?

16  A.  Mh-hm.

17  Q.  After these two guns were brought back from Michigan; is

18  that an accurate statement?

19  A.  Yes.

20  Q.  And where was this meeting?

21  A.  At the Tucson clubhouse.

22  Q.  And who was the meeting with?

23  A.  I believe me, Doc, and Two Dogs and Holiday and perhaps

24  Little John.

25  Q.  Had they come -- was Holiday a member of the Tucson
```

91

1  chapter?

2  A.  No.

3  Q.  Where was he a member of?

4  A.  California.

5  Q.  California?

6  A.  Mh-hm.

7  Q.  Had he come to Tucson for this meeting?

8  A.  I think it may have been Turkey Day, too.  I'm not

9  positive.

10  Q.  And approximately when did this occur?

11  A.  (No response.)

12  Q.  I'm asking you for the year.

13  A.  I couldn't -- I'm not clear on that.

14  Q.  Well --

15  A.  Within two years, minimum, probably before the -- my ending

16  of the membership.

17  Q.  All right.  So just so that the jury is clear, were you one

18  of the individuals that was in the Box Canyon on August or

19  April the 27th and 28th of 2003?

20  A.  Yes.

21  Q.  Okay.  And was that the end of your membership or

22  involvement with the Devils Diciples as a member?

23  A.  Yes.

24  Q.  So this was within a year or two --

25  A.  Yeah.

1    Q.  -- of that event?

2    A.  Yes.

3    Q.  Did you have an understanding of how much before that

4    event?

5    A.  That's what I'm thinking, about a year.

6    Q.  All right.  During this meeting, was there any discussion

7    about drugs being sold from within the clubhouse?

8    A.  Maybe.

9    Q.  All right.  And when you say "maybe," go ahead, explain

10   that, please.

11   A.  All right.  I don't remember if that was a topic in that

12   meeting, but I was having problems with Two Dogs anyway with

13   that.

14   Q.  When you say you were having problems with that, were you

15   the chapter president when Two Dogs was a member?

16   A.  Sometimes.

17   Q.  And when Two Dogs went to Michigan and came back with two

18   guns, were you the chapter president?

19   A.  Yes, I was.

20   Q.  And when this meeting occurred with Holiday, were you the

21   chapter president?

22   A.  Yes, I believe I was.

23   Q.  When you said you had problems with Two Dogs selling drugs

24   from the Tucson chapter clubhouse, were you the president at

25   that time?

1   A.  Yes.

2   Q.  And so if you are the president and someone is selling

3   drugs from a clubhouse, is that a problem or is that something

4   sanctioned by the club?

5   A.  No, that was not permissible there.  And I made him move

6   into the clubhouse thinking that we could curb that behavior.

7   Q.  What's wrong with selling drugs from within the clubhouse?

8   A.  What's wrong with it?

9   Q.  Yes.

10  A.  Yeah.  You were putting your property at risk.

11  Q.  And when you say "putting the property at risk," what type

12  of risk?  What is the risk?

13  A.  Of them getting caught doing that.

14  Q.  So is this a concern about law enforcement or is it a

15  concern --

16  A.  Yes.

17  Q.  -- about someone else?

18  A.  Yes.  Law enforcement.

19  Q.  Okay.

20          THE COURT:  Let's take our morning recess at this

21  point.  Twenty minutes in the jury room, ladies and gentlemen.

22  We'll resume at 11 a.m.  Thank you.

23      (Jury out, 10:41 a.m.)

24          COURT REPORTER:  All rise.  Court is in recess.

25      (Recess taken, 10:42 a.m. - 11:02 a.m.)

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

```
 1              THE CLERK:  All rise.  Court is now in session.
 2       (Jury in, 11:02 a.m.)
 3              THE COURT:  The Court notes the presence of all
 4    attorneys and all defendants.
 5              All right.  The jury has assembled.  Please be seated.
 6    And everyone is present.
 7              And, Ms. Mohsin, you may proceed.
 8              MS. MOHSIN:  Yes, your Honor.
 9    BY MS. MOHSIN:
10    Q.  Mr. Higgins, before we stopped at the break, we were
11    talking about an individual by the name of Two Dogs.  And you
12    had indicated that you had reason to believe that he was
13    selling drugs in the clubhouse in Tucson; is that correct?
14    A.  Yes.
15    Q.  Were there other events that occurred that were problematic
16    with respect to Two Dogs during this time period?
17    A.  I would -- yes.
18    Q.  Yes?
19              Now, I want to direct your attention --
20              THE COURT:  Sir, would you pull your chair up about 6
21    inches, please?
22              THE WITNESS:  Yeah.
23              THE COURT:  Are you able to scoot it up some?
24              MS. MOHSIN:  Judge, I think his height is such --
25              THE COURT:  If you're up against the --
```

```
 1              THE WITNESS:  I'm about that close.

 2              THE COURT:  Okay.  Well, that's far enough.  But do

 3    try to keep your voice a little more firm, please.

 4              THE WITNESS:  All right.

 5              THE COURT:  Thank you.  That will be fine, just like

 6    that.

 7              Go ahead, Ms. Mohsin.

 8              MS. MOHSIN:  Yes, your Honor.

 9    BY MS. MOHSIN:

10    Q.  Mr. Higgins, I want to direct your attention now to an

11    individual by the name of Chuck or Chucky.  Are you familiar

12    with someone by that name or nickname?

13    A.  Yes.

14    Q.  Now, when you were a member and sometimes a leader of that

15    southern Tucson chapter, were there occasions that you were

16    aware of in which individuals in the community represented

17    themselves to be members of the Devils Diciples when, in fact,

18    they were not?

19    A.  Yes.

20    Q.  Is that something that happened on one occasion or more

21    than one occasion?

22    A.  Probably a dozen times over ten years.

23    Q.  Now, if someone represents themselves to be a member of the

24    Devils Diciples and they are, in fact, not a member of the

25    Devils Diciples, is that considered a problem for the club?
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  Why would that be a problem?

3    A.  (No response.)

4    Q.  Could you explain that to the jury?

5    A.  I'm trying to think of how to explain that.

6    Q.  All right.

7    A.  Because they were doing illegal things in our name, you

8    know.

9    Q.  So if someone were to say that they were a member of the

10   Devils Diciples and they were not, did that have an impact on

11   you, if you were the president?

12   A.  Yes.

13   Q.  What -- did it require any sort of a response?

14   A.  Yeah.  The first time, they would usually be talked to, and

15   it could escalate from that.  I don't think it really ever

16   happened like that.

17   Q.  So when you say they would be talked to, if an individual

18   represented themselves to be a member of this club and were

19   not, is that something that required them to -- required

20   someone to take affirmative steps --

21   A.  Yes.

22   Q.  -- from within the club?

23           And you said they would be talked to?

24   A.  Yes.

25   Q.  What type of talked to or talking to could be required?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

97

1   A.   Basically, just to discontinue that behavior or the matter

2   is going to escalate.

3   Q.   Now, did there come a time -- you indicated that there were

4   a number of occasions over the ten years that you were a member

5   where people represented themselves to be members of the Devils

6   Diciples that were, in fact, not members; is that a fair

7   statement?

8   A.   Yes.

9   Q.   Was that sort of in connection with any other activity?

10   You had mentioned something about illegal activity?  In other

11   words --

12   A.   Drug dealing, yes.

13   Q.   Drug dealing.

14        So were there occasions that you were aware of that

15   people said they were Devils Diciples when they were dealing

16   drugs?

17   A.   Yes.

18   Q.   Would there be, from your understanding, any benefit to

19   claiming that you were affiliated with a motorcycle club when

20   dealing drugs?

21   A.   I don't know.

22   Q.   But the club didn't like it?

23   A.   No.

24   Q.   Is that a fair statement?

25   A.   That's correct.

1   Q.  So did there come times where you were called upon to go

2   and talk to any of these individuals?

3   A.  Yes.

4   Q.  How many occasions did you, did you engage in that sort of

5   talking -- talked with someone?

6   A.  Two or three times.

7   Q.  And when you say that you talked to them, did it escalate

8   to violence on any of those occasions?

9   A.  Once, yes, because I walked right in on a person doing it.

10  Q.  Doing what?

11  A.  Demanding that these people buy drugs from him, as if he

12  was a Devils Diciple.

13  Q.  And so when you say it called for violence, what kind of

14  violence did it call for, from your point of view?

15  A.  Fists.

16  Q.  Fists?

17  A.  Mh-hm.

18  Q.  Was this individual someone who had been affiliated with

19  any motorcycle clubs?

20  A.  No.

21  Q.  And did you know this person?

22  A.  No.

23  Q.  How did it come to your attention that this person had been

24  selling drugs or needed to be talked to?

25  A.  People had actually -- those individuals had come down in

1   the clubhouse and complained about it.

2   Q.   The buyers?

3   A.   Yes.

4   Q.   And they had complained to the clubhouse about what?

5   A.   Why were we doing that to them.

6   Q.   Why were the Devils Diciples doing that to them?

7         At that time, what was your position?  Were you a

8   chapter president or something --

9   A.   No.

10  Q.   -- something else?

11  A.   I was an enforcer.

12  Q.   Now, you said you were an enforcer.  So when someone needs

13  a talking to, is that a job for the president, the enforcer, or

14  someone else?

15  A.   Either the enforcer or the warlord.

16  Q.   And so other than that occasion, were there any other

17  occasions where violence was required when you were asked to go

18  talk to someone?

19  A.   No.

20  Q.   And so on the occasions where you were asked to go talk to

21  someone, did you convince people to stop using the Devils

22  Diciples' name?

23  A.   Yes.

24  Q.   And you indicated that there were yet other occasions.  I

25  want to direct your attention to this individual named Chuck.

 1   And was this after Two Dogs was a member?  Was there an

 2   occasion where you learned that Chuck was doing that?

 3   A.  Yes.

 4   Q.  What did you learn?

 5   A.  That he was representing himself as a Devils Diciple.

 6   Q.  And was he doing that in connection with some other illegal

 7   activity?

 8   A.  Yes, drug dealing.

 9   Q.  And so when you said that drug dealing, was he selling

10   drugs and claiming to be a member of the Devils Diciples, to

11   your understanding?

12   A.  Yes.

13   Q.  How was that information brought to your attention?

14   A.  He had told numerous people that.

15   Q.  And that word came back to you?

16   A.  Yes.

17   Q.  Were you the chapter president at the time?

18   A.  I was.

19   Q.  And was Two Dogs a member at the time?

20   A.  He was also.

21   Q.  By the way, how long in total was Two Dogs a member of the

22   Devils Diciples?

23   A.  Two and a half, maybe three years.

24   Q.  Two and a half to three years?

25           So during that period of time, was he also one of the

1   people that was left in the Box Canyon?

2   A.   Yes.

3   Q.   Kicked out of the club?

4          So during that two-and-a-half, three-year period of

5   time, would it be a fair statement that it would be between

6   2001 and 2003?

7   A.   Yes.

8   Q.   Did there come a time where you sent anyone to go deal with

9   Chuck?

10  A.   Yes, there was.

11  Q.   Can you tell the jury about that?

12  A.   Doc and Golf Club and Two Dogs went to talk to him.  And he

13  accidentally got shot with his own gun.

14  Q.   Now, you said Doc, Golf Club and Two Dogs.

15  A.   Yes.

16  Q.   What were their roles in the club at that time?

17  A.   Doc was the warlord.  I don't believe either of the other

18  two had a position.

19  Q.   And so Doc was the warlord, and Two Dogs and Golf Club,

20  were they newer members at the time?

21  A.   Yes.

22  Q.   And did you send Doc or did you send the other two to go

23  talk to Chuck?

24  A.   I sent Doc.

25  Q.   And what were your instructions to Doc about what was

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   supposed to happen?

2   A.   To talk to him.

3   Q.   And when you say to talk to Chuck, was it to dissuade him

4   from using the Devils Diciples' name?

5   A.   Yes.

6   Q.   And then did you accompany them?

7   A.   No.

8   Q.   Did there come a time where Doc came back to you, or

9   someone else came back to you, after they had talked to Doc?

10  A.   Yes.

11  Q.   And what did you learn?

12  A.   That he had been accidently shot.

13  Q.   "He," meaning who?

14  A.   Chuck.

15  Q.   Chuck had been shot?

16  A.   Mh-hm.

17  Q.   And that occurred during this talking to?

18  A.   Yes.

19  Q.   What was your understanding about how he got shot?

20  A.   There was an accident.  I don't -- you know, the exact

21  conditions, I don't know.

22  Q.   Did you know what happened to Chuck?

23  A.   I believe Two Dogs shot him with his own gun.  I don't know

24  how that transpired.

25  Q.   Did -- with Chuck's own gun?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.  Yes.

2   Q.  That's what you're saying?  And what happened to Chuck

3   after that?

4   A.  What happened to him is what?

5   Q.  Did he survive?

6   A.  Yes.

7   Q.  All right.  So did he -- was he, was he injured, obviously?

8   What did you know about that, as far as --

9   A.  I don't know the extent of it.

10  Q.  You don't know the extent of it.

11          Now, I want to direct your attention to --

12  A.  I believe that he went to the hospital the next day.

13  Q.  Okay.

14  A.  But I'm not -- it was a .22.  I don't know that for sure.

15  Q.  And this was an incident that occurred between Chuck and

16  Two Dogs, as well as Golf Club and Doc; is that a fair

17  statement?

18  A.  It was my understanding that Golf Club was outside, and Doc

19  and Two Dogs were inside with Chuck.

20  Q.  And that Two Dogs was involved in the discharge of the

21  firearm; is that your understanding?

22  A.  Yes.

23  Q.  All right.  I want to direct your attention now to an

24  individual by the name of Heather Ford.  Are you familiar with

25  a female by the name of Heather Ford?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.  Yes.

2   Q.  How are you familiar with her?  How do you know this

3   person?  Had you ever met her?

4   A.  No.

5   Q.  Were you aware of who she was, perhaps not her name?

6   A.  That would be probably true, yes.

7   Q.  How were you aware of who she was, but not her name?

8   A.  I knew her fiancé.

9   Q.  And --

10  A.  Ex-fiancé.  He was dead at the time I, believe.

11  Q.  So you knew her fiancé when the fiancé was alive?

12  A.  Yes.

13  Q.  Who was the fiancé?

14  A.  He was a stunt man.  And he was a Hells Angel prospect at

15  the time he died.

16  Q.  Now, he was a prospect for the Hells Angels Motorcycle

17  Club?

18  A.  Yes.

19  Q.  What was his nickname?

20  A.  "Ringo."

21  Q.  And you indicated that he was also a stunt man, like a real

22  stunt man, that as a job?

23  A.  A real stunt man, yeah.

24  Q.  And did you know him before he was a prospect for the Hells

25  Angels?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    A.  Yes, much before.

2    Q.  And what circumstances did you know him before that?

3    A.  (No response.)

4    Q.  As a member of a motorcycle club?

5    A.  No.

6    Q.  Just from the community?

7    A.  Yeah.

8    Q.  All right.  At some point did you become aware that Ringo

9    was a prospect for the Hells Angels?

10   A.  Yes.

11   Q.  Now, I want to talk about the Hells Angels for a minute.

12   You indicated that the Devils Diciples had one chapter in

13   southern Arizona.

14   A.  Yes.

15   Q.  Did the Hells Angels have any chapters in Arizona?

16   A.  Yes.

17   Q.  How many chapters did you know them to have in Arizona?

18   A.  I couldn't tell you that.  More than two.

19   Q.  All right.  More than two?

20   A.  Yes.

21   Q.  More than three?

22   A.  I don't really know.

23   Q.  All right.  Did they have a chapter in southern Arizona?

24   A.  Yes.

25   Q.  Did they have a chapter in northern Arizona?

1    A.  Yes.

2    Q.  Did you know any of the members?

3    A.  Some of them.

4    Q.  And did you know whether or not they were a more powerful

5    motorcycle gang than the Devils Diciples?

6    A.  In Arizona?  Certainly.

7    Q.  All right.  And when you say "certainly," is that based

8    upon their numbers --

9    A.  Yes.

10   Q.  -- or some other fact?

11   A.  Yes, their numbers.

12   Q.  About how many Devils Diciples did you know were in

13   southern Arizona, or all of Arizona at that time, 2003?

14   A.  Maybe ten.

15   Q.  And did you have any understanding of how many Hells Angels

16   were in Arizona at that time?

17   A.  More than 50.

18   Q.  More than 50?

19   A.  Mh-hm.

20   Q.  Now, you had indicated that you had been a member of the

21   Boozefighters before you became a Devils Diciples?

22   A.  That's correct.

23   Q.  So during your years as a member of these two motorcycle

24   clubs, had you ever had any encounters from anyone with the

25   Hells Angels?

1   A.  Well, they weren't always present in Arizona, you know.  So

2   very little, I would say.

3   Q.  So you said they weren't always present.

4   A.  No.

5   Q.  Do you know -- did there come a time where -- withdrawn.

6           When you were first a member of the Boozefighters, did

7   they have a presence in Arizona?

8   A.  No.

9   Q.  Did there come a time where they developed a presence in

10  Arizona?

11  A.  Yes.

12  Q.  And did that come about at a certain time period?

13  A.  About the time that I became a Devils Diciple.

14  Q.  And were they in some sort of -- did 50 members all come at

15  once or did they expand over time?

16  A.  No.  They took over another club that had been in Arizona

17  from the '60s.

18  Q.  What was that club?

19  A.  Dirty Dozen.

20  Q.  So the Dirty Dozen had been in Arizona since the '60s.  Was

21  that a large club?

22  A.  Fairly large.

23  Q.  Did the Hells Angels patch over all of those Dirty Dozen

24  folks?

25  A.  No.

108

1   Q.  So how did they take it over?

2   A.  They patched over the ones -- some of them didn't want to

3   change, you know, so they just retired.

4   Q.  And so some of them did?

5   A.  Yes.

6   Q.  Did the Dirty Dozen stop existing --

7   A.  Yes.

8   Q.  -- at that point?

9   A.  Yes.

10  Q.  So based on your experience with motorcycle clubs, was the

11  Hells Angels one of the larger clubs in Arizona?

12  A.  Yes.

13  Q.  Was it the largest club in Arizona?

14  A.  Yes.

15  Q.  And did you know whether or not they had chapters in other

16  states?

17  A.  Yes, certainly.  Other countries even.

18  Q.  And in other countries.

19       And you were aware of all of this?

20  A.  Yes.

21  Q.  So you indicated that Heather Ford or a woman that you

22  understood to be associated with Ringo, that he had a fiancée;

23  is that a fair statement?

24  A.  Yes.

25  Q.  How did you come to be aware that he had a fiancée, or

1    someone that he was affiliated with?

2    A.   I think he told me that.

3    Q.   When he was alive?

4    A.   Mh-hm.

5    Q.   While he was a prospect for the Hells Angels?

6    A.   I don't think he had started that yet.

7    Q.   All right.  And did there come a time where you learned

8    whether or not they had any children?

9    A.   I don't think that they had any children together, no.

10   Q.   All right.  Now, did there come a time that after he passed

11   away, where you were once again made aware of this female?

12   A.   Maybe.

13   Q.   All right.  When did you first become aware of this female?

14   A.   As opposed to what happened at the clubhouse?

15   Q.   Correct.

16   A.   (No response.)

17   Q.   There comes a time where you see her at the Tucson

18   clubhouse, correct?

19   A.   Oh, yeah.

20   Q.   All right.  Did you know about her before that?

21   A.   Would you clarify that?

22   Q.   Other than the fact that she was the --

23   A.   The victim?

24   Q.   Well, I'm going to back it up.

25            Before the clubhouse, did you have any involvement,

1  knowledge, or interaction with this female before the

2  clubhouse?

3  A.  I'm not sure that I knew that was her.  I know that one of

4  the other members had let someone stay at his house, and that

5  she had been stealing his property and been evicted from there.

6  Q.  All right.  So now, let's, let's bring that into focus.  I

7  want to direct your attention to the early part of 2003.  Were

8  you the chapter president in southern Tucson at the time?

9  A.  I believe so.

10  Q.  And was Two Dogs a member?

11  A.  Yes.

12  Q.  Who were some of the other members of that chapter at that

13  time?

14  A.  Doc, Dean, Panhead, Mac Tonight.  Mexican John was

15  inactive.

16  Q.  Was Golf Club a member?

17  A.  Yes.  Golf Club, Johnny Old School.  Who am I forgetting?

18  Q.  Was Cuz a member?

19  A.  Yes.  Cuz.

20  Q.  Was there a member named Huevos?

21  A.  Huevos, yes.

22  Q.  All right.

23  A.  I think that's about all of them.

24  Q.  All right.  So to recap, you mentioned Cuz, Doc, Mac

25  Tonight, Huevos, Johnny Old School, Dean, Golf Club, and

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN                 111

1   Panhead Mike; is that accurate?

2   A.   Yes.

3   Q.   All right.  Now, in the early part of 2003, you mentioned a

4   guy by the name of Johnny Old School.

5   A.   Mh-hm.

6   Q.   When did he become a member of the Devils Diciples?

7   A.   At the same time as Golf Club.

8   Q.   So Johnny Old School and Golf Club, had they been new

9   members at the time?

10  A.   Yes.

11  Q.   Had they been patched recently?

12  A.   Yes.

13  Q.   I want to direct your attention to Panhead Mike.  You

14  mentioned him.  How long had he been a member of the Devils

15  Diciples in early of 2003?

16  A.   Maybe three years.

17  Q.   Okay.  And you also mentioned an individual by the name of

18  Dean.  How long had Dean been a member of the Devils Diciples?

19  A.   About the same length as Panhead.

20  Q.   All right.  So a couple years?

21  A.   Yeah.

22  Q.   Huevos, how long had he been a member?

23  A.   About a year longer.

24  Q.   So four years?

25  A.   Mh-hm.

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

1   Q.  Okay.  What about Doc, Mac Tonight and Cuz?

2   A.  Doc was, was in the chapter longer than I was.

3   Q.  And how about Cuz?

4   A.  Cuz, 30 years.

5   Q.  And what about Mac Tonight?

6   A.  A long-time member.

7   Q.  Longer than you?

8   A.  Yes.

9   Q.  All right.  So you were the chapter president and there

10  were a few newer guys and a couple that had been around for a

11  year or two; is that a fair statement?

12  A.  Mh-hm.

13  Q.  And then some older members?

14          Now, you said you had become aware there had been a

15  female living at one of the members' houses?

16  A.  Yes.

17  Q.  Whose house was this female living in?

18  A.  Panhead's.

19  Q.  Panhead Mike's?

20  A.  Mh-hm.

21  Q.  And he had been a member for a couple years at this point?

22  A.  Yes.

23  Q.  And who brought that to your attention?

24  A.  I believe Mike did.  He was working in San Diego.

25  Q.  Panhead Mike?

1    A.   Mh-hm.

2    Q.   And he had a house in Tucson?

3    A.   He rented a house in Tucson, yes.

4    Q.   And did he allow someone to live there?

5    A.   Yes.  He allowed Heather to live there.

6    Q.   Now, did you know, at the time that he allowed Heather to

7    live at this apartment, that she had been the fiancée of Ringo?

8    A.   Not initially, no.

9    Q.   That's something you learned later?

10   A.   Mh-hm.

11   Q.   So at the time, all you knew was that she was renting a

12   house from Panhead Mike; is that a fair statement?

13   A.   Yeah.  And I had not seen her at that time.

14   Q.   You didn't meet her or anything; you just knew about her?

15   A.   Yes.

16   Q.   Was there information provided to you about her activities

17   at that house?

18   A.   Very shortly before all that, that incident transpired

19   there, yes.

20   Q.   And was Mike, Panhead Mike, the one who gave you that

21   information?

22   A.   Yes.

23   Q.   What was the nature of the information that he gave you

24   about her activities at his rental house?

25   A.   That she had been taking his property to the swap meet, had

1   been selling it, and that he had wanted her out of there.  The

2   landlord had evicted her and then a sheriff caught her there

3   afterwards.  So there were all three incidents.

4   Q.  Was there any discussion at any time about any sort of drug

5   use?

6   A.  No, I don't think so.

7   Q.  Was there any discussion any time about any sort of drug

8   debt?

9   A.  No.

10  Q.  So after you receive this information from Panhead Mike,

11  did you meet her at some point?

12  A.  Yes.

13  Q.  All right.  Now, would that have been at the clubhouse?

14  A.  Yes.

15  Q.  All right.  How long after you received this information

16  did the events take place at the clubhouse?

17  A.  Not long.  A couple days maybe.

18  Q.  A couple of days?

19  A.  Mh-hm.

20  Q.  And I want to direct your attention now to the first week

21  of April of 2003.

22          Once again, were you the chapter president at that

23  time?

24  A.  Yes, I was.

25  Q.  And where were you living?

1   A.  At the clubhouse.

2   Q.  When you say you were living at the clubhouse, were you

3   living inside the clubhouse or at some other place?

4   A.  No.  I was -- I had brought my trailer from where I used to

5   live, down there.  And I lived out behind the clubhouse.

6   Q.  In a trailer?

7   A.  Yes.

8   Q.  And who did you live with?

9   A.  My wife and brother-in-law.

10  Q.  What was your wife's name?

11  A.  Terri.

12  Q.  Terri?

13  A.  Mh-hm.

14  Q.  And how long had you been married?

15  A.  Well, we've been married almost 18 years now, so that -- I

16  don't know what that would have been then.  Maybe five or

17  something.

18  Q.  And you're still married to her?

19  A.  Yes.

20  Q.  Now, you indicated your brother-in-law.  Would that be her

21  brother?

22  A.  Yes.

23  Q.  And had you been living there for any period of time?

24  A.  Maybe seven or eight months.

25  Q.  So in that first week of April of 2003, there was some

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    things that happened inside the clubhouse, yes?

2    A.  Yes.

3    Q.  I want to direct your attention to that.  Where were you on

4    that day, on April, you know, the earlier part of that day?

5    A.  Out back for the second day trying to repair the generator

6    so we could have water and, and power.

7    Q.  So you're -- was your club powered by a generator?

8    A.  Yes.

9    Q.  And by the way, was this a particularly large structure or

10   a small structure?

11   A.  I don't know square feet-wise.  It was like three small

12   apartments and then a larger area, maybe a third the size of

13   this room, maybe.

14   Q.  So the room that you're describing, that was a third the

15   size of this room?

16   A.  Yeah.

17   Q.  This courtroom.

18          Was that sort of a common area for the club members to

19   use?

20   A.  Yes.

21   Q.  And the three apartments that you described, were they

22   residences of any kind for members to live in?

23   A.  Sometimes.

24   Q.  And the room that you're describing that was the common

25   area, can you describe generally what it looked like?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.  Well, the whole place was L-shaped, with the three

2   apartments in a row and then the other area.  And that was

3   divided into, like, three rooms.

4   Q.  So separate from the apartments?

5   A.  Great big one, one behind it, and then one over here with a

6   pool table in it.

7   Q.  So there were three apartments that were on one side of the

8   "L," and on the other side of the "L," you said that there were

9   another three rooms.  One had a pool table in it, one was a

10  common area?

11  A.  Yeah.  One was empty, yeah.

12  Q.  And one was empty.

13          So the one that was a common area, did it have a bar,

14  or --

15  A.  Yes.  It had a bar in it and --

16  Q.  What else?

17  A.  Fireplace.

18  Q.  Were there any seating?

19  A.  Yeah, a couch.  I think there was a couch and some stools

20  at the bar.

21  Q.  All right.  Now, you're out behind this structure, this

22  L-shaped structure?

23  A.  Yes.

24  Q.  Is that where the generator is located?

25  A.  Yeah.

1  Q.  And you indicated that this was the second day you had been

2  trying to repair it.

3  A.  Mh-hm.

4  Q.  About what time of day is this?

5  A.  Three in the afternoon, I think.

6  Q.  So what happens after you're out there -- first of all, are

7  you by yourself or are you working alone or is there someone

8  with you?

9  A.  I think Golf Club and I were working on it.

10  Q.  Okay.  And you're trying to repair it?

11  A.  Yes.

12  Q.  And what happened?

13  A.  My wife came out and -- from the front of the clubhouse and

14  said that something was happening in there; I needed to go and

15  do something about it.

16  Q.  So your wife, had she been inside the clubhouse or she came

17  from somewhere else?

18  A.  I think she drove up while this was happening and went to

19  walk through there, you know, because nothing was happening, to

20  get to the back.  She come to the trailer, yeah.

21  Q.  All right.

22  A.  Well, there was -- the whole place is fenced in and people

23  parked outside.  So they -- you know, that's what she would

24  have been doing.

25  Q.  Is traveling through the clubhouse to get to the back?

1   A.  Yes.

2   Q.  And she came to you.  And when she came to you, what was

3   her demeanor?

4   A.  Agitated, maybe.

5   Q.  All right.  And was she concerned in any way?

6   A.  Yes.

7   Q.  And did she express that to you in any way?

8   A.  Yeah.  And then we all got up and went in there.

9   Q.  All right.  Did Golf Club accompany you?

10  A.  Yes.

11  Q.  All right.  What did you see when you went in there?

12  A.  There were two other women there, along with Two Dogs and

13  I'm going to say Johnny and Heather, and she was sitting naked

14  in the chair on the other side of the bar.

15  Q.  And when you say that she was sitting in a chair and she

16  was naked, what were these other individuals doing while she

17  was sitting in a chair?

18  A.  Well, the one girl, Tina Butts, which I believe was her god

19  -- her children's godmother, they were -- looked like they had

20  just got done fighting.

21  Q.  When you say "it looked like they had got done fighting,"

22  how would you know that?

23  A.  Because Tina was still yelling and she's standing right

24  over her.

25  Q.  All right.  Did this woman appear to be physically injured?

1    A.  I think she had a broken finger.

2    Q.  All right.  Were there other injuries on her --

3    A.  Not --

4    Q.  -- that you could see?

5    A.  Not that I could see.  No.

6    Q.  And what were the other people doing?

7    A.  I got a phone call right in the middle of all of this from

8    Panhead Mike, and it was extremely irritating.  So I went

9    outside to try to deal with this, because it became apparent

10   that is who caused this to happen, right?  He must have called

11   Two Dogs and said, "Grab her up, she's stealing my stuff," or

12   whatever.  And he was talking to me on the phone.  And he

13   wanted her hurt and everything else.  And I just gave the phone

14   away.  I said, you know, boy.

15   Q.  So what did you do?

16   A.  I went in.  I stopped it.  Had them take her somewhere

17   else.  And then, you know, wanted to figure out what I could

18   do, you know.

19   Q.  So when you came into the clubhouse, you said that you had

20   observed these other individuals along with Heather.

21   A.  Yes.

22   Q.  And were, were -- was there any -- and you observed an

23   injury to her hand.

24   A.  Yes.

25   Q.  Did you observe any other injuries to her?

1  A.  No, not at that time.  I found out afterwards, by

2  questioning the people that were there, I found out there was

3  more damage or injuries.

4  Q.  And when you said that you stopped it, how did you do that?

5  A.  I just told them to stop.  I mean, if you read her

6  testimony, she mentioned a statement --

7  Q.  Without going into her testimony.

8  A.  Yeah, I know that.  But I'm saying that's what she said.

9  Q.  All right.  So you said stop it?

10  A.  Yeah.

11  Q.  And did you enforce that order?

12  A.  Yes, I did.

13  Q.  And what happened next to Heather Ford?

14  A.  She was given her clothes back and, and a soda.

15  Q.  And where did she go?

16  A.  To Mac Tonight's.

17  Q.  Did you talk to her at all?

18  A.  No.  Well, a little bit.  Not much.

19  Q.  After she was taken to Mac Tonight's, did you talk to the

20  people who had been there?

21  A.  Yes.

22  Q.  And did they tell you some of the things that had gone on

23  in the clubhouse?

24  A.  Yes.

25  Q.  And did they tell you about the types of things that they

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    had done?

2    A.  Yeah.  Tasering, and Johnny had said that he had hit her

3    once.

4    Q.  Now --

5             MR. PITTS:  Can you speak up a little bit, please?

6             THE WITNESS:  Yes.

7             MR. PITTS:  Into the microphone?

8             THE WITNESS:  I know that a taser was used on her,

9    because it was admitted to me, and also physical violence from

10   two of them.

11   BY MS. MOHSIN:

12   Q.  All right.  And as a result of this -- withdrawn.

13            Did you find that out that day?  Did you talk to the

14   people who had been inside the clubhouse that day?

15   A.  Yes.

16   Q.  And after you found out what had happened, what steps did

17   you take next?

18   A.  In what way?

19   Q.  What did you do about it?  Were you concerned about it?

20   A.  I did not think that she was injured as bad as she was.

21   Q.  You didn't realize it?

22   A.  No.

23   Q.  And was that based on what you had seen?

24   A.  Yes.

25   Q.  But after you had talked to these individuals and they

```
 1   admitted to you what they had done, did you revise your opinion
 2   in any way?
 3   A.  No.
 4   Q.  Did there come a time where you learned she had been
 5   seriously injured?
 6   A.  Well, eventually I got arrested, you know.  But that was
 7   probably the first time I seen all of it.
 8   Q.  All right.  So after you had seen her and talked to these
 9   individuals, did you have any concerns about whether or not the
10   assault that had occurred on her would be -- would have an
11   impact on you or on the Devils Diciples?
12   A.  Yes.
13   Q.  All right.  And what was that concern?
14   A.  It shouldn't have happened.
15   Q.  Did you have --
16   A.  I was responsible regardless of it, you know.  I had no
17   prior knowledge that that was going to happen, but yeah, I
18   believe there would be repercussions over it.
19   Q.  When you say "repercussions," did you believe any of the
20   repercussions would be related to the motorcycle community?
21   A.  Yeah.
22   Q.  Tell the jury what repercussions you were concerned about,
23   as they relate specifically to the motorcycle community.
24   A.  Well, I mean, just within the club itself.
25   Q.  All right.  Within the Devils Diciples?
```

124

```
 1              Now, did there come a time where you found out this
 2    woman was the same woman that had been engaged to Ringo?
 3    A.  Yes.
 4    Q.  And when did you find that out?
 5    A.  Maybe the next day or so.
 6    Q.  Did you have a meeting with the Hells Angels?
 7    A.  Two times, yes.
 8    Q.  All right.  And the meetings that you had with Hells
 9    Angels, did they occur on the same day or in close proximity to
10    this event?
11    A.  I would say twice within a week.
12    Q.  So when this event occurred, did you contact anyone about
13    this event in the Hells Angels?
14    A.  Yes.
15    Q.  Who did you contact?
16    A.  "Joe Joe."
17    Q.  Did you ever contact Fang?
18    A.  I think Doc did, yes.
19    Q.  Okay.  Who is Fang, and who are Joe Joe?
20    A.  The president and the warlord in Tucson.
21    Q.  Go ahead.
22    A.  That's who they were, the president and the warlord of the
23    Tucson chapter.
24    Q.  Of the Hells Angels?
25    A.  Yeah.
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  Which one was the president and which one was the warlord?

2   A.  Fang was the president.

3   Q.  And Joe Joe was the warlord?

4       Did you have any independent affiliation or

5   relationship with either of those two men?

6   A.  What do you mean?

7   Q.  Did you know them?

8   A.  Yes.

9   Q.  How did you know them?

10  A.  From the Dirty Dozen days.

11  Q.  So you knew them personally.  You had interacted with them?

12  A.  I knew Joe Joe fairly well, yes.

13  Q.  So when, when there was some communication with Fang, you

14  indicated that you believe it was Doc?

15  A.  Mh-hm.

16  Q.  How did you know that?

17  A.  Well, that -- Doc and I were the only ones doing any

18  communicating, so I don't believe I did it.  So he did.  And

19  then they established this meeting with Joe Joe.

20  Q.  And so when you say "they," are you referring to Doc?

21  A.  Yeah.

22  Q.  And Fang?

23  A.  Yeah.

24  Q.  What was Doc's role in the club at that time?

25  A.  Warlord.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

126

1    Q.  He was the warlord?

2         So did you meet face-to-face with Joe Joe?

3    A.  Yes.

4    Q.  Did you go on your own or with another individual?

5    A.  I believe we met at Doc's house.

6    Q.  You and Joe Joe met at Doc's house?

7    A.  And Doc.

8    Q.  And Doc was present as well?

9    A.  Yes.

10   Q.  And what was the purpose of this meeting?

11   A.  To explain what had happened.

12   Q.  To Joe Joe?

13   A.  Mh-hm.

14   Q.  Why did you feel that you had to explain what had happened

15   to Joe Joe?

16   A.  (No response.)

17   Q.  Why does he have to know about it?

18   A.  Because she was affiliated with them.

19   Q.  All right.  And so even if she was affiliated with them,

20   why does that make a difference?

21   A.  Well, it would have to us, you know.

22   Q.  Was there some sort of a concern about her relationship

23   with the Hells Angels on your end, in other words, the nature

24   of her relationship?

25   A.  Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1  Q.  Can you explain that, please?

2  A.  How can I explain it?  It's like a family member, you know.

3  So of course there's going -- there was concern.

4  Q.  If someone assaults a female who is affiliated with a

5  patched member of the Devils Diciples, is that like an

6  assault --

7  A.  Yes.

8  Q.  -- on the Devils Diciples?

9  A.  Yes, it is.

10  Q.  And if someone were to assault a female who is affiliated

11  with the Hells Angels, is that like an assault on the Hells

12  Angels?

13  A.  I can't speak from that experience, but I would presume so.

14  Q.  And when you say you would presume so, is that based upon

15  your years of involvement in the motorcycle club community?

16  A.  Some motorcycle clubs, it would be, and some, it wouldn't

17  be, you know.  I don't -- I didn't -- I don't have specific

18  knowledge of the Hells Angels.

19  Q.  Well, when you talked to Joe Joe, did he express he was

20  concerned to you about it?

21  A.  He wasn't, but he said some of the guys from up north were.

22  Q.  And when you -- what was the purpose of you communicating

23  with Joe Joe?  In other words, what did you say to him?

24  A.  That would have happened any time there was any kind of

25  incident between any, you know, any of the clubs, just so that

1   there wouldn't be any, you know, problem.

2   Q.  All right.  And so when you went to talk to Joe Joe, did

3   you explain what had happened?

4   A.  Yes.

5   Q.  And did it appear that he was already aware of it?

6   A.  Yes.  I believe he was already aware of it.

7   Q.  And what -- how did you leave it with him at the meeting?

8   Was there any further action that needed to be taken?

9   A.  No.

10  Q.  Did he -- was he going to communicate with his leadership?

11  A.  Yes.

12  Q.  All right.  Was he going to contact you again?

13  A.  Yes.

14  Q.  And --

15  A.  In fact, we did a few days before the Box Canyon stuff.

16  Q.  So in this first meeting that you had with Joe Joe, how did

17  you leave things with him?  Were you supposed to wait to hear

18  back from him?

19  A.  Yes.

20  Q.  And did he express any -- withdrawn.

21          After that first meeting with Joe Joe, how long of a

22  time period passed before he contacted you or you contacted him

23  again?

24  A.  Maybe three days.

25  Q.  All right.  And during that time period, had you had any

1   discussion with any of the DDMC, the Devils Diciples national

2   leadership?

3   A.  No.

4   Q.  So you didn't contact Fat Dog?

5   A.  No.

6   Q.  Or any of the other national leaders or warlords?

7   A.  No, I did not.

8   Q.  Did there come a time then that you had a second meeting

9   with Joe Joe?

10  A.  Yes.

11  Q.  And it was a face-to-face meeting?

12  A.  Yes.

13  Q.  Where did that take place?

14  A.  Doc's.

15  Q.  Same place, at Doc's house?  Who else was there?

16  A.  Just Doc and myself.

17  Q.  And what was relayed to you during that meeting?

18  A.  If everything was all right.

19  Q.  And who relayed that to you?

20  A.  Joe Joe.

21  Q.  So when you -- did you leave the meeting believing that

22  there were going to be any repercussions from the Hells Angels

23  in connection with Heather Ford?

24  A.  No.

25  Q.  And so did you report this communication to the national

1    leadership?

2    A.  No, I did not.

3    Q.  Why not?

4    A.  I didn't think it was necessary.

5    Q.  Had the Hells Angels told you, or Joe Joe from the Hells

6    Angels told you that it was a problem, that they were not going

7    to be satisfied with your answers, did you have any obligations

8    as the chapter president to do anything about that?

9    A.  Yes.  I would have reported that.

10   Q.  And why would you have done that?

11   A.  For the safety of the members.

12   Q.  And when you say "the safety of the members," what would --

13   what would the threat be?

14   A.  It wouldn't necessarily have to be -- I wouldn't have to

15   know what the threat is, just if it's possible, you know.

16   Q.  Possible in what way, is what I'm asking?

17   A.  Injury.  Whatever.

18   Q.  From who?  You have to say it.

19   A.  Injury from the Hells Angels?  What?  Is that what you want

20   me to say?

21   Q.  I want you to tell the jury what the threat was and where

22   it was coming from.

23   A.  But there wasn't one; that's what I'm saying.

24   Q.  All right.  If there had been one --

25   A.  Okay.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  -- if there had been --

2   A.  I got you now.

3   Q.  All right.

4   A.  All right.

5   Q.  All right.  So if they had been dissatisfied, would you

6   have had to report that to anyone?

7   A.  Yes, I would.

8   Q.  And who would you report that to?

9   A.  Probably Dog.  Fat Dog.

10  Q.  Fat Dog.

11  A.  Mh-hm.

12  Q.  Now, in this instance, you believe there was no threat?

13  A.  Right.

14  Q.  And you did not communicate with anyone?

15  A.  No.

16  Q.  So what happens next?

17  A.  The, the whole beating.

18          MR. PITTS:  Can he keep his voice up, please?

19          THE WITNESS:  Excuse me?

20          THE COURT:  Yes.  Yes, sir.  Thank you, Mr. Pitts.

21  You can address that to the Court or to Ms. Mohsin.

22          MR. PITTS:  Thank you.

23          THE COURT:  Your earlier one you directed to the

24  witness.  It's not your turn yet.

25          Go ahead, Ms. Mohsin.

1   BY MS. MOHSIN:

2   Q.  Mr. Higgins, I'm going to ask you to keep your voice up so

3   everyone can hear you, sir.

4        After this meeting that you had with Joe Joe, you said

5   that it was a few days before the Box Canyon thing.

6   A.  I think so.

7   Q.  Did anything happen between this meeting with Joe Joe and

8   the Box Canyon thing?  By that, I mean were there any

9   additional meetings or communications with either the Hells

10  Angels or the leadership of the Devils Diciples?

11  A.  No.

12  Q.  So I want to direct your attention now to April the 27th of

13  2003.  Did you have a church meeting on that date at the, at

14  the clubhouse?

15  A.  Yes.

16  Q.  And so this was about two days later; is that accurate?

17  A.  I think there was about two and a half, three weeks between

18  everything in that.  I'm not sure exactly where it fell, the

19  first week in April and then the last week it happened.

20  Q.  So the first week in April would have been what happened

21  with Heather Ford?

22  A.  Right.

23  Q.  And the last week in April is when the Box Canyon event

24  occurred?

25  A.  So two weeks maybe between those incidents.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

133

1   Q.  And your communications with Joe Joe, would they have

2   occurred in between that time period?

3   A.  Yes.

4   Q.  So I want to direct your attention to April the 27th.  Was

5   there a church meeting on that day?

6   A.  Yes.

7   Q.  And who was that church meeting for?

8   A.  Us.

9   Q.  And when you say "us," was it just the southern chapter

10  members?

11  A.  That's all that I was expecting, yes.

12  Q.  Was it expected to be a usual or ordinary church meeting?

13  A.  Yes.

14  Q.  And again, are you still the chapter president?

15  A.  Yes, I was.

16  Q.  Do nomads ever attend these church meetings?

17  A.  String Bean frequently did.

18  Q.  How about Smoky or Grog?  Did they normally attend these

19  meetings?

20  A.  Sometimes.  Grog was from a northern part of the state.

21  Q.  All right.  So on this particular day, did you have --

22  again, are you living at the clubhouse still?

23  A.  Yes.

24  Q.  Is your wife still living there?

25  A.  Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1  Q.  Is your brother-in-law still living with you?

2  A.  Yes.

3  Q.  And did you have an expected time where this meeting was

4  going to begin?

5  A.  Usually in the afternoon, some time after noon.

6  Q.  And so tell the members of the jury where you were when --

7  right before this meeting occurred.

8  A.  We had given up on the old generator and got a new one.

9  And I was trying to get that -- we did get it hooked up and

10  running, wired into the building.  That's what I was working

11  on.

12  Q.  So you were working on this generator?

13  A.  Yeah.

14  Q.  And what happens?  Are you outside?  I'm sorry.  Are you

15  outside the clubhouse?

16  A.  Yeah.  Outside.

17  Q.  What happens?

18  A.  I'm trying to think exactly.  We just had just gotten the

19  generator going, so then we got to run the well, fill up the

20  water tank and all that so all the toilets and everything

21  worked, you know.  And about --

22  Q.  Can you shift that microphone a little bit?  Yeah, right

23  there, please.

24  A.  All right.  Is that better?

25  Q.  Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

135

1    A.  All right.  People started to arrive and it was obvious

2    that it was a lot more than just southern Arizona.

3    Q.  Did you see how they arrived?

4    A.  Cars.

5    Q.  In vehicles?

6    A.  Mh-hm.

7    Q.  And did you see one vehicle or multiple vehicles?

8    A.  Multiple vehicles.

9    Q.  And were there any number of people?  In other words, can

10   you tell us how many you saw, or an approximation?

11   A.  A lot.  I guess maybe altogether between Arizona and

12   California, maybe 20 people.

13   Q.  And did you see how they came out of the vehicles?  Did

14   they come out in any particular way?

15   A.  Not initially.  But then again, I was, I was inside at this

16   point.

17   Q.  So at what point did you go inside the clubhouse?

18   A.  Right when they started driving up.

19   Q.  And where were you inside the clubhouse?

20   A.  Behind the bar.

21   Q.  Is that in that common area that you had described earlier?

22   A.  Yes.

23   Q.  The one that's about a third of the size of this room?

24   A.  Yeah.

25   Q.  And you said you were behind the bar.  Who else was inside

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    of the clubhouse at that time from the southern Arizona

2    chapter; if you recall?

3    A.  I think Johnny Old School -- well, Doc and everyone came

4    with them in the car.  So Doc was sitting at the bar.  Holiday

5    was at the end of the bar, and I think Little John, by the

6    window.  I'm not sure.  I think that there were some -- a lot

7    of them outside still.

8    Q.  Now, before these vehicles pulled up, did any of the other

9    southern Arizona chapter members arrive in anticipation of this

10   church meeting?

11   A.  All of them.

12   Q.  Directing your attention to Huevos and Dean.

13   A.  Oh, yeah.  They came by earlier before the church.  Huevos

14   and Dean rode up there when we were still working on that

15   generator.

16   Q.  And was there anything in particular that you noticed or

17   that was noticeable about one or both of them?

18   A.  Yeah.  Dean was wearing a pistol, which was unusual for

19   him.

20   Q.  And did you see Johnny Old School attend church that day?

21   A.  Yes.

22   Q.  How about Golf Club?

23   A.  Golf Club was living in the first apartment at that time.

24   So I think that's where he was.

25   Q.  Did you see Panhead Mike at this church meeting?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.   I didn't see him until the end of it.

2   Q.   So he was there at some point?

3   A.   Yeah.  He may have been outside.

4   Q.   And did you see Two Dogs?

5   A.   Yeah.  He was inside.

6   Q.   All right.  I want to direct your attention now to some of

7   the members that you saw, the 20 or so people that were coming

8   into the clubhouse for this meeting.  You said they were not

9   expected?

10  A.   No.

11  Q.   Now, you mentioned Holiday and Little John?

12  A.   Yes.

13  Q.   Did Little John at that time hold any position of any

14  authority within the Devils Diciples?

15  A.   He was a boss of California.

16  Q.   And was this a state boss of some kind?

17  A.   Yeah.

18  Q.   And what about other individuals did you see?

19  A.   Moses, Crusher, Holiday.  Who else?  Grog.

20  Q.   Did you see Smoky?

21  A.   Yes.

22  Q.   And did you see String Bean?

23  A.   No.

24  Q.   Did you see an individual by the name of Wizard?

25  A.   Yes, I did.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

138

1  Q.  Was he a southern Arizona chapter member by this point?

2  A.  Yes.

3  Q.  And you mentioned that you saw Doc.

4  A.  Yeah.  Doc was inside.

5  Q.  Did you see Mac Tonight?

6  A.  Later.  He was outside at that point.

7  Q.  And how about an individual with the name of Kick Start or

8  Kickstand?

9  A.  Yeah.  I don't, I don't know what his name was, but he was

10  there.

11  Q.  All right.  Now, were there others there whose names you

12  don't know or recall?

13  A.  It's possible.

14  Q.  Now, after these guys came into the clubhouse, what

15  happens?  What's your expectation and what occurs?

16  A.  I probably started it because I -- one of the concepts in

17  that, in that club was that black eyes were free.  And I

18  figured I had that coming.  So I took my glasses off and walked

19  up to Holiday and I got a black eye.

20  Q.  Now, you said that you -- you said a lot of things there.

21  "Black eyes are free," what does that mean?

22  A.  That if you were to mess up, you know, that was a common

23  accepted -- what would I call it -- punishment or -- yeah, I

24  would call it that.

25  Q.  A punishment?

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

1   A.  Mh-hm.

2   Q.  And why did you think that you were going to get a

3   punishment?

4   A.  Because I was responsible.

5   Q.  And what were you responsible for?

6   A.  What had happened to Heather.

7   Q.  So when you saw all these guys and they came in, you felt

8   like you had been responsible for what had occurred in the

9   clubhouse?

10  A.  I was the boss.  Whether, you know, I was directly culpable

11  or not didn't matter, you know.  I mean, it was my

12  responsibility.

13  Q.  And so when you said you saw Holiday --

14  A.  Mh-hm.

15  Q.  -- and you walked up to him and you took your eyeglasses

16  off, did someone say anything to you at this point?

17  A.  I think Doc said, "You're not going to like this."

18  Q.  And so when you saw Holiday, did you tell him give me a

19  black eye?

20  A.  No.

21  Q.  Or something like that?

22  A.  No.  No.  No.

23  Q.  What happened?

24  A.  He had tears in his eyes.

25  Q.  And what did he do?

1   A.  Gave me a black eye.

2   Q.  All right.  How did he do that?

3   A.  He hit me in the eye.

4   Q.  With what?

5   A.  His fist.

6   Q.  And how hard did he hit you?

7   A.  It was a pretty good whack.

8   Q.  All right.

9   A.  It knocked me across the bar.

10  Q.  All right.  It knocked you across the bar?

11  A.  Yeah.  It broke my cheek and my eye socket.  I didn't know

12  that then.

13  Q.  All right.  And so after you were knocked across the bar,

14  what happens next?

15  A.  I believe that everybody was getting beat about then.  I

16  shook my head and someone hit me in the head with what I

17  believed was Johnny Old School's pistol, which was a Ruger

18  Vaquero single action, which that's not safe to have a, you

19  know, round chambered under there because if it fell or

20  something, it could go off.  Well, it did go off.

21  Q.  And it was hit -- you feel like you were hit with it?

22  A.  I know I was hit with it.

23  Q.  Did you see it before it hit you?

24  A.  No, I did not.

25  Q.  What did you hear?

1  A.  I had powder burns on my face.  I thought I was shot in the

2  head.

3  Q.  All right.  And in that moment when the gun went off, did

4  you think it had hit you?

5  A.  Yes.

6  Q.  All right.  So what happens next?

7  A.  I was down on the floor.

8  Q.  And what's going on around you?  Do you know or can you

9  perceive it?

10  A.  Fighting is going on.  I can't see it because the bar is

11  right there.  Somebody zip-tied my hands up and put a gun to my

12  head.

13  Q.  Did you know who that was?

14  A.  I believe it was the person you were talking about,

15  Kickstand or -- I don't know.  He was a brand-new brother from

16  California.

17  Q.  And could you see or understand or hear anything going on

18  around you?  Were there people speaking or talking or doing

19  something else?

20  A.  I heard Doc try to, try to stop it or, or slow it down and

21  him yelling.  He was the closest person to me on the other side

22  of the bar.  But I could just hear all kinds of stuff, noise

23  outside, which later turned out to be them wrestling with Golf

24  Club.

25  Q.  Now, when you're lying on the ground and you said your

1    hands were zip-tied --

2    A.   Mh-hm.

3    Q.   -- did -- were you assaulted in any other way while you're

4    lying on the ground?

5    A.   Yeah.  But I was so far into shock it didn't -- I mean, I

6    didn't feel it, you know, honestly.

7    Q.   What type of things do you think were happening to you that

8    you didn't feel?

9    A.   I got tasered.  I could hear it.  I didn't feel it.  Kick

10   and punched, you know.

11   Q.   On one occasion or on more than one occasion?

12   A.   It would be difficult to say.

13   Q.   Okay.

14   A.   Like, I, I could hardly, you know, comprehend this was

15   happening in the first place.  And I thought, boy, if I lose

16   consciousness, I'm not going to wake up.  That's what I

17   thought.

18   Q.   And were you being assaulted by one person or could you

19   perceive if there were more than one person?

20   A.   It was probably not so bad after I quit trying to get up,

21   you know.

22   Q.   So did you think it was one person or did you think it was

23   more than one person?

24   A.   I don't know.  I really don't know.

25   Q.   Now, did there come a time where you were moved --

1    A.   Yes.

2    Q.   -- from the floor?

3    A.   Yeah.

4    Q.   Where were you taken?

5    A.   Out to the couch around the other side of the bar.

6    Q.   And were you -- how were you taken there?

7    A.   I, I think someone just grabbed me by the zip-ties and

8    somehow we just ended up out there.

9    Q.   And were you alone on the couch or --

10   A.   No.

11   Q.   -- was there anyone else there?

12   A.   By then, let's see, who was there?  The first thing I

13   remember seeing is Johnny Old School, and he looked like he was

14   dead.

15   Q.   Okay.  Was he on the couch?

16   A.   No.  He was on the floor and Grog was trying to clean his

17   face up.  And --

18   Q.   What was on his face?

19   A.   Just solid blood.

20   Q.   All right.  And so when you got to the couch, did anybody

21   else get brought to the couch?

22   A.   I believe Panhead.  In the middle of all that, they dragged

23   my brother-in-law in there.

24   Q.   Did you see Golf Club at any time?

25   A.   He got brought there later.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.   When you say "there," you're talking about the couch?

2   A.   Yeah.  Eventually.

3   Q.   How about Two Dogs?

4   A.   He was on the couch on the other end.

5   Q.   Now, what type of couch is this?  Is this a --

6   A.   Like a pit groove kind of thing.

7   Q.   Was it a sectional?

8   A.   Yeah.

9   Q.   All right.  And so at some point, who, who is all on the

10  couch?  Is it you?

11  A.   Yeah.  They eventually put Johnny there, but he was

12  unconscious.

13  Q.   So you, Johnny Old School?

14  A.   Two Dogs.

15  Q.   Two Dogs?

16  A.   Yeah.  I would say all five of us eventually were on there.

17  Q.   Golf Club and Panhead Mike being the other two?

18  A.   Mh-hm.

19  Q.   What happens when you're sitting on the couch?

20  A.   We get -- I got poked in the ribs with a ball bat and hit

21  on the shins and the knees.  And Mac put several cigarettes out

22  on me.

23  Q.   Now, you said cigarettes were put out on you by Mac.  Is

24  that Mac Tonight?

25  A.   Yeah.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.   Where was he putting cigarettes out on you?

2   A.   Up here on my shoulders.

3   Q.   And you said that you were poked in the ribs with a bat.

4   A.   By Smoky, yes.

5   Q.   Is that a baseball bat?

6   A.   Yeah.

7   Q.   When you say "poked," did it do any damage?

8   A.   Yeah, it did damage.

9   Q.   What kind of damage did you feel like it did?

10  A.   Fractured ribs.

11  Q.   And what about the ball bat to the knees and the legs, did

12  you have -- did that occur?

13  A.   Yes.

14  Q.   And who administered that?

15  A.   Cuz.

16  Q.   Cuz?

17  A.   Mh-hm.

18  Q.   Were those incidents limited to you or did any of the

19  other --

20  A.   No.  All of us got that.

21  Q.   All right.  And what happened next?

22  A.   We got loaded in the back of a truck and taken out to the

23  desert.

24  Q.   So how long would you say you had been in the, in the

25  clubhouse when -- if you can, perhaps it's difficult to assess,

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN                    146

1    but if you can, can you give us a sense on how much time passed

2    from the time that the church meeting started until you guys

3    were taken off the couch?

4    A.  I don't think it was more than maybe 45 minutes or

5    something.  It probably was less than that, but it seemed like

6    it, it was a long time.

7    Q.  Did your brother-in-law get brought in at some point, you

8    said?

9    A.  Yes.

10   Q.  Tell the jury about that.

11   A.  They had slapped him around, too, you know.

12   Q.  And how was he brought in?

13   A.  They just brought him in and sat him down on the floor

14   inside.

15   Q.  And did it appear as if he had been injured?

16   A.  Yes.  He was injured.

17   Q.  Was he a member of the Devils Diciples?

18   A.  No.  No.

19   Q.  So --

20   A.  He still lives with me.  I've supported him as long as I've

21   been with my wife, you know.  He's had, I think it's called

22   Bell's palsy.  So he's not really able to go out and work or

23   anything.

24        MS. STOUT:  Objection to relevance of this and the

25   narrative.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

```
 1            THE COURT:  Overruled.  Continue.
 2            MS. MOHSIN:  Yes, your Honor.
 3   BY MS. MOHSIN:
 4   Q.  So your brother-in-law was not affiliated with the club; is
 5   that a fair statement?
 6   A.  Yes.
 7   Q.  And he was a dependent of yours?
 8   A.  Yes.
 9   Q.  And when he was brought inside, did you say anything?
10   A.  No.
11   Q.  All right.  Was he eventually let go?
12   A.  (No response.)
13   Q.  Or do you know?
14   A.  Oh, yeah, he was.  I mean, he still lives with me.  But not
15   before we were gone.  He was still inside there.  At some
16   point, my wife came to the door not knowing what was going on.
17   Q.  Did you see her?
18   A.  No, I did not.  I could hear her, because Mac was bothering
19   her, and Grog dealt with that.
20   Q.  So when you guys are seated on the couch, is there still
21   other activity going on inside and, from what you can tell,
22   outside the clubhouse?
23   A.  Yes.
24   Q.  Did you see, other than the firearm that was discharged and
25   the gun that was put to your head, did you see other firearms
```

1  at that time?

2  A.  Yes.

3  Q.  Who did you see with a firearm?

4  A.  Mac had a shotgun.  I'm trying to -- I think pretty much

5  everybody had a gun.

6  Q.  And did there come a time where someone was given an order

7  to put you in the vehicle?

8  A.  Yes.

9  Q.  Or withdrawn.

10        Was there a time where a vehicle was brought in?

11  A.  Wizard was ordered to load us up and he refused.  And it

12  later come to my attention that he was made to do it at

13  gunpoint.

14  Q.  And when you say "a vehicle," what vehicle was this?

15  A.  It was a one-ton truck that belonged to Panhead.

16  Q.  Was it unique in any way?  A unique color?

17  A.  Bright yellow.

18  Q.  Bright yellow?

19  A.  Yes.

20  Q.  So when you were -- did you hear Wizard getting ordered to

21  get the truck?

22  A.  Yes.

23  Q.  Or to put you in the truck?

24        Who gave that order?

25  A.  I believe Little John.

1    Q.   And -- Little John?

2    A.   Yes.

3    Q.   And so how did you get from the couch into the truck?

4    A.   Was just picked up and dragged out there.

5    Q.   Now, was duct tape used on you or any of the other members?

6    A.   Yes.

7    Q.   What was the duct tape used for?

8    A.   Like around the mouth.

9    Q.   All right.  To prevent you from speaking?

10   A.   Yeah.

11   Q.   All right.  Was there duct tape used on anyone's hands?

12   A.   We were zip-tied.

13   Q.   Zip-tied?

14   A.   They used zip-ties.

15   Q.   And were you the only one who had been zip-tied or had

16   others been zip-tied as well?

17   A.   No, everybody was by the time that we got in the back of

18   the truck.  Golf Club and, and Johnny were unconscious.

19   Q.   Were, were your shoes -- did you have your shoes?

20   A.   No.

21   Q.   What happened to your shoes?

22   A.   They took the shoes.

23   Q.   All right.  And did they remove all of your shoes?

24   A.   Yes.

25   Q.   How about other belongings?  Did you have any other things

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   taken from you at that time?

2   A.  My shirt.

3   Q.  And did any of the other members have things taken from

4   them at that time?

5   A.  I don't know.

6   Q.  All right.  And so when you --

7   A.  Shoes.

8   Q.  I'm sorry?

9   A.  Their shoes.

10  Q.  Their shoes?

11  A.  For sure, yeah.

12  Q.  And you indicated that Golf Club and Johnny were both

13  unconscious.

14  A.  Yes.

15  Q.  Were they -- how did they make it into the truck?

16  A.  They were brought there.

17  Q.  Were they lifted up?

18  A.  Mh-hm.

19  Q.  And were they lifted up and put into a seat or some other

20  place?

21  A.  In the back of the truck.

22  Q.  Okay.  The bed?

23  A.  The metal floor, you know.  It had a camper top on it.

24  Q.  And so were you also loaded into it or did you get in on

25  your own?

```
 1   A.  I was not able to walk at that time.  So I got dragged out

 2   there and just tossed in, you know.

 3   Q.  How many of you were in the bed of that truck?

 4   A.  Five.

 5   Q.  And did you have any understanding about who was going to

 6   drive this truck?

 7   A.  Huevos and Cuz were the -- in the cab of the truck.

 8   Q.  And they were both southern Arizona members?

 9   A.  Mh-hm.

10   Q.  Is it daylight out when this happens?

11   A.  Still, yes.

12   Q.  And do you remember when you were in the bed of that truck,

13   where that truck went?  Did you know?

14   A.  No.

15   Q.  Did you make any stops?

16   A.  Yes.  Once for gas.

17   Q.  So at one point, the truck stopped at a gas station?

18   A.  Yes.

19   Q.  Could you see who was pumping the gas?

20   A.  I believe Cuz was.

21   Q.  Were you conscious the entire time?

22   A.  Yes.

23   Q.  Now, did there come a time where the truck stopped again?

24   A.  Yeah.

25   Q.  Where would that have been?
```

1  A.  I didn't know where it was at the time.  It's way out in

2  the desert.

3       What happened is they stopped and took one of us out

4  at a time, you know, and more beatings and then pull up the

5  road a little ways and the next one.

6       And when it came my turn, I had gotten my hands loose

7  in there, but it didn't --

8       MS. STOUT:  Can he identify "they," your Honor?

9       THE WITNESS:  -- it did not do me any good.

10      MS. STOUT:  Could he identify "they"?

11      THE WITNESS:  Huevos and Cuz.

12      THE COURT:  That's fine.  But it would be as --

13      MS. MOHSIN:  I intend to follow it up.

14      THE COURT:  It would be appropriate or convenient

15  to --

16      MS. MOHSIN:  Yes.

17      THE COURT:  -- provide additional detail, as Ms. Stout

18  suggests.  Go ahead.

19      MS. MOHSIN:  I have been doing that, your Honor, and I

20  will continue to do that.

21      THE COURT:  Yes, you have.  And I don't fault you.

22      MS. MOHSIN:  Okay.  Thank you, your Honor.

23  BY MS. MOHSIN:

24  Q.  So you had indicated that you were in the back of the

25  truck, and it drove to a place that, that you didn't know where

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

153

1   you were going; is that an accurate statement?

2   A.   Yes.

3   Q.   And could you tell who was driving the truck?

4   A.   Huevos was driving, and Cuz was the one that was coming out

5   and removing people one at a time.

6   Q.   Other than Huevos and Cuz, and obviously the five of you in

7   the bed of the truck, was anyone else in that car?

8   A.   No.

9   Q.   All right.  So when you were driving, do you have any sense

10  of how long you were driving after the gas -- you know, not

11  including the gas station stuff?  Did you have any sense of it?

12  A.   I'm really not clear on that, you know, at all, the

13  time-wise.

14  Q.   Could you tell if the others in the, in the bed of the

15  truck were conscious at this point?

16  A.   Golf Club and Johnny were not.

17  Q.   And you said that you drove.  At some point, the car

18  stopped?

19  A.   Yes.

20  Q.   While you were driving, do you know if Cuz or Huevos, were

21  they saying anything, were they doing anything that you could

22  understand?

23  A.   I couldn't hear them, no.

24  Q.   Did either one of them, to your knowledge, have any

25  firearms?

1   A.  Both of them.

2   Q.  And did you see those firearms at any point?  Did they

3   point them at you?

4   A.  No.

5   Q.  All right.  So after you stopped at this desert area, had

6   you been there before?

7   A.  No.

8   Q.  Did you recognize it in any way?

9   A.  No.

10  Q.  And you indicated that you guys were beaten some more.

11  A.  Yeah.

12  Q.  Which of the two individuals that were driving or being --

13  or in the cab of the truck were doing the beating?

14  A.  That would be Cuz.

15  Q.  Did Huevos participate in that?

16  A.  I don't believe he got out of the truck.

17  Q.  So you believe he stayed in the driver's seat?

18  A.  Yeah.

19  Q.  And you indicated that at different intervals, the vehicle

20  stopped.

21  A.  Yeah.

22  Q.  What was the first time or when -- the first time that it

23  stopped, were you taken out of the vehicle or was someone else

24  taken out?

25  A.  I believe Johnny was the first one.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1  Q.  When you say "Johnny," you're referring to Johnny Old

2  School?

3  A.  Yes.

4  Q.  And when he was taken out, did you see Cuz beat him in any

5  way?

6  A.  They just -- actually, Huevos did help on that.  They

7  pushed him off of the road, because he could not -- I mean,

8  they just, plop, there he is on the ground.  He was still

9  unconscious.

10 Q.  So would it be fair to say they threw him off?

11 A.  Yes.

12 Q.  And when they threw him off, at this point, do you know if

13 it's daylight or dark?

14 A.  It's still daylight, yes.

15 Q.  And do you have any sense of how close it is to sundown?

16 A.  No, not really.  I wasn't even thinking about that.

17 Q.  Now, you said that the car, that after they dropped Johnny

18 Old School and threw him down, could you see where they threw

19 him?  In other words, was this some sort of a hilly area?

20 A.  It's a dirt road in the mountains somewhere, you know, in

21 the desert.

22 Q.  Okay.  Was there any sort of a steep --

23 A.  There was a guardrail, yeah.  It was real steep.

24 Q.  There was, there was a guardrail or there was not?

25 A.  There is a guardrail, I think.

1  Q.  All right.

2  A.  Yeah.

3  Q.  And could you see where Johnny Old School landed?

4  A.  No.

5  Q.  Why not?

6  A.  Well, you just couldn't see that from the truck.

7  Q.  And I guess my question to you is, was Johnny Old School

8  thrown down into a ravine of some kind or could you tell where

9  he was thrown?

10  A.  I would say -- I don't know that for sure, but I would --

11  based on what happened to me, I think that's reasonable.

12  Q.  All right.  So after he is thrown out, does the vehicle

13  move or are other people taken out?

14  A.  No.  They drive up the road a ways, and then out come Golf

15  Club.

16  Q.  Now, is Cuz the only one that gets out this time?

17  A.  Yeah.

18  Q.  And is Cuz using a baseball bat or any other object?

19  A.  Yeah.

20  Q.  And does he beat Golf Club some more?

21  A.  Some, but Golf Club got up and started going back down the

22  road again a ways.

23  Q.  All right.  Did Golf Club get thrown down the ravine?

24  A.  No.

25  Q.  All right.  And when he went down the road, did anybody

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

157

1    stop him?

2    A.  No.

3    Q.  All right.  Did you see him?

4    A.  Yes.

5    Q.  What was he doing?

6    A.  Staggering down the road.

7    Q.  Okay.  And was he in -- was he -- were you able to talk to

8    him at all in any way?

9    A.  No.  Then it's driving more, you know.

10   Q.  All right.

11   A.  Immediately.  So I didn't see him for long.

12   Q.  All right.  And when the car drove again, did it go any

13   sort of a distance?

14   A.  Yeah.  Each time was probably maybe several hundred yards.

15   Q.  Okay.

16   A.  Then I came out.  My hands were loose.  I thought I could

17   grab a rock or something from the road, you know, and do

18   something, but no way.  They are all smashed into the road.

19   You couldn't get them out.  So I got hit a few times with a

20   bat, and I willingly went over the side to get away from that,

21   you know.  And that was a big mistake.

22   Q.  Why was that a big mistake?

23   A.  Because it was like almost vertical.

24   Q.  A vertical drop?

25   A.  I didn't even look.  You know, I just bailed over that.

1    And I went down there probably eight, 900 feet --

2    Q.  Okay.

3    A.  -- in one bounce, then a longer bounce and a longer bounce,

4    and then finally boom, on the flat rock.  And if I would have

5    gone one more, I wouldn't be here talking today.

6    Q.  Was there a reason why?  Was there a cliff at that point?

7    A.  How I ended up where I did, I don't know.  There was a

8    great big rock, and then a very small flat rock behind it.

9    Q.  Like a ledge?

10   A.  And then straight down.  And I hit hard on that flat spot

11   from 20, 30 feet above, probably.  It never hit the big rock,

12   you know, or I would have been over the edge.  I remember

13   thinking, well, they would have a hard time shooting me now,

14   you know, because of where I was, I could barely see the road.

15   Q.  Now, you mentioned shooting you.  Did you have a concern

16   about that?

17   A.  Yeah, I thought so.

18   Q.  Why did you have a concern about that?

19   A.  Because Johnny and Golf Club looked about dead.  And I was

20   worse than I thought I was.  I didn't think I was in as bad a

21   shape as I was.

22   Q.  Did you see any other vehicles on the road?

23   A.  Yeah.  But right away, what happened next, I saw the truck

24   continue on and stop, and that was when they off-loaded Two

25   Dogs.  And then once more, at the top of the hill I saw just

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   the brake lights.  And then came a Jeep that Grog was driving.

2   Q.  And there was a Jeep that Grog was driving?

3   A.  Yeah.

4   Q.  Did you see Grog?

5   A.  Yes.

6   Q.  This is the nomad?

7   A.  Yeah.

8   Q.  And what did he do?  What did you see him do, if anything?

9   A.  He just slowly drove behind.

10  Q.  All right.  And so did there come a time where the two

11  vehicles left?

12  A.  Yeah.

13  Q.  Did they shoot at you?

14  A.  No.

15  Q.  So after they left, what did you do?

16  A.  I climbed back up to the road and started heading the way

17  that they had headed, thinking I would get Panhead and, and Two

18  Dogs.

19  Q.  And so when you say "headed the way they had headed"?

20  A.  Which was still up.  At this point, I don't know where the

21  road went, you know, to be honest with you, you know.  I've

22  never gone back there either.

23  Q.  So when you first -- the first stop you said was Johnny Old

24  School, when he was taken out --

25  A.  Right.

1    Q.  -- of the vehicle and thrown down the ravine.

2            Was that at the -- a lower elevation than where you

3    were?

4    A.  Yes.

5    Q.  In other words, is this road traveling in an upward

6    elevation?

7    A.  Yes.

8    Q.  And so when you finally climbed out of this location, did

9    you continue to travel up?

10   A.  I met Two Dogs about halfway down, and I asked him what he

11   saw.  And he said that Panhead had just gotten out of the back

12   of the truck and got into the front and left.  So we turned

13   around to go find the rest of the people.

14   Q.  So you did travel up to look for Two Dogs; is that a fair

15   statement?

16   A.  Yes.  Yes.

17   Q.  And you believed that Panhead was up there as well?

18   A.  Yes.

19   Q.  And so part of the way up, you ran into Two Dogs?

20   A.  He was headed, yeah, back.

21   Q.  In other words, down?

22   A.  Yes.

23   Q.  Back down the road towards the, the way you had come?

24   A.  Right.

25   Q.  Is it nighttime yet or is it still daytime?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

161

1  A.  It's, I would say, getting, getting toward dark.

2  Q.  And when you see Two Dogs, and he tells you that Panhead is

3  not there --

4  A.  Right.

5  Q.  -- what did you do next?

6  A.  We went to find Golf Club and Johnny.

7  Q.  And how, how were you able to, or what was your physical

8  condition, I should ask?

9  A.  Not good.

10  Q.  All right.

11  A.  We just walked down the road, and we found Golf Club.  And

12  we could not find Johnny.  I mean, we looked everywhere,

13  tried -- I couldn't even yell because it made my head, like,

14  hurt way too much, like, almost made me nauseous, you know, to

15  do that.  But Two Dogs was yelling and we couldn't hear

16  anything, couldn't know exactly where it was.  You know, and

17  it's so rough, the terrain out there, that you can't, you can't

18  see anything, you know, and it was getting dark.

19       And we just kept walking.  We could see the lights way

20  far away, maybe 10 miles, of a small town.  And then some

21  lesser lights, maybe a rancher or something.  So we kept

22  walking.

23  Q.  Was Two Dogs and Golf Club with you the entire time or did

24  there come a time where you guys had split up?

25  A.  Somehow Golf Club got away, separated from us.  I don't

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

 1   even know.  It was like all I could do to walk.  I didn't go

 2   too much farther.

 3   Q.  Were you able to see or did you have any difficulty?

 4   A.  I couldn't see right, no.  I couldn't see my feet.

 5   Q.  Okay.

 6   A.  You know.  It probably maybe -- I really don't know how far

 7   I walked out there, but it --

 8   Q.  How long did you walk?

 9   A.  Until late, until after dark.

10   Q.  All right.

11   A.  I know that.  It was dark.  And I just laid down, I told

12   Two Dogs, you got to find a rancher.  I can't go anymore, you

13   know, and I was out.

14   Q.  So did you pass out at that point?

15   A.  Yeah.  Yeah.

16   Q.  And did Two Dogs leave you there?

17   A.  Yes.

18   Q.  And was Golf Club with you at this point?

19   A.  No.

20   Q.  How long had you guys been with Golf Club at this point?

21   Was it hours or minutes or --

22   A.  An hour, probably.  And then we -- all of a sudden he just

23   wasn't, wasn't there anymore.

24   Q.  Now, when he was with you, was he -- you know, he was

25   conscious, he was walking.

1   A.  Yeah.  He was walking better than we were.  But I mean, I

2   think that had to just be adrenalin, because he was in worse

3   shape.  I think I was probably, of the four of us, I was in the

4   middle as far as damage.  Both Johnny and Golf Club were in far

5   worse shape than me.

6   Q.  So after you passed out, what's the next thing that you

7   were aware of?

8   A.  He re -- Two Dogs returned with a rancher and a glass of

9   juice.

10  Q.  And do you know about how long of a time passed?

11  A.  I don't.  It was later, I know that.

12  Q.  And the rancher, did he help you?

13  A.  Yes.

14  Q.  And did there come a time then where some other help

15  arrived?

16  A.  Yeah, an ambulance and the sheriffs.

17  Q.  And did you go to the hospital?

18  A.  Yes, I did.

19  Q.  Did you see -- did you see Johnny Old School that night?

20  A.  No.  But I convinced them before we got to the hospital

21  that they -- you know, that he needed -- they needed to find

22  him.

23  Q.  The sheriffs, are you talking about?

24  A.  Yeah.

25  Q.  And did you tell them about Panhead?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1  A.  No.

2  Q.  All right.  Now, when you got to the hospital, did you see

3  any of the other individuals that you had been with earlier?

4  A.  No.  But I had heard in the ambulance, I guess, that Golf

5  Club had, had beaten us all out of there.  He walked to some

6  other ranch and got an ambulance.  But they said no, had no

7  knowledge of Johnny, you know.  And I'm, like, "He's out there,

8  you got to find him."

9  Q.  Did there come a time where you learned that Johnny had

10  been found?

11  A.  Yes.

12  Q.  All right.  And were you at the hospital when that happened

13  or at some other time?

14  A.  That was almost before I left the hospital.

15  Q.  Okay.  Did you talk to any law enforcement personnel at the

16  hospital?

17  A.  Yes.

18  Q.  And did they ask you questions about what had happened?

19  A.  Yeah.  And I wanted to, to get to my wife as soon as

20  possible, so I was not truthful with them at all, you know.  I

21  told them we went down there to buy motorcycle parts and fell

22  out of a truck.

23         And you look at it afterwards, I've got duct tape

24  wrapped around, and my head all split open, it probably wasn't

25  a very convincing lie.

1  Q.  So you --

2  A.  And they, they figured that out, the detective.  She says,

3  don't you have a wife?  And I'm, like, yes, I do, you know, and

4  I got to get down there.

5  Q.  Were you concerned about her?

6  A.  Yes, I was.

7  Q.  Why?

8  A.  Because of, you know, she was there when it happened.

9  Q.  So after you were in the hospital -- how long did you stay

10  in the hospital?

11  A.  Long enough for, like, an MRI or something of that nature.

12  And I think they took x-rays of my knees and ribs and back.

13  They never did fix my feet, and they were shredded.

14         And so when the police left, I just got up and

15  wandered around.  And I found -- it's a strange place it seems

16  like to me, in the hospital, more like a warehouse area.  And I

17  just went into the bigger room and there was Johnny and Golf

18  Club.  And they were both unconscious.  I thought they were

19  dead at first.

20  Q.  What did you do?

21  A.  What did I do?  I walked outside.  They didn't want to let

22  me out.  They said, "You can't leave."  And I just -- they

23  opened the door eventually.  And I went and made some phone

24  calls to get a ride.  And we did get Johnny out.  Golf Club

25  was -- he had to stay there.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  And where did you go from there?

2   A.  To a hotel.

3   Q.  All right.  And did you find out if your wife -- about your

4   wife?

5   A.  After I got my -- the stuff out of my feet, I called Doc,

6   which was a risk, you know.  But I mean, I was the closest to

7   him.  He was all apologizing.  He said Angel was all right.

8   Q.  Is that your wife's nickname?

9   A.  Yeah.

10  Q.  Angel?

11  A.  Mh-hm.

12  Q.  All right.  And so after this happened, what did you do

13  after that?

14  A.  Well, we only had a day to stay in that hotel.  And we did

15  get Golf Club out, his son did.  He was having seizures.  And

16  we all were at Johnny's house.  And all I could do was sleep.

17  That's all I could do, for a long time.

18  Q.  How long did it take you to recover from the injuries?

19  A.  More than two years.  I thought I was better.  I mean, we

20  didn't work for six or eight months.  Golf Club was a mechanic,

21  also.  And we went to tune my wife's car up and we couldn't

22  even do -- we couldn't even finish it.  You know, just like,

23  boy, we're not better.

24  Q.  Did there come a time that you were arrested?

25  A.  Yeah.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

167

1   Q.  And were you arrested by the Pima County Sheriff's

2   Department?

3   A.  Yes, I was.

4   Q.  And were you charged in connection with the events that

5   occurred at the clubhouse in that first week of April of 2003?

6   A.  Yes, I was.

7   Q.  And were you charged with other crimes as well?

8   A.  Yes, I also was.

9   Q.  And did you plead guilty?

10  A.  I pled guilty to kidnapping, acts of intimidation, and

11  contributing to a criminal street gang.

12  Q.  Now, the acts of intimidation, did that relate to what had

13  occurred with Heather Ford or was it in relation to something

14  else?

15  A.  I don't know at all.

16  Q.  And the kidnapping, was that in relation --

17  A.  Yes.

18  Q.  -- to Heather Ford?

19  A.  That was.

20  Q.  And the acts of intimidation -- I'm sorry.  The street

21  gang, was that in relation to Heather Ford?

22  A.  No, I don't think so.

23  Q.  So at some point, you said you pled guilty to those

24  charges?

25  A.  Yes.

1    Q.   And did you serve any time?

2    A.   Yeah.  Two years, and five years of probation.

3    Q.   All right.  Two years' incarceration?

4    A.   Mh-hm.

5    Q.   And five years of probation?

6    A.   Yes.

7    Q.   And to your knowledge, did any of the individuals that were

8    involved in that beating ever get arrested for --

9    A.   No.

10   Q.   -- that crime?

11   A.   Never.

12   Q.   Now, after you left the hospital and you went to the hotel

13   room, you had indicated that you had been living at the

14   clubhouse.

15   A.   Mh-hm.

16   Q.   You had a trailer there?

17   A.   I had a trailer and a bus with all of like a machine shop

18   and all my tools in it.  Yeah.  Everything I owned was down

19   there.

20   Q.   Everything you owned, because you had been living there?

21   A.   Mh-hm.

22   Q.   Clothing?  Personal possessions?  Tools?  Yes?

23   A.   Yes.

24   Q.   How about other items, such as firearms?

25   A.   Yes.

2:11-cr-20066-RHC-MKM  Doc # 241  Filed 12/30/14  Pg 169 of 287  Pg ID 6667
JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

169

1  Q.  A motorcycle?

2  A.  A motorcycle.  I had about 12 vehicles, but some of them

3  weren't worth very much.

4  Q.  More of a junk sort of a thing?

5  A.  Yeah.

6  Q.  And did you own a motorcycle?

7  A.  Yes.

8  Q.  And so were these things taken, once you were kicked out of

9  the club and taken to the Box Canyon?

10  A.  Yes, they were.

11  Q.  They were taken?  Did you ever get any of those items back?

12  A.  I got one car and a one-ton truck that I had, but I lost

13  them when I was in jail.

14  Q.  All right.  And what happened to your motorcycle?

15  A.  Wizard got it.

16  Q.  Did you make any attempts to contact any of the Devils

17  Diciples leadership?

18  A.  Yes.

19  Q.  What were those attempts?

20  A.  Phone calls.

21  Q.  And what was the purpose of making phone calls?

22  A.  I wanted to know why, you know, why did that happen.

23  Q.  Who did you call?

24  A.  Fat Dog.  Twice.

25  Q.  And did you talk to him?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    A.   No.

2    Q.   Did you leave messages for him?

3    A.   Yes.

4    Q.   Did he return the messages?

5    A.   No.

6    Q.   Did you talk to anyone else?

7    A.   Yeah.  I talked to Fast Eddie, and he said he was going to

8    go and, and get someone to call me, but Fat Dog was out of

9    town.  And Pauli didn't want to talk to me.

10   Q.   Okay.  Did you ever talk to anyone in the leadership in the

11   Devils Diciples about this event?

12   A.   No, I did not.

13   Q.   After you were incarcerated and then you were on probation

14   and you left the jail, did you ever become involved with the

15   Devils Diciples again?

16   A.   No.  Or any other motorcycle club.

17   Q.   Or any other motorcycle club?  No?

18   A.   No.

19   Q.   And was there any change in your lifestyle in any way?

20   A.   Yeah.  I'm not involved with motorcycles at all.

21   Q.   All right.  Now, I want to show you some photographs.

22            THE COURT:  We have just five minutes until the normal

23   lunch break.  Do you want to wrap -- do you have a five-minute

24   segment here or --

25            MS. MOHSIN:  I think we should break.  I don't have a

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

 1    lot more, but it's more than five minutes.

 2              THE COURT:  All right.  Let's, let's do that then.

 3              And you may recess, ladies and gentlemen, to the jury

 4    room where your lunch will be provided as per usual.  We'll see

 5    you at 1:30 p.m.  Thank you.  We're in recess.

 6         (Jury out, 12:26 p.m.)

 7              COURT REPORTER:  Court is in recess.

 8         (Recess taken, 12:27 p.m. - 1:37 p.m.)

 9              THE CLERK:  All rise.  United States District Court

10    for the Eastern District of Michigan is now in session, the

11    Honorable Robert H. Cleland presiding.

12              All those having business before the Court draw near,

13    give attention and you shall be heard.  God save these United

14    States and this Honorable Court.

15         (Jury in, 1:38 p.m.)

16              THE COURT:  Everyone is back.  The witness may be

17    seated.

18              The attorneys are all present.  Jurors are all

19    present.  All right.  And the witness has returned.

20              And we have replaced the microphone so it's possible

21    for you to move it, sir, left or right or draw it somewhat

22    closer to you, I hope.  And that's for subsequent witnesses,

23    as well.

24              All right, Ms. Mohsin.  Do you want to continue with

25    questioning?

2:11-cr-20066-RHC-MKM  Doc # 241  Filed 12/30/14  Pg 172 of 287  Pg ID 6670
JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

172

1          Somebody -- before you do, this is the second time

2    that I have heard a cell phone from that general area.  Is it

3    a deputy, is it an attorney?

4          MR. PITTS:  We're trying to figure it out, to be

5    honest with you.  It isn't us, Judge.

6          THE COURT:  Those of you that have -- the attorneys'

7    machines should be off, not vibrating, and if any of the court

8    officials or deputies or whatever have, be guided accordingly,

9    please.

10          All right.  Go ahead, Ms. Mohsin.

11          MS. MOHSIN:  Thank you, your Honor.

12   BY MS. MOHSIN:

13   Q.  Good afternoon, Mr. Higgins.

14   A.  Good afternoon.

15   Q.  Mr. Higgins, I'm going to show you on the screen here, and

16   quite possibly on the screen next to you, Government's Exhibit

17   11-4.  See if you recognize it.

18   A.  Yeah.

19   Q.  Have you seen that before?

20   A.  Not from that viewpoint.

21   Q.  All right.  What do you recognize it to be, sir?

22   A.  Box Canyon.

23   Q.  Directing your attention to 11-5, do you recognize that

24   photo?

25   A.  Not the exact spot, but yes.

1  Q.  Now, when you say yes, what do you recognize that -- not

2  the exact spot, but what do you recognize?

3  A.  That's the road through Box Canyon.

4  Q.  And is that similar to what the area looked like that night

5  between April 27 and 28 of 2003?

6  A.  Yes.

7  Q.  All right.  I want to direct your attention now to some

8  proposed exhibits.

9          One moment, please.

10         MS. MOHSIN:  Your Honor, at this time the Government

11  would, with no objection from the defense, move for the

12  admission of Proposed Exhibits 11-28, 11-29, and 11-32.

13         THE COURT:  28, 29, and 30 -- I'm sorry, 28, 29, and

14  32?

15         MS. MOHSIN:  Correct.

16         MR. SABBOTA:  No objection.

17         THE COURT:  Without objection, each of these is

18  received.

19         MS. MOHSIN:  Thank you.

20     (Exhibits 28, 29, 32 received, 1:41 p.m.)

21  BY MS. MOHSIN:

22  Q.  Mr. Higgins, you described that when you were being

23  transported to the Box Canyon it was inside of a yellow truck?

24  A.  Yes.

25  Q.  I'm going to direct your attention to Government's

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

174

1    Exhibit 11-28 and ask you to take a look at that image.  Do you

2    recognize that?

3    A.   Yes, I do.

4    Q.   What do you recognize that to be?

5    A.   Panhead Mike's truck.

6    Q.   And is the bed of that truck covered?

7    A.   Yes.

8    Q.   Is that some sort of a glass cover on top of the bed or is

9    it something that you can't see out of?

10   A.   You can't see out of it, no.

11   Q.   All right.  Directing your attention to 11-29, sir, what's

12   depicted in that photo?  Do you recognize it?

13   A.   The back of it.

14   Q.   And could you see out of the window there at the top of the

15   back of the truck?

16   A.   Probably, yes.  I wasn't looking that way.  I was looking

17   at the floor.

18   Q.   Were you face-down or face-up in the truck?

19   A.   Face-down.

20   Q.   And were you face-down the entire time you were back there?

21   A.   Until I got my hands loose.

22   Q.   And were you working on getting your hands loose while you

23   were in the bed of that truck?

24   A.   Yes.

25   Q.   And once you got your hands loose, by the way, was the

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   truck still moving when you got your hands loose?

2   A.  Yes.

3   Q.  Were you able to see out of the back of that truck?

4   A.  Not really.

5   Q.  And the door to that truck, did that open or did it open

6   when you were in it?

7   A.  I don't think so.

8   Q.  Directing your attention to 11-32, do you recognize that?

9   A.  No.

10  Q.  No?

11  A.  I don't think so.

12  Q.  All right.  I want to direct your attention to some

13  additional photos now.

14          THE COURT:  Expecting these to be introduced?

15          MS. MOHSIN:  Yes, your Honor.  There are a series of

16  photos.

17          Your Honor, I believe that there are no objections.

18  These are from the 11 series.  I will just ask to admit them as

19  I move through them, if that's okay with the Court, because

20  they are voluminous, or do you want me to do it in a chunk?

21          THE COURT:  If there's to be no objection, and am I

22  correct that there's no objection anticipated?

23          MR. SABBOTA:  No objection.

24          THE COURT:  What I would suggest, if they are that

25  voluminous, is that you publish them as you're asking the

1    witness about them, identify them each, and at the end of this

2    series move introduction of those that have been discussed and

3    already published.

4            MS. MOHSIN:  Yes, your Honor.

5    BY MS. MOHSIN:

6    Q.  I want to direct your attention now to proposed Exhibit

7    11-84 -- I'm sorry -- 11-81.  Do you recognize that?

8    A.  Yes.

9    Q.  What is that?

10   A.  It's a sign that was over the bar.

11   Q.  And when you say over the bar, inside of the clubhouse?

12   A.  I believe so.

13   Q.  All right.  Directing your attention to 11-82, do you

14   recognize that?

15   A.  Yeah.  That's the front of the clubhouse.

16   Q.  So this is the Southern Arizona Tucson Chapter Devils

17   Diciples Clubhouse?

18   A.  Yes.

19   Q.  And is that in the L-shape that you previously described?

20   A.  Yes.

21   Q.  There are two trucks parked in this particular image; is

22   that right?

23   A.  Yeah.

24   Q.  Where is the front door that leads into the clubhouse?

25   A.  Right behind those two trucks.

1   Q.  Okay.

2   A.  Where the awning is.

3   Q.  There's a laser pointer there, sir, in front of you.  You

4   can -- not there, on the big screen.

5   A.  Right there.  (Indicating).

6   Q.  That's where the front door is?

7   A.  Yes.

8   Q.  And you had indicated that there were apartment-style rooms

9   or apartments.  Where were those located?

10  A.  Right there, right there and right there.  (Indicating).

11  Q.  Okay.  Where was the common area located, was it beyond

12  that front door?

13  A.  Yes.

14  Q.  Okay.  Directing your attention to 11-83, do you recognize

15  that, sir?

16  A.  Yeah.

17  Q.  And can you tell the jury what's shown in that particular

18  picture?

19  A.  That's just the front of the previous picture, if you

20  were to turn and look to the right.  So it shows the three

21  apartments, and what you can't see would be the main part of

22  it, the main entrance.

23  Q.  And there's a bus parked behind there.  Was that one of

24  your buses?

25  A.  No.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    Q.  All right.  Directing your attention to 11-84, can you

2    describe what view is depicted?  Is the front of the clubhouse

3    or the front door to the clubhouse depicted in this photo?

4    A.  Yes.

5    Q.  And can you identify where?

6    A.  Right there.

7    Q.  All right.  Directing your attention to 11-85, tell the

8    jury what's depicted in that.

9    A.  It's the same three apartments.

10   Q.  So this is all attached to the main clubhouse?

11   A.  Yeah.

12   Q.  11-86?

13   A.  Same thing.

14   Q.  Same thing, the apartments that you have been talking about

15   earlier?

16   A.  Yeah.

17   Q.  Where is your trailer in relation to these apartments?

18   A.  Diagonally, back there.

19   Q.  Behind the clubhouse from where the point of view is in

20   this picture?

21   A.  Yeah.

22   Q.  And where is the generator that you talked about?

23   A.  In between.

24   Q.  Is it outside?

25   A.  Some -- well, we had more than one, you know.  They didn't

JURY TRIAL, VOLUME XXV – 12/8/2014
CHARLES HIGGINS – DIRECT BY MS. MOHSIN

1    last that long.  The last one that we had was on the back

2    porch, so it was covered.  The one before that was right in

3    front of my bus.

4    Q.  I'm talking about at the time of the Heather Ford assault.

5    A.  That was on the back porch, which, if you were to go

6    through the front building off of the back, there is a porch.

7    Q.  So not --

8    A.  That's the common area.

9    Q.  Okay.  Past the common area.

10            11-87, is that also part of the clubhouse property,

11    that area?

12    A.  Yeah.

13    Q.  And is the clubhouse to the front of that picture, behind

14    the bus?

15    A.  That's actually the back.  What you see behind the bus is

16    the back of those three apartments.

17    Q.  Okay.

18    A.  And the back of the common area and where that fence is, is

19    pretty much almost the property line.

20    Q.  Okay.  Directing your attention to 11-88, what is that a

21    picture of?

22    A.  That's just another building that was out there.

23    Q.  Are those on the property, those buildings?

24    A.  Yes.

25    Q.  So that's part of the Devils Diciples clubhouse property

 1  that existed at that time?

 2  A.  Yes.

 3  Q.  Everything that's depicted in that picture?

 4          Is that yes, sir?

 5  A.  Yeah.  I don't recognize any of these extra motor homes or

 6  things like that, but --

 7  Q.  Was it common to have different motor homes or other things

 8  back there at the time?

 9  A.  Not really.

10  Q.  All right.  Directing your attention to 11-89, do you

11  recognize that?

12  A.  Yeah.

13  Q.  What's that a picture of, sir?

14  A.  Compared to the front one, that's the side of the common

15  area.  And the three over here, the apartments in the front

16  would be right behind that tree.

17  Q.  All right.  So the left side of the screen is the back of

18  the common area?

19  A.  The side of it, like the north side.

20  Q.  The side of it?

21  A.  Yeah.

22  Q.  Okay.  11-90, what is that a view of?

23  A.  All right.  Now, I don't know what the front one is, but

24  that's my trailer right there.  The bus is right there.  You

25  can just see a little bit of it.  That's the water tank.

181

1   Q.  And is there a chain-link fence along the side?

2   A.  I don't think so.

3   Q.  On the left side of that, can you see it?

4   A.  Oh, that's a separate property.  That's a business.

5   Q.  On the other side of that fence?

6   A.  Yeah.

7   Q.  Okay.  But the property, the Devils Diciples clubhouse at

8   that time went up to that?

9   A.  This side of the fence, yeah.

10  Q.  It went up to the chain-link fence?

11  A.  Yes.

12  Q.  Directing your attention to 11-91, do you recognize that?

13  A.  Yeah.  I don't recognize all the vehicles or the extra

14  motor homes, but --

15  Q.  What do you recognize, if anything?

16  A.  That's the back of the clubhouse up there where the trees

17  are right up here.

18  Q.  Okay.  And were people living in any of those trailers, to

19  your knowledge?

20  A.  I don't even recognize them.

21  Q.  Directing your attention to 11-92, do you recognize that?

22  A.  That's my trailer.

23  Q.  Which one?

24  A.  This one.

25  Q.  Okay.  And is that where you lived with your wife and your

1   brother-in-law?

2   A.   Yes.

3   Q.   Directing your attention to 11-93, is that also part of the

4   property, the clubhouse property at the time?

5   A.   Yeah.   Yeah.

6   Q.   Okay.   Directing your attention to 11-94, is this picture

7   also part of the clubhouse property at the time?

8   A.   Yeah.

9   Q.   Directing your attention to 11-95, can you describe whether

10  the clubhouse is depicted in this particular image?

11  A.   Yeah.   That's it right there.   There's the bus where I had

12  all my tools and that's my trailer.

13  Q.   And again, all property of the Devils Diciples at the time?

14  A.   Yes.

15  Q.   Directing your attention to 11-96, can you tell what's

16  depicted in this picture?

17  A.   I don't recognize all them.   All the trailers, they weren't

18  there when I was there.

19  Q.   Were these on the property of the Devils Diciples?

20  A.   Yeah, they are.

21  Q.   Okay.   Directing your attention to 11-97, do you recognize

22  that trailer?

23  A.   No.

24  Q.   Okay.   Directing your attention to 11-98, do you recognize

25  any of those?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   A.   Not any of them, no.

2   Q.   Okay.  Were these also on the property of the Devils

3   Diciples?

4   A.   Yeah.

5   Q.   11-99, do you recognize that?

6   A.   Yeah.  That's the back of the property, but I don't

7   recognize the trailers.

8   Q.   Okay.  I want to direct your attention now to photographs,

9   specifically, 11-101.  Do you recognize that particular --

10  A.   That's out front.

11  Q.   The front door?

12  A.   Yeah.

13  Q.   Is that depicted --

14  A.   Straight behind the sidewalk, that goes right up to it.

15  Q.   Now, directing your attention to 11-102.

16  A.   Yeah.

17  Q.   What is depicted in that photo, sir?

18  A.   Front door.

19  Q.   Again, of the Devils Diciples clubhouse?

20  A.   Yes.

21  Q.   Directing your attention to 11-103, what's depicted in that

22  photo, do you know?

23  A.   That's the front room.

24  Q.   Is this the common room that you had been talking about

25  earlier?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1    A.   Yeah.

2    Q.   And is this what you come into if you enter the front door

3    of the clubhouse?

4    A.   Yeah.

5    Q.   Is this where you had church meetings?

6    A.   Yes.

7    Q.   Is this where the beatings occurred?

8    A.   Yes.

9    Q.   Directing your attention to 11-104, can you describe what's

10   depicted in that photo?

11   A.   There's Johnnie's tool boxes.

12   Q.   Can you use that laser pointer, please, and point them out?

13   A.   Right there.  (Indicating).

14   Q.   Those were tool boxes that belonged to?

15   A.   Johnnie Old School.

16   Q.   Johnnie Old School.  Did you know what kind of work Johnnie

17   Old School did?

18   A.   Yeah.  He was a motorcycle mechanic.

19   Q.   And inside of those tool boxes, what type of tools were in

20   there?

21   A.   Snap-On, Matco, KD.

22   Q.   Tools used to repair motorcycles?

23   A.   Yeah.

24   Q.   All right.  Is the sign, Devils Diciples Southern Arizona

25   Clubhouse, is that the sign we had seen in a previous

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

185

1    photograph?

2    A.   Must be, yeah.

3    Q.   Directing your attention to 11-105, is this all the same

4    room that you had described in the last two photos?

5    A.   Yes.

6    Q.   And is there a fireplace in this room?

7    A.   Yeah, right, right there, but there's a piece of the bar

8    missing.

9    Q.   And is this the room that the beatings occurred in?

10   A.   Yeah.

11   Q.   Where were you standing when you saw these members come

12   inside and you approached Holiday?

13   A.   Behind -- well, Holiday was right here and I was behind the

14   bar.

15   Q.   Okay.  And so from this point of view, being behind the bar

16   would mean to be on the opposite end of what's depicted as the

17   bar here?

18   A.   Yes.

19   Q.   Directing your attention to 11-106, can you describe what's

20   depicted in this photo?

21   A.   The fireplace and what you see from behind the bar looking

22   out.

23   Q.   Now, this bar, was it along one wall or more than one wall?

24   A.   No, it was -- it almost closed up -- well, you can't see it

25   on the previous picture.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  You could see it in the previous picture or you cannot?

2   A.  I can show you on the previous picture.

3          MS. MOHSIN:  11-105, please.

4          THE WITNESS:  Yeah.  Right here there used to be --

5   the bar would continue right up to the wall and there was an

6   opening with a hinge on it.

7

8   BY MS. MOHSIN:

9   Q.  Okay.  And was it fairly long, the distance between the

10  edge of the bar and that wall that has the 44 sign above it?

11  A.  Eight, nine feet.

12  Q.  So it extended from what's depicted as the bar all the way

13  out towards that sign that says 44, by eight or nine feet?

14  A.  Yeah.

15  Q.  And you were standing on the other side of that bar when

16  you saw these individuals first come into the clubhouse?

17  A.  Right.

18  Q.  All right.  Directing your attention to 11-107, can you

19  describe what's depicted in this photo?

20  A.  Yeah.  That's my old motorcycle, and the bathroom.

21  Q.  All right.  And is that also part of the common area or

22  it's --

23  A.  Pretty much, like the tool boxes that -- Johnnie's would

24  be right about here.  That might even be them in the shadow.

25  Q.  Okay.  Directing your attention to 11-108.

1    A.  Yeah.

2    Q.  Can you describe what's depicted here?

3    A.  Yeah.  I don't recognize the air compressor, but that's

4    Johnnie's tool boxes, that's my old bike.

5    Q.  Is that the bike that you referenced earlier?

6    A.  Yeah.

7    Q.  All right.  Did you get that bike back?

8    A.  No.

9    Q.  All right.  Directing your attention to 11-109, what is

10   that a picture of, sir?

11   A.  The same.

12   Q.  This is your old motorcycle?

13   A.  Yeah.

14   Q.  Okay.  Directing your attention to 11-110, is this another

15   view of the same room?

16   A.  Yeah.

17   Q.  And is this that third room you mentioned that was not

18   being used or is this another room?

19   A.  No, this is the one that had the pool table in it.

20   Q.  So in addition to the motorcycle that's depicted, the

21   compressor and the tool boxes, there is a pool table in this

22   room?

23   A.  It's not in there right now, but there used to be.

24   Q.  All right.  Directing your attention to 11-111, is there

25   another room leading off of this one?

1   A.  That, that's the porch, actually.  There's the pool table,

2   it looks like.

3   Q.  Can you show with the laser pointer where the porch is?

4   A.  Yeah.  That looks to me like the pool table with a mattress

5   on top of it.

6   Q.  Okay.  Directing your attention to 11-113.

7   A.  Yeah.

8   Q.  Is that what you were referring to?

9   A.  Yeah.  Exactly.

10  Q.  All right.  And 11-114, is this the condition of the

11  clubhouse when you last saw it?

12  A.  No.

13  Q.  Does it look different?

14  A.  Yeah.

15  Q.  Okay.  Were those mattresses on that pool table the last

16  time you were in there?

17  A.  No.

18  Q.  Okay.  Directing your attention to 11-112, do you know what

19  that is?

20  A.  No.  Must be the bathroom, that's what I would think.

21  Q.  Does it appear to be the bathroom?

22  A.  Yeah.  But it's all torn up.

23  Q.  Directing your attention to 11 -- I'm sorry -- 11-115, do

24  you recognize that room?

25  A.  That must -- no.  I don't know.

189

1   Q.  Okay.  Directing your attention to 11-116, do you recognize

2   that?

3   A.  Yeah, that's -- that's the bar when it's intact.  See,

4   there is the hinge piece.

5   Q.  Does that hinge piece appear to have been lifted up?

6   A.  Yeah.

7   Q.  All right.  And so is this the area behind the bar?

8   A.  Yeah.

9   Q.  All right.  And directing your attention to 11-117, what's

10  depicted in that photo?

11  A.  The same thing.

12  Q.  So when you say --

13  A.  But that's looking out the other way.

14  Q.  So when you say the same photo, is that the area behind the

15  bar?

16  A.  Yes.

17  Q.  And it's from an opposite direction?

18  A.  No, it's -- one is looking out toward the front and the

19  other one is looking to the side.

20  Q.  Of this L-shaped bar?

21  A.  Yeah.

22  Q.  Directing your attention to 11-118.

23  A.  And that's looking out the back.  That's the back porch.

24  Q.  So is the bar area directly accessible from the back porch?

25  A.  Yeah.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  And so this is also the bar area; is that correct?

2   A.  Yeah.

3   Q.  When you were knocked down and punched by Holiday, was

4   there anybody else back in this area at that time?

5   A.  Yeah.  Kickstand or Kick -- I don't know, he was a brand

6   new California brother.

7   Q.  Were there any other victims of the beating back there?

8   A.  No.

9   Q.  All right.  Did you know where Johnnie Old School was?

10  A.  No.

11  Q.  Did you know where Golf Clubs was?

12  A.  He was outside somewhere when it started.

13  Q.  And could you see where Panhead Mike was at that point?

14  A.  I didn't see him until it was almost over with.

15  Q.  And how about Two Dogs, could you see where he was?

16  A.  He was on the other side of the bar.

17  Q.  He was on the opposite side of the bar?

18  A.  Mh-hm.

19  Q.  All right.  Directing your attention to 11-119, do you

20  recognize that area?

21  A.  Yeah.

22  Q.  What is that area?

23  A.  That's toward the empty room behind, from behind the bar.

24  Q.  Okay.

25  A.  Actually, that 44 sign is over the door, I think, right

191

1    there, that you saw before.

2    Q.  And the previous photo that had the 44 sign on it?

3    A.  Yeah.

4         MS. MOHSIN:  All right.  Your Honor, at this time the

5    Government would move for the admission of proposed Exhibits

6    11-81 through 11-99, inclusive.

7         THE COURT:  Each is received without objection.

8       (Exhibits 11-81 through 11-99 received, 2:01 p.m.)

9         MS. MOHSIN:  And 11-101 through 11-119, inclusive.

10         THE COURT:  Each is received.

11       (Exhibits 11-101 through 11-119 received, 2:01 p.m.)

12    BY MS. MOHSIN:

13    Q.  I want to direct your attention now to proposed Government

14    Exhibit 11-144.  Tell me if you recognize this person.

15    A.  That's Dean.

16    Q.  Dean.  Was he a member of the Southern Arizona Chapter of

17    the Devils Diciples?

18    A.  Yeah.

19    Q.  And was he there on August -- excuse me -- April 27 of

20    2003?

21    A.  Yes.

22    Q.  Directing your attention to 11-146, do you recognize that

23    individual?

24    A.  Yeah.

25    Q.  Who is that?

1   A.   Cuz.

2   Q.   And this is the same Cuz that was also a member of that

3   chapter, correct?

4   A.   Right.

5   Q.   Directing your attention to 11-150, do you recognize that

6   individual?

7   A.   Huevos.

8   Q.   Huevos?

9   A.   Mh-hm.

10  Q.   And was he a member of the Southern Arizona Chapter?

11  A.   Yeah.

12  Q.   And did he drive in the vehicle with Cuz in the previous

13  picture when you drove to the desert?

14  A.   Yes.

15  Q.   Yes?

16  A.   Mh-hm.  Yes.

17  Q.   Thank you.

18       Directing your attention to 11-153, do you recognize

19  the person depicted in that photo?

20  A.   Yeah.  That's my stepdaughter Tracy.

21  Q.   And directing your attention to 11-155, do you recognize

22  the person depicted in that photo?

23  A.   That's my wife.

24  Q.   Is that your wife Terry?

25  A.   Yes.  Yeah.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1  Q.  Okay.  I want to direct your attention --

2          MS. MOHSIN:  I'm sorry, at this time, your Honor, the

3  Government would move for the admission of proposed Exhibits

4  11-144, 146, 150, 153 and 155.

5          THE COURT:  Without objection, each is received.

6          MS. MOHSIN:  Thank you, your Honor.

7      (Exhibits 11-144, 146, 150, 153, 155 received, 2:01 p.m.)

8  BY MS. MOHSIN:

9  Q.  I want to direct your attention now to some of the

10 individuals that you have talked about.

11         Directing your attention to proposed exhibit -- I'm

12 sorry an admitted exhibit.  This is a previously admitted

13 Exhibit 11-234.  Do you recognize anyone in that photo?

14 A.  Little John.  I recognize some people.  I can't put a name

15 to them.

16 Q.  Which one is Little John?

17 A.  Right there (indicating).

18 Q.  All right.  Now, directing your attention to 11-236, do you

19 recognize that individual?

20 A.  I'm not sure.

21 Q.  All right.  Directing your attention to 11-238.

22 A.  That's Fast Eddie.

23 Q.  Fast Eddie?

24 A.  Mh-hm.

25 Q.  And was he a member of the Devils Diciples?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

194

1   A.  Yeah.

2   Q.  Do you recognize where these photos were taken?

3   A.  No.

4   Q.  Okay.  Directing your attention to 11-239.

5   A.  That's Cuz.

6   Q.  Can you speak up, sir, please?

7   A.  Cuz.

8   Q.  Okay.  Thank you.

9         And directing your attention to 11-240, do you

10  recognize this individual?

11  A.  That would be Pauli.

12  Q.  I'm sorry?

13  A.  Pauli.

14  Q.  Thank you.

15        I want to direct your attention now to admitted

16  Exhibit 12-30.  Do you recognize anyone in that photo?

17  A.  Yes.  Sly, Fat Dog and Fast Eddie.

18  Q.  And when you say Sly, which one is Sly?

19  A.  On the left.

20  Q.  And who is the individual in the center?

21  A.  I believe that's Fat Dog.

22  Q.  All right.  You can turn that monitor if you are having

23  trouble seeing it at all or you can look at the other screen.

24  A.  It's all right.

25  Q.  All right.  Who is the person on the right?

```
 1   A.  Eddy.

 2   Q.  Fast Eddie?

 3   A.  Mh-hm.

 4   Q.  Directing your attention to 13-53.

 5   A.  I think that's -- in the center is Dog and then that's

 6   Detroit Red, I believe.

 7   Q.  Which one is Detroit Red?

 8   A.  On the right.

 9   Q.  And which one is Dog?

10   A.  In the center.

11   Q.  Directing your attention to 13-454, do you recognize anyone

12   in that photo?

13   A.  Yeah.

14   Q.  Do you want to use the laser pointer?

15   A.  Yeah.  I'm working at it.

16         That's Pauli.  That's Grog, I believe.  Fat Dog.

17         THE COURT:  Speak into the microphone, sir, as best

18   you can.

19         THE WITNESS:  And that's Holiday.

20   BY MS. MOHSIN:

21   Q.  All right.  You have identified Pauli, Holiday, Grog, and

22   who else?

23   A.  Fat Dog.

24   Q.  All right.

25   A.  That might be Little Dog in the far back.  I can't tell.
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - DIRECT BY MS. MOHSIN

1   Q.  Now, I want to direct your attention to 13-77, an admitted

2   exhibit.  Do you recognize anyone in that photo?

3   A.  Yeah.

4   Q.  Who do you recognize?

5   A.  Fangers, Little Dog, and Fat Dog.

6   Q.  Can you identify those three with the laser pointer,

7   please?

8   A.  Yes.  That's Fat Dog, Little Dog and Fangers, I believe.

9   Q.  Okay.  I'm going to show you what's been marked and

10  admitted as 11-263.  Do you recognize the person depicted in

11  this photo?

12  A.  Holiday.

13  Q.  I'm sorry, I can't --

14  A.  Holiday, yes.

15  Q.  Thank you.

16      And do you recognize the person in this photo?

17  A.  Looks like String Bean.

18  Q.  Sir, now, after the assault at the clubhouse you said that

19  you had been taken to the hospital and you had suffered some

20  injuries.  I'm going to show you some photos and ask you if you

21  can identify them and describe some items from them.

22      Directing your attention to 11-35 in evidence, I'm

23  going to ask if you could display that, please.

24      Sir, do you recognize that individual?

25  A.  I think that's Johnnie.

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

1    Q.  And Johnnie Old School?

2    A.  Yeah.

3    Q.  And sir, can you represent whether you have seen him look

4    like that before?

5    A.  What do you mean?

6    Q.  Do you recognize that photo; when it was taken or around

7    the time it was taken?

8    A.  Yeah.  It would have been at the hospital.

9    Q.  Okay.  And is that what he looked like after the beating?

10   A.  Yeah.

11   Q.  Okay.  Directing your attention to 11-37, can you identify

12   that individual?

13   A.  That's Johnnie.

14   Q.  Okay.  Johnnie Old School?

15   A.  Yes.

16   Q.  All right.  Is that another view of him?

17   A.  Mh-hm.

18   Q.  Directing your attention, sir, to 11-56, which is an

19   admitted exhibit, do you recognize that?

20   A.  Yeah.  That's me.

21   Q.  Is that you?

22   A.  I think so.

23   Q.  I'm going to show you the photo close up.

24   A.  Oh, that's Two Dogs, maybe.

25   Q.  Do you recognize it?

1   A.   Is that Two Dogs?  I can't -- I'm not sure.

2   Q.   Can't recognize it?

3   A.   No.

4   Q.   All right.  I'm going to show you another photo, 11-49.

5   A.   That's Two Dogs.

6   Q.   Do you recognize 11-49?

7   A.   Yeah.  That's me.

8   Q.   I'm sorry, I messed up the number.  I'm sorry.  69, 11-69.

9   Do you recognize the person in this photo?

10  A.   That's Two Dogs.

11  Q.   That's Two Dogs?

12  A.   Mh-hm.

13  Q.   And he was with you in the Canyon, as well?

14  A.   Yes, he was.

15  Q.   Okay.  Directing your attention now to 11-44, do you

16  recognize that?

17  A.   Yeah.  That's me.

18  Q.   That's you?  All right.  And is that taken at the hospital?

19  A.   Yes.

20  Q.   Okay.  Which one of your eyes, which of your eyes was --

21  and cheek was broken?

22  A.   The other side.

23  Q.   The side that's not showing in that picture?

24  A.   Mh-hm.

25  Q.   And you had indicated that the firearm had gone off?

1    A.  It's all on the other side.

2    Q.  It occurred on the other side of your face?

3    A.  Mh-hm.

4    Q.  So that is not depicted in this photo?

5    A.  No.

6    Q.  Directing your attention to 11-45, do you recognize that?

7    A.  Yeah.

8    Q.  Is that -- who is that?

9    A.  That's me.

10   Q.  Okay.  Is that your tattoo?

11   A.  Yeah.

12   Q.  Directing your attention to 11-46, can you describe that

13   injury you have in that photo?

14   A.  Just banged up.

15   Q.  Okay.  And that's you?

16   A.  Yeah.

17   Q.  Directing your attention to 11-47, who is depicted in this

18   photo?

19   A.  That might also be me.  I think it is.

20   Q.  All right.  And was there --

21   A.  Yeah, it is.  I can see the tattoo.

22   Q.  Was there an injury in your elbow there on your left arm?

23   A.  Yeah.

24   Q.  Okay.  And what type of injury was that?

25   A.  I don't know.  That might have got caused when I went down

1    the side of that mountain.

2    Q.  Okay.  It was a cut of some kind?

3    A.  A big bruise, yeah.

4    Q.  Directing your attention to 11-48, do you recognize that?

5    A.  Yeah.  That's me.

6    Q.  Okay.  Directing your attention to 11-49, is that -- what's

7    that a picture of?

8    A.  Yeah, the other elbow, I guess.

9    Q.  Your other arm?

10   A.  Yeah.  I don't know what they were taking the pictures for.

11   Q.  Directing your attention to 11-50, what is that a picture

12   of, do you know?

13   A.  Yeah.  My legs.

14   Q.  Now, in this particular image can you describe what's being

15   shown?

16   A.  Like the bottom of this leg and your feet.

17   Q.  Okay.  Now, directing your attention to 11-51?

18   A.  Same.

19   Q.  That's the same, just a different view of your legs?

20   A.  Yeah.

21        MS. MOHSIN:  All right.  Your Honor, at this time the

22   Government would move for the admission of the following

23   exhibits:  11-37, 11-69, and then 11-44 through 11-51

24   inclusive.

25        MS. STOUT:  No objection.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1          THE COURT:  Each is received.

2      (Exhibits 11-37, 69, 44 through 51 received, 2:01 p.m.)

3          MS. MOHSIN:  One moment, please.

4      (Discussion held off the record at 2:16 p.m.)

5          MS. MOHSIN:  Your Honor, the Government has no further

6   questions of Mr. Higgins.  I just want to make sure that I

7   moved for the admission of two additional exhibits, 11-81 and

8   82.  I don't recall if I did or did not.

9          THE COURT:  81 and 82 are both received.

10         MS. MOHSIN:  Thank you, your Honor.

11         Thank you, Mr. Higgins.

12         THE COURT:  I should say they have previously been

13  moved and received.

14         MS. MOHSIN:  Yes, your Honor.

15         THE COURT:  Cross examination, then?

16         MS. STOUT:  Yes, your Honor.

17         THE COURT:  Ms. Stout.

18                          CROSS-EXAMINATION

19  BY MS. STOUT:

20  Q.  Good afternoon.

21         Mr. Higgins, since the incidents that you have been

22  testifying about, you have had many discussions with various

23  law enforcement agencies, correct?

24  A.  I wouldn't say that, no.

25  Q.  Well, is it true that you spoke with the police in 2003

```
 1   following what we will call the Box Canyon incident?

 2   A.  You mean at the hospital?

 3   Q.  The hospital.

 4   A.  Yeah.

 5   Q.  Okay.  You also had a lengthy conversation, isn't it true,

 6   sir, with a Pima County correctional officer when you were

 7   in the jail for the Heather Ford rape in November -- on

 8   November 17, 2004?

 9        MS. MOHSIN:  Objection.  Assumes facts not in

10   evidence, your Honor.

11        THE COURT:  Well, I think it's an open-ended question.

12   I don't think it impermissibly suggests.

13        MS. STOUT:  Thank you, your Honor.

14        THE WITNESS:  You said with a female deputy?

15   BY MS. STOUT:

16   Q.  No, not a female.  A correctional officer at the Pima --

17   or deputy, they might call him, at the Pima County Jail in

18   November, you took a letter to him; is that accurate?

19   A.  Yes.  Yes.  That is correct.

20   Q.  And you had a lengthy conversation, didn't you?

21   A.  Yes.

22   Q.  Did they tell you they were taping you?

23   A.  No.

24   Q.  You also testified before the grand jury?

25   A.  That's right.
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   Q.  In this building?

2   A.  Yes.

3   Q.  And that was in October of 2010?

4   A.  Yes.

5   Q.  Now, you have already told us that you weren't truthful

6   with the police at -- following the Box Canyon incident?

7   A.  That's correct.

8   Q.  But I'm going to assume you were truthful with the

9   correctional officer and the grand jury, is that accurate?

10  A.  Correct.

11  Q.  Now, when you testified before the grand jury in October of

12  2010 you had already been charged with the incident involving

13  Heather Ford?

14  A.  And sentenced.

15  Q.  And sentenced.  Okay.

16          You were on probation at the time, then?

17  A.  Almost finished with it.

18  Q.  Almost -- excuse me, almost had completed your sentence?

19  A.  Yes.

20  Q.  Okay.  And you were told when you testified before the

21  grand jury here that you weren't a target of the investigation

22  of the Devils Diciples Motorcycle Club going on before the

23  grand jury at that time, correct?

24  A.  I believe that's correct.

25  Q.  Okay.  And you understood that to mean you weren't going to

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

204

1   be charged, as far as you knew?

2   A.  I already had been.

3   Q.  Charged with the incidents -- the investigation that they

4   were discussing before the grand jury in 2010, racketeering.

5   A.  Correct.

6   Q.  All right.  Now, when you were prosecuted for the sexual

7   assault of Ms. Ford, you spoke with the probation officer,

8   correct?

9   A.  From the jail, yes.

10  Q.  Okay.  Because probation officers write reports about

11  defendants that are going to be sentenced; is that accurate?

12  A.  I don't have any idea.

13  Q.  But you do remember speaking to a probation officer?

14  A.  Who are you referring to?

15  Q.  You just indicated you spoke with a probation officer in

16  the jail.

17  A.  The correction officer, yes.

18  Q.  Okay.

19  A.  I spoke to Pretrial Services and I spoke to my Probation

20  Officer after I had been locked up for about 20 months.

21  Q.  Okay.  And they asked questions.  She asked you -- he or

22  she asked you questions about the Devils Diciples Motorcycle

23  Club?

24  A.  Which person are we talking about?

25  Q.  Before you were sentenced for the Heather Ford incident,

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   there was a presentence report written?

2   A.  Okay.

3   Q.  Is that accurate, sir?

4   A.  Yes, there is.

5   Q.  And the purpose of that is to provide the Judge, whoever is

6   going to sentence you in Arizona on the Heather Ford incident,

7   with information about you; is that accurate?

8   A.  No.  You're talking about Pretrial Services?  That was

9   before I was even charged officially.

10  Q.  Would it refresh your recollection to look at a document,

11  sir?

12  A.  Certainly.

13          MS. STOUT:  Thank you.  May I approach, your Honor?

14          THE COURT:  Yes.

15          MS. STOUT:  Thank you.

16          THE WITNESS:  I just want to make sure we're talking

17  about the same person.

18  BY MS. STOUT:

19  Q.  Of course.  Just take a look at that document for a moment.

20  A.  Okay.  That's Pretrial Services.

21  Q.  You were interviewed for this report; is that accurate?

22  A.  On a couple of times, I think, yes.

23  Q.  Thank you.

24          And at that time you indicated to Pretrial or

25  Probation that there was no real national organization of the

1   Devils Diciples; is that true?

2   A.   I couldn't answer that.

3   Q.   Well, why couldn't you answer that?

4   A.   In what -- I just don't remember, that simple.

5   Q.   Well, could I refresh your recollection by showing you the

6   report and what was written?

7   A.   I don't have any objection to that.

8   Q.   Well, thank you.

9   A.   I don't think I have ever read that report, either.

10  Q.   You have a constitutional right to read your report before

11  sentencing.

12  A.   I'm well aware of that.

13          MS. MOHSIN:  Objection, your Honor.  Assumes facts not

14  in evidence.

15          THE COURT:  I agree with that.  Let's have questions

16  and answers as opposed to statements, Ms. Stout.

17  BY MS. STOUT:

18  Q.   Would it refresh your recollection to look at this report

19  of what you said to a law enforcement officer; yes or no?

20  A.   Yeah.  Since I don't remember it, it would obviously help

21  me.

22  Q.   Thank you, sir.

23          I'm just going to direct you to this paragraph here

24  and look at it.  Read it to yourself, not out loud?

25  A.   Yeah, I agree with that.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   Q.  Thank you, sir.

2           So this refreshes your recollection?

3   A.  I have never seen that paper, so it -- you know, I --

4           THE COURT:  The question now becomes whether --

5           MS. STOUT:  Is it -- I'll ask --

6           THE COURT:  The question now becomes whether, having

7   read whatever that was, if the witness now has an independent

8   recollection irrespective of what may have been written on the

9   page, an independent recollection on the substance of whatever

10  the question is that's coming up now.  And the question is

11  what?

12  BY MS. STOUT:

13  Q.  Is it true, then, that Devils Diciples didn't have a real

14  national organization?

15  A.  As a criminal organization?

16  Q.  Yes.

17  A.  Yes, that is true.

18  Q.  And isn't it also true, sir, that chapters of the Devils

19  Diciples in different states had different rules?

20  A.  Not that I'm aware of, but that's possible, I suppose, some

21  of them added to the bylaws.  We didn't.

22  Q.  So there was bylaws --

23  A.  Mh-hm.

24  Q.  -- as you understood, a one-page set of bylaws that pretty

25  much you thought everybody abided by?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

208

1   A.  That's correct.

2   Q.  All right.  But when -- would you agree with me that as far

3   as what Michigan did, and maybe California or Arizona, things

4   were done somewhat differently among those different chapters?

5   A.  I can't really answer that.

6   Q.  But you answered it before the grand jury, so I think you

7   can answer it now.

8           Sir, was it your testimony before the grand jury:

9           Answer:  Just because it's different, as far away from

10  Michigan as we were, California and Arizona, and being here in

11  Michigan directly under that, I mean, things were different.

12          MS. MOHSIN:  Can I have a page number, please?

13          MS. STOUT:  That is page 86 of the grand jury

14  transcript.

15          MS. MOHSIN:  Thank you.

16  BY MS. STOUT:

17  Q.  Was that your testimony, sir?

18  A.  Yes, it was.

19  Q.  And you were sworn to tell the truth when you gave that

20  testimony?

21  A.  And I certainly was telling the truth.

22  Q.  And did you give the truth, sir?

23  A.  Yes.

24  Q.  Thank you.

25          Now, when you joined, you said you joined the Devils

1   Diciples in approximately 1993?

2   A.  Yeah, about that time.

3   Q.  About that.  Okay.  And at that time you agreed to give

4   your bike to the club; isn't that accurate?

5   A.  That is quite accurate.

6   Q.  All right.  As a matter of fact, sir, you believed that was

7   a condition of getting into the club --

8   A.  Right.

9   Q.  -- that you actually gave the title to the club.  It was

10  understood that it belonged to them?

11  A.  We did not actually give the title to it, but yes, I -- you

12  don't hear any objection to me.  I have not tried to get the

13  bike back, you know.  I know who has it.

14  Q.  Thank you, sir.

15  A.  You know, it said property of Devils Diciples right on it.

16  Q.  And when you joined, you also indicated to one -- during

17  one of those interviews that you were not in the -- you were

18  not joining to steal motorcycles, right?

19  A.  Correct.

20  Q.  All right.  Now, you said on direct that you lived in the

21  trailer behind the clubhouse in Arizona?

22  A.  For about the last six months, yes.

23  Q.  All right.  And let's move to the Heather Ford incident.

24          You testified both here and before the grand jury that

25  you were directed to the clubhouse by your wife?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   A.  Correct.

2   Q.  All right.  And that would be Tracy Way?

3   A.  No, that's my stepdaughter.  Terry Wayman.

4   Q.  Terry Way?

5   A.  Wayman.

6   Q.  Wayman.  Thank you, sir.

7          Now, when you testified today, I believe, that when

8   you went into the club you noticed that Heather Ford had a

9   broken finger.

10  A.  Mh-hm.

11  Q.  And no other injuries; is that correct?

12  A.  That's how it appeared to me at that time, yes.

13  Q.  All right.  Now, when you were arrested for that incident

14  in 2004, it was what, about a year after the incident that you

15  were arrested?

16  A.  Yes.  About that.

17  Q.  And you were incarcerated at Pima County Jail?

18  A.  Yes.

19  Q.  And when you talked to that correctional officer about the

20  letter --

21  A.  Mh-hm.

22  Q.  -- let's clarify that.  You went to the correctional

23  officer because you felt your wife had received a letter or

24  that she --

25  A.  She was being actively threatened.

211

1   Q.  And you believed that was by Cuz?

2   A.  That's what she said in the letter.  I think that's a

3   matter of record.

4   Q.  So you wanted the correctional officers to know that, or

5   law enforcement, in general?

6   A.  Right.

7   Q.  And that's why you went to them?

8   A.  Correct.

9   Q.  Okay.  And you also then continued to talk to the

10  correctional officer and you discussed the Heather Ford

11  incident with him, didn't you?

12  A.  I don't remember.  I only saw him once.

13  Q.  Right.  But you had a lengthy conversation with him that

14  one time?

15  A.  Yeah.

16  Q.  Now, you had told him, too, that you didn't feel you did

17  anything wrong as a Devils Diciple or as a human; is that fair?

18  A.  Uh, I don't know that I would agree with that, but if

19  that's what I said, that's what I said.

20  Q.  Well, it was only a year after the incident, right?

21  A.  Yeah.

22  Q.  Yes?

23  A.  Yes.

24  Q.  Well, if you don't speak loud, the court reporter can't

25  hear you and I can't hear you, so thank you.

1    A.  All right.

2    Q.  You also told him that Ms. Ford stole over $1,000 from the

3    Devils Diciples, right?

4    A.  Yes.

5    Q.  You also told him that that girl is no innocent, either,

6    right?

7    A.  Correct.

8    Q.  Now, you indicated to that correction officer, "Half the

9    marks she already had on her from Ringo."  Is that accurate?

10   A.  I couldn't tell you.

11   Q.  Well, who is Ringo?

12   A.  Her -- I believe we discussed him earlier in here.  He was

13   a body -- or a stuntman and he was at one time engaged to her.

14   Q.  So what marks were on her body?

15   A.  I really couldn't say.  I know that her hand was injured.

16   Her and Tina Butts had been fighting, so that her face was

17   probably -- I cannot honestly remember.

18   Q.  You indicated to the correctional officer that half of them

19   were from her boyfriend?

20   A.  Yeah.

21   Q.  How did you know that?

22   A.  I was not thinking very clearly at that point.  I had been

23   up all night and I was worried about Angel.

24   Q.  So you just made that up?

25   A.  I didn't say that.  I said I don't recollect what I said.

 1   You said that.

 2   Q.  Would it refresh your recollection to view that

 3   conversation?

 4   A.  You may do what you want.  I don't remember it, so how is

 5   that going to recollect it?

 6          MS. STOUT:  Judge, may we approach?

 7          THE COURT:  Yes, you may approach.

 8          MS. STOUT:  Thank you.

 9          THE COURT:  You mean the witness?

10          MS. STOUT:  Your Honor, there is a CD that we received

11   on Thursday -- Tuesday or Wednesday, I'm sorry -- and to

12   refresh recollection you don't play those things before the

13   jury, so I am not sure how I can refresh his recollection about

14   things he said that are material, if I can't -- without him

15   seeing it, so I -- that's my concern.

16          THE COURT:  I'm not sure that -- well, you think you

17   have a basis to refresh recollection or just to introduce what

18   you -- what relates to the prior inconsistent statements or

19   past memory recorded or some other mechanism?

20          MS. STOUT:  Well, I could do it in another way, your

21   Honor, but I was doing it in recollection and he denies

22   recalling it.

23          THE COURT:  Why don't you consult briefly with

24   Ms. Mohsin and see if there's an agreement.

25          MS. STOUT:  All right.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1          THE COURT:  Stretch your legs.

2      (Discussion off the record between Counsel at 2:32 p.m.)

3          THE COURT:  Let's come back to order.

4          MS. STOUT:  Thank you, your Honor.

5          THE COURT:  Ready to proceed?

6          MS. STOUT:  I think I can rephrase the question and

7  maybe clean this up.

8          THE COURT:  All right.  Very well.

9  BY MS. STOUT:

10  Q.  Sir, Mr. Higgins, you're aware that Ringo beat Ms. Ford or

11  something?

12  A.  Most of the women that he was involved with.  Most of

13  the --

14  Q.  But I didn't ask about most women.  I asked about Ms. Ford.

15  A.  No, I am not.

16  Q.  So when you told the correctional officer that half the

17  marks on her body were associated with Ringo, you were just

18  making that up?

19  A.  I don't know what I was thinking at the time.  Like I said,

20  I was --

21  Q.  Did she have marks on her body when you walked into the

22  room?

23          THE COURT:  Please allow him to conclude.  He was

24  saying something else when you began another question,

25  Ms. Stout.  Please allow a conclusion to that, if he wishes to.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1           THE WITNESS:  That's all right.

2           THE COURT:  Go ahead, Ms. Stout.

3    BY MS. STOUT:

4    Q.  When you walked into the clubhouse pursuant to your wife's

5    request, something bad was happening, were there marks on

6    Ms. Ford's body?

7    A.  I could not tell you what they were, if there were.  There

8    probably was, you know.  I mean, I didn't spend a lot of time

9    in there.

10   Q.  Were there marks from jumper cables?

11   A.  I don't know.

12   Q.  Did you see any jumper cables?

13   A.  I can't say that I did.  I know there were tasers there.

14   Q.  How many?

15   A.  Quite a few.

16   Q.  Were there marks from tasers?

17   A.  I didn't see any.  I don't think tasers leave marks.  I

18   mean, I didn't have any.

19   Q.  Okay.  Whose tasers were they?

20   A.  Dean worked for United Cutlery and he brought them there.

21   Crossbows, tasers.  A lot them were broken and Golf Clubs fixed

22   them.

23   Q.  So they were at the clubhouse?

24   A.  Yeah.

25   Q.  Tasers?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1    A.   Mh-hm.

2    Q.   And you saw them out when Heather Ford was in the

3    clubhouse?

4    A.   No, I didn't say that, but when I talked to them

5    afterwards, Golf Clubs admitted to having used one on her.

6    Q.   Did he acknowledge using jumper cables on her nipples?

7    A.   No.

8    Q.   No?

9    A.   No.

10   Q.   How about the hose?

11   A.   What hose?

12   Q.   Oh, you're not aware of a hose that was used on this poor

13   woman?

14   A.   No, I'm not.

15   Q.   Could she walk?

16   A.   Yes.

17   Q.   She was naked, right?

18   A.   Not for very long after I got called in there, but --

19   Q.   Well, you got called out --

20   A.   When I came in there, she was naked, yes.

21   Q.   Stark naked?

22   A.   That's --

23   Q.   And how many men were standing around her?

24   A.   Two.

25   Q.   Who?

1   A.   Johnnie and -- no, Two Dogs, that's three.  Three of them.

2   Q.   I'm sorry, Johnnie?

3   A.   Two Dogs.

4   Q.   Two Dogs?

5   A.   And Golf Clubs.

6   Q.   I'm sorry?

7   A.   And Golf Clubs.

8   Q.   And Golf Clubs?

9   A.   Mh-hm.

10  Q.   All right.

11  A.   And Tina Butts and some other woman that I don't know the

12  name of.

13  Q.   Okay.  And when you walked in on this scene, you got a

14  phone call, is that what --

15  A.   Yes.

16  Q.   So you walked out to take the call?

17  A.   I already took the phone call inside.  I couldn't hear what

18  Panhead was saying.

19  Q.   So you don't know what continued to happen to this woman

20  when you took the phone call?

21  A.   No.

22  Q.   Now, did you hang up that phone call and then call the

23  police?

24  A.   No, I did not.

25  Q.   Did you call them later that day?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1    A.   No.

2    Q.   Call them the next day?

3    A.   No.  I didn't call them at all.

4    Q.   Did you call them when you learned she was raped and

5    sodomized?

6    A.   I don't believe that she was raped or sodomized.

7    Q.   Did you call them when you learned she was tasered?

8    A.   No.  I told you, just told you, I did not call them.

9    Q.   Thank you.

10   A.   You're welcome.

11   Q.   Now, when you learned about this incident to Heather Ford,

12   did you throw Two Dogs out of your club?

13   A.   No.

14   Q.   Did you throw Johnnie Old School out of your club?

15   A.   No, I did not.

16   Q.   Did you throw Golf Clubs out of your club?

17   A.   No.

18   Q.   Now, you testified that you -- or did you testify that you

19   stopped some action that was going on when you walked in?

20   A.   Yeah.  She testified that, also.

21   Q.   Who is she?

22   A.   Heather Ford.

23   Q.   That you did what?

24   A.   That I came in and stopped it.

25   Q.   Stopped what?

1   A.   The incident.

2   Q.   Did you hear her testify?

3   A.   It was in my paperwork.

4   Q.   Well, when you say -- what did you stop?  Because you said

5   she wasn't raped or sodomized or jumper cabled or --

6   A.   I didn't say that she wasn't hit or tasered.

7   Q.   Okay.  Was she duct taped?

8   A.   Maybe.  I don't remember.  I mean, it's been a long time.

9   Q.   You don't remember if she was duct taped?

10  A.   I don't.

11  Q.   But you remember an awful lot about what happened to you,

12  don't you?

13  A.   Not -- I don't remember a lot that happened to me.

14  Q.   Now let's talk about Box Canyon that followed the, I guess,

15  alleged rape of Heather Ford.

16       Let's back up.  You were -- weren't you charged with

17  sodomy and rape?

18  A.   No, I was not.

19  Q.   You were charged with sexual assault?

20  A.   No.  I was charged with kidnapping.

21  Q.   That's what you pled guilty to.

22  A.   Right.  Right.

23  Q.   But what were you charged with, sir?

24  A.   Oh, I couldn't tell you.  I was probably charged with the

25  children, too, and they weren't -- I never even saw them.  I

1  was charged with conspiracy of first degree murder for someone

2  that never was killed.

3  Q.  So you're just an innocent?

4  A.  I'm not innocent.  I -- I am obviously guilty.  I did seven

5  years total.

6  Q.  So what you pled to and what you were charged with are two

7  different things?

8  A.  Isn't -- yeah, that's generally what happens when you

9  plead.

10  Q.  You made a plea bargain.

11  A.  The advice of my lawyer, that's what I did.

12  Q.  You did.  So you got lesser charged than when what the

13  allegations and charges were.

14  A.  Actually, I got additional charges.

15  Q.  Oh, did you?

16  A.  Yeah.

17  Q.  That's not a very good lawyer.

18          MS. MOHSIN:  Objection, your Honor.

19          THE COURT:  Ms. Stout, let's not have editorials.

20          MS. STOUT:  Sorry.

21          THE COURT:  Shall we, please?

22          MS. STOUT:  Okay.

23          THE COURT:  Let's ask questions.

24  BY MS. STOUT:

25  Q.  So at the church meeting on Sunday following the rape of

1  Heather Ford --

2          MS. MOHSIN:  Objection as to the characterization.

3  The witness has repeatedly said he was neither charged with it,

4  nor did he witness it.

5          THE COURT:  I will invite counsel to rephrase, at

6  least moderately, please.

7          MS. STOUT:  All right.

8  BY MS. STOUT:

9  Q.  The alleged rape of Ms. Ford.  So your main concern was

10 just that she might have been hit and tasered and she had a

11 broken finger?

12 A.  My concern was that it happened at all.

13 Q.  Okay.  You said that in the clubhouse you saw my client,

14 Mr. Witort; is that true or not true?

15 A.  Who?

16 Q.  Holiday?

17 A.  Yes, that's true.

18 Q.  And you said you went to hug him?

19 A.  I cared very much for that man.

20 Q.  You cared very much for him, is that what you said?

21 A.  That's what I said.

22 Q.  He was good to you, a friend?

23 A.  Good one.

24 Q.  And you said that because of the alleged rape of Heather

25 Ford you wouldn't be surprised if you got a black eye.

```
1    A.   That's correct.

2    Q.   Did you testify that -- I think I heard you testify that

3    Mr. -- or Holiday, as you know him, correct --

4    A.   Mh-hm.

5    Q.   -- had tears in his eyes?

6    A.   That's correct.

7    Q.   Did you -- what did you take that to mean, he didn't want

8    to hurt you?

9    A.   I don't know what it meant.  I just stated the fact.

10   Q.   Do you know him as a gentle giant?

11   A.   I don't know if I would call him that, but I know -- I knew

12   him as a brother.

13   Q.   You knew him as a kind man?

14   A.   I don't know how to answer that.

15   Q.   And now after you said that you were hit by Holiday, you

16   were then hit by a pistol?

17   A.   Yes.

18   Q.   And you didn't know who hit you with that pistol, right?

19   A.   I do not, no, know who did that.

20   Q.   And you also told the grand jury that you're not sure if

21   your damage to your eye socket or cheek was because of that

22   pistol or not?

23   A.   Correct.

24   Q.   And you then remember -- but you know that the pistol that

25   you were hit with wasn't by Holiday?
```

1   A.  No.

2   Q.  All right.  And then you remember somebody named Kickstart

3   holding a gun at you?

4   A.  At -- when I was on the floor, yeah, because I started to

5   get up.

6   Q.  And you said you were tasered like Heather Ford was?

7   A.  Yeah.

8   Q.  And you don't know who tasered you?

9   A.  No.

10  Q.  You have no idea?

11  A.  I was face-down.

12  Q.  And you said you were zip-tied?

13  A.  Mh-hm.

14  Q.  And you have no idea who did that either?

15  A.  No.

16  Q.  Now, you said Cuz.  What's Cuz's real name?

17  A.  Lowell.

18  Q.  Lowell?

19  A.  Yes.

20  Q.  And he had a bat?

21  A.  Yes.

22  Q.  All right.  And you said that Mack Tonight?

23  A.  Mh-hm.

24  Q.  Is that his club name?

25  A.  Yes.

1  Q.  He had cigarettes that he was putting out on you?

2  A.  Yeah.

3  Q.  Now, you testified before the grand jury that Cuz and

4  Little John were in charge of this event?

5  A.  Okay.

6  Q.  Correct?

7  A.  I don't recall, but that's the way it was.

8  Q.  That they were in charge of this event, you're saying?

9  A.  Yes.

10  Q.  And Cuz is in what role with the Devils Diciples?

11  A.  He was vice president of the Tucson chapter.

12  Q.  So he was a colleague, so to speak, of yours?

13  A.  From the same chapter.

14  Q.  And you said that Little John was from LA?

15  A.  Correct.  Hollywood.

16  Q.  Hollywood chapter.  And he was a boss there?

17  A.  Mh-hm.

18  Q.  Now, Cuz or Lowell owned the property that your clubhouse

19  was on?

20  A.  Correct.  Or the whole thing, actually.  I mean, the

21  property and the building weren't separate.

22  Q.  And you said about what, three acres, I think you said?

23  A.  Yeah.

24  Q.  Now, he wanted to sell the property, right?

25  A.  We looked into it.  We got an appraisal.  Yes, he did want

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   to sell it.

2   Q.  And it was worth a lot more than what he paid for it,

3   right?

4   A.  Yes.

5   Q.  Was it appraised at almost 250,000?

6   A.  I'm not sure exactly what it was, but it was about that.

7   Q.  Now, was that -- part of the reason was, there was wells on

8   the property?

9   A.  Correct.

10  Q.  And that's water, like --

11  A.  Nine of them.

12  Q.  Dig down and get water, is that what you mean by wells?

13  A.  Yes.

14  Q.  And that's really valuable in Arizona, isn't it?

15  A.  They won't issue any permits, they haven't for a long time,

16  so you can't -- you have to buy city water as opposed to having

17  your own.

18  Q.  Certainly there's a hope that they will need that water in

19  Arizona?

20  A.  It just saves you a lot of money.

21  Q.  Okay.  So he wanted to sell this because it was worth so

22  much money, but not everybody else did; is that correct?

23  A.  Yeah.

24  Q.  All right.  You didn't want to sell it, did you?

25  A.  I was concerned that he was near to filing bankruptcy and

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

226

```
 1   it could be lost that way.  No, I really didn't want to sell

 2   it or -- you know, we did go look for other property.

 3   Q.  So is it fair to say, then, that everybody in the club

 4   didn't agree that it should be sold?

 5   A.  Right.

 6   Q.  And Cuz had serious financial problems and wanted to sell

 7   it?

 8   A.  Right.

 9   Q.  Because he was going to go bankrupt perhaps?

10   A.  Yeah.

11   Q.  True?

12   A.  True.

13          THE COURT:  Are you going to wrap up in just a few

14   minutes or shall we take our afternoon recess?

15          MS. STOUT:  We can take a recess, your Honor.  Thank

16   you.

17          THE COURT:  Twenty-minute recess.  We will resume at

18   ten past the hour, ladies and gentlemen.

19      (Jury out, 2:49 p.m.)

20      (Recess taken, 2:49 p.m. - 3:18 p.m.)

21          THE CLERK:  All rise.  Court is back in session.

22          THE COURT:  Let's call the jury in.

23          THE CLERK:  They have a side bar matter.

24          MS. STOUT:  Just one issue, your Honor, outside the

25   presence of the jury.
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1           THE COURT:  Well, hold on there a moment with the

2      jury.  Yes, be seated.

3           Ms. Stout?

4           MS. STOUT:  Your Honor, I wanted to bring this to the

5      Court's attention so as to not say something in front of the

6      jury that the Court would have a problem with.

7           I think it's relevant to bring up the fact that this

8      gentleman has reported a mental illness to a correctional

9      officer and his probation officer, because I think it's

10     relevant to his perception of how he views things.  He's

11     reported that he's been diagnosed as a sociopath and he

12     actually called it a homicidal sociopath, but I would be

13     satisfied with sociopath.  I think that's relevant to how he

14     perceives things, his reactions to things, everything about

15     him, his, his ability to tell the truth.  That's a serious

16     diagnosis.

17          THE COURT:  Government agrees or disagrees?

18          MS. MOHSIN:  I disagree.  There's been no diagnosis.

19     In fact, in a conversation that he had with the corrections

20     officer, which was a very sort of laid-back conversation, I

21     think what he said to the correction's officer is that people

22     have said that to him; that 25 years ago, someone said to him

23     that he was a homicidal sociopath.

24          That is a conversation he has during the course of a

25     communication with a corrections officer in discussion about a

1   number of different topics.  It's a very casual conversation.

2   It's certainly not a reporting of a mental illness.  I'm not

3   aware of a mental illness.

4          What I am aware of is casual conversation in which

5   they are talking about whether or not there were going to be

6   any repercussions by this individual as a consequence of the

7   Box Canyon beatings, and the fact that he did not take any

8   actions, even though someone once said that to him.

9          Now that statement was made in 2004, so it would have

10  been 25 years before then, is what he says to the corrections

11  officer.  I do not think it's admissible.  It is not probative

12  of truthfulness.  I don't think it's relevant.  I don't think

13  it's relevant for any legitimate purpose, and therefore, I

14  would ask that she not be permitted to make that line of

15  inquiry.

16         THE COURT:  The objection is relevance.  And the

17  relevance, you suggest, is the propensity to accurately report,

18  propensity to tell the truth or the absence of it?

19         MS. STOUT:  Let me just state for the record that I

20  got a very important 2004 interview on Wednesday.  I tried --

21  I'm trying to comprehend everything in it.  It's quite lengthy.

22  It's not a casual conversation.  It's somebody reporting what

23  they perceive is a threat to their wife.  So it's a serious

24  conversation.  And it's his choice to further engage with the

25  correctional officer about many things.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1          He indicates to the correctional officer that it was a

2    psychiatrist that made that diagnosis.  And he also said that

3    he's easily provoked, many other things.  Apparently he met --

4    or he's just a, a pathological liar, which I certainly think

5    the jury has a right to know.

6          THE COURT:  He said that about himself?

7          MS. STOUT:  Yes.  He said that about himself in this

8    tape that I received on Wednesday, to the correctional officer.

9          THE COURT:  He said that he assesses himself that way?

10         MS. STOUT:  He says, "I'm not so sure if I believe it

11   or I don't," but he said, "people 20 years ago," as Ms. Mohsin

12   is correct, "called me a homicidal sociopath."  He said it was

13   a psychiatrist's diagnosis and the psychiatrist said he's

14   easily provoked.  I don't know who the psychiatrist was.

15         MS. MOHSIN:  May I respond?

16         THE COURT:  Yes.

17         MS. MOHSIN:  I've -- this is a casual conversation.

18   It's not a custodial interrogation of any kind.  It is a

19   meeting between him and a corrections officer in which they

20   talk about a lot of different things, very, very limited about

21   the relevant circumstances of what's going on here today.

22         The vast majority of this conversation relates to

23   other people in the prison, threats made against him, people

24   who have assaulted him in the prison.  It is not overwhelmingly

25   about this case.

1              That one conversation that she is referring to in

2      which Ms. Stout acknowledges that he says just that, that

3      people have told him that, the psychiatrist that he's referring

4      to is a member of the Devils Diciples that he spoke to about it

5      at some later date.

6              Once again, your Honor, this is not --

7              THE COURT:  Wait.  The psychiatrist was a Devils

8      Diciples member?

9              MS. MOHSIN:  Yes.  That's correct.  That's correct.

10     Because I listened to that portion very carefully myself.

11             MS. STOUT:  Which is more the reason.

12             MS. MOHSIN:  There is a, there is a, there is a

13     professor of --

14             MS. STOUT:  We can play it.

15             MS. MOHSIN:  -- at the University of South Carolina

16     or South Florida -- excuse me -- South California who, too, is

17     a member of the Devils Diciples that we're aware of.

18             THE COURT:  Here's where this case would go if I, if

19     I were to permit this line of questioning:  Down a rabbit hole

20     chasing more and more details that are not relevant to the

21     matters at issue in this case.

22             Rule 403 provides a limitation for matters that would

23     be unnecessarily distracting and insufficiently tied to the

24     matters that actually matter, matters that actually are at

25     issue in the case.

1           This kind of testimony from years ago, harkening to

2    things that were supposedly said decades earlier even than that

3    are not sufficiently probative of anything significant in this

4    case.

5           And I sustain the Government's objection on relevance

6    and we'll call the jury in.

7       (Jury in, 3:24 p.m.)

8           THE COURT:  The jury has assembled.  The witness and

9    others may be seated, please.

10          Ms. Stout, please proceed.

11          MS. STOUT:  Thank you.

12   BY MS. STOUT:

13   Q.  Mr. Higgins, we were talking about Cuz, or Lowell, who is

14   also known as Cuz, who was part of your chapter in Arizona,

15   correct?

16   A.  Yes.

17   Q.  Okay.  And we were talking about his financial woes.  You

18   agreed that he might have been ready to file bankruptcy back

19   in the early 2000's, late 19 -- late 1990's or early 2000's,

20   correct?

21   A.  Yes.

22   Q.  Okay.  Now, you indicated that he wanted to sell the

23   property because it increased so much in value, yes?

24   A.  Yes.

25   Q.  You have to speak for the court reporter.

1   A.  Yes.

2   Q.  Thank you.

3           And you indicated that you were not in agreement with

4   this?

5   A.  I wasn't against it.  You know, if we could have found --

6   we did actually go look at some other properties.

7   Q.  Well, you did testify before a grand jury, as we

8   established before, in 2010; is that accurate?

9   A.  Yes.

10  Q.  And you were sworn to tell the truth, against penalty of

11  perjury, correct?

12  A.  Correct.

13  Q.  And you testified at that time that you did not want to

14  sell the property; is that accurate?

15  A.  Right.

16  Q.  All right.  And you also testified that there was a

17  disagreement causing a division in your club over the sale of

18  this property; is that accurate?

19  A.  Yes.

20  Q.  All right.  And you said it almost led to having two

21  chapters; fair statement?

22  A.  I believe that was what I said about when I first got in

23  the club, between Cuz and Sleepy, there were two factions.

24  Q.  Okay.  You were asked the question --

25          MS. MOHSIN:  Page number, please.

1    BY MS. STOUT:

2    Q.  -- on page 116 of the grand jury transcript:

3            "Cuz wanted to sell the property because he was going

4    bankrupt?

5            Answer:  Right.

6            Question:  And did you not want to sell it, the

7    property?

8            Answer:  No.

9            Question:  Did this disagreement develop into a divide

10   between members of the clubhouse?

11           Answer:  Yes."

12           Then you were asked:  "What type of divide?  What did

13   it lead to?

14           Answer:  It led to just about having two chapters.

15   Nobody that was on Cuz's side would do any work, you know, on

16   the place or anything, couldn't get dues up, and it was five to

17   five that way."

18   A.  Okay.

19   Q.  Was that the truth or perjury?

20   A.  I don't have a problem with that statement.

21   Q.  So that was the truth?

22   A.  Yes.

23   Q.  And the divide was, as you testified to, on Cuz's side to

24   sell it, Wizard, Mac, Huevos and Dean?

25   A.  That seems reasonable.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

234

1    Q.  And on your side, besides you, of course, Doc, Johnnie

2    Old School, Gulf Clubs and Two Dogs; accurate?

3    A.  Mh-hm.

4    Q.  And Johnnie Old School, Two Dogs, Golf Clubs, and you, were

5    the one pushed off a cliff by Cuz, correct?

6    A.  Yeah.

7    Q.  You indicated on direct that it was Cuz who ordered Two

8    Dogs, Golf Clubs, Johnnie Old School, and yourself, into this

9    yellow truck; is that accurate, sir?

10   A.  (No response.)

11   Q.  You also testified to the grand jury, I believe.

12   A.  Yeah.

13   Q.  Accurate?

14   A.  I'm not positive of that.

15   Q.  You do not remember?

16   A.  That's correct.

17   Q.  Would it refresh your recollection to look at your

18   testimony?

19   A.  Not really.

20   Q.  No?  Okay.

21           Well, Cuz was the one in the truck with Huevos?

22   A.  That's correct.

23   Q.  Nobody else?

24   A.  No.

25   Q.  Not Holiday?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1    A.   No.

2    Q.   Okay.  Now, they stopped for gas?

3    A.   Yes.

4    Q.   Did anybody scream at the gas station?

5    A.   Well, half of us were incapable of making any noise.

6    Q.   Did you stick your hand out of the back of the truck or

7    anything?

8    A.   No, I did not.

9    Q.   Okay.  So when you were removed from the truck -- after

10   driving, then, you got gas and you drove, after driving, you

11   were removed from the truck by Cuz, yes?

12   A.   Me personally, or the first people?

13   Q.   Johnnie Old School was first.

14   A.   Yes.

15   Q.   And it was Cuz or Huevos who took him out?

16   A.   No.  Huevos was not.  He helped him toss Johnnie off the

17   road.

18   Q.   So Cuz appeared to be in charge of the tossing?

19   A.   Yeah.

20   Q.   And then you testified today that you willingly threw

21   yourself off to avoid being --

22   A.   That's correct.

23   Q.   -- thrown by them?

24   A.   That's correct.

25   Q.   Okay.  And you testified that you fell about 900 feet.

1   A.  A long ways.

2   Q.  A long way.  All right.

3           Now, in May of 2003, you gave some taped statements to

4   police officers of Pima County regarding this incident.

5   A.  A police officer?

6   Q.  Is that true?

7   A.  Who?

8   Q.  A Detective George interviewed you at the Medical Center?

9   A.  Yes, that's correct.

10  Q.  Okay.  And she recorded this?

11  A.  I believe you.

12  Q.  Okay.  Well, I'm not asking you if you believe me.  I'm

13  asking you if that's accurate.

14  A.  I was unaware that she recorded it, but I was aware that --

15  Q.  But you remember talking to her.  Okay.

16          Now, that was just, what, 24 hours after the incident

17  or less?

18  A.  Much less than that.

19  Q.  Okay.  And you told her that you fell about 30 or 40 feet?

20  A.  I also told her I fell out of a truck.

21  Q.  Okay.  About 30 or 40 feet down the ravine, though;

22  accurate?

23  A.  I, I could not tell you that, but I don't have a problem

24  with it.

25  Q.  Okay.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   A.   I was not factual with her.

2   Q.   So the 900 you said today is the truth, and the 30 or

3   40 you told her a few hours later was a lie?

4   A.   Yeah.  It was probably somewhere in between that.  I didn't

5   measure it.  I've never been back there since.  It took me --

6   Q.   Okay.

7   A.   -- about 40 minutes to climb back up to the road.

8   Q.   Sure.  Now, you indicated something was fractured in your

9   cheek and your eye socket?

10  A.   Yes.

11  Q.   Possibly from the gun?

12  A.   Quite possibly, or the falling off the mountain.

13  Q.   Or the fall.  Okay.  You had no other broken bones, true?

14  A.   Just fractures.

15  Q.   Did you get a cast on anything or --

16  A.   I didn't ever go back for treatment.

17  Q.   Okay.  Did -- you didn't break your neck, did you?

18  A.   No.

19  Q.   So that brace was a precautionary thing?

20  A.   I don't know what they put that on there for.

21  Q.   Okay.  All right.  Now, you left the hospital within hours?

22  A.   I don't know how long I was there, but I left as quickly

23  after the cops left as I could.

24  Q.   Okay.  You were concerned about your wife?

25  A.   Yes.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

238

1    Q.   All right.  And then you -- once you situated yourself, you

2    made phone calls?

3    A.   Right.

4    Q.   And those phone calls you made were from Johnnie Old

5    School's house?

6    A.   No.  They were from a hotel Inn Suites.  We hadn't gotten

7    Johnnie Old School out of the hospital yet.

8    Q.   But you did then go to Johnnie Old School's house?

9    A.   After the hotel, yes.

10   Q.   And you made calls from his home?

11   A.   I had already found out from the day before what -- where

12   Angel was.

13   Q.   So you were comfortable with Angel and you went to Johnnie

14   Old School's?

15   A.   I wasn't comfortable with it, but I had no way of getting

16   there.

17   Q.   My question is, when you were at Johnnie Old School's

18   house, you made phone calls?

19   A.   To whom?

20   Q.   Fat Dog.

21   A.   I tried, I believe, from his house, and other people's

22   houses I stayed at later.

23   Q.   From Johnnie Old School's phone number?

24   A.   Okay.

25   Q.   Yes?

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1   A.  I don't, I don't recall.

2   Q.  Well, would it refresh your recollection to look at the

3   grand jury testimony where you testified that you called

4   Fat Dog from Johnnie Old School's house?

5   A.  I called him twice.  I couldn't -- that's 12 years ago that

6   this happened, you know.  I cannot tell you precisely out of my

7   mind where I was when I made the phone calls.  I called him

8   twice.  Is that really relevant?

9   Q.  I don't think that --

10        MS. STOUT:  Your Honor, would you instruct the jury --

11  the witness to please answer my question?

12        THE COURT:  Just proceed with questions, Ms. Stout.

13        MS. STOUT:  Thank you.

14  BY MS. STOUT:

15  Q.  Mr. Higgins, you testified before a grand jury --

16  A.  Okay.

17  Q.  -- under oath --

18  A.  Yes.

19  Q.  -- that you called Fat Dog from Johnnie Old School's house?

20  A.  And that's what I did.

21  Q.  Was that the truth?

22  A.  To the best of my knowledge, yes.

23  Q.  Thank you.

24        Now, you indicated Panhead, what's his name, Panhead

25  Mike?

1   A.  Yes.

2   Q.  He -- you didn't find him when you were --

3   A.  I was told by Two Dogs that all he did was, they get out of

4   the back of the truck and get into the front and ride away with

5   Cuz and Huevos.

6   Q.  So you didn't know what happened to him?

7   A.  No.

8   Q.  He rode away with Cuz and Huevos?

9   A.  Mh-hm.  And later got his truck back and his motorcycle

10  back.

11  Q.  But you didn't know that until later?

12  A.  Correct.

13  Q.  And you didn't tell the police about Panhead Mike?

14  A.  I knew that he wasn't there.

15  Q.  But you didn't know where he was?

16  A.  Correct.

17  Q.  Now, with regard to Ms. Ford, I'm going to -- you had

18  indicated, testified here that you weren't charged with any

19  sort of rape?

20  A.  Not convicted.

21  Q.  Okay.  So in other words, you were charged with rape and

22  sodomy; is that a fair statement?

23  A.  I don't know.  I believe that's probably true, even though

24  I never got within six feet of her, you know.

25  Q.  But you did indicate, too, that when you saw her, you left

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

1  the room to take a phone call?

2  A.  Which would pertain to her directly.

3  Q.  Okay.  And when you testified before the grand jury under

4  oath in 2010 and told them you were charged with rape and

5  sodomy, you were telling the truth, right?

6  A.  To the best of my knowledge, yes.

7  Q.  Okay.  Now, on direct you indicated you had no idea why

8  you were charged with intimidation; is that accurate?

9  A.  I don't believe there were any specifics.

10  Q.  Well, you admitted to having a conversation with an

11  undercover agent to murder somebody; is that accurate?

12  A.  No.  I had several conversations with him where he

13  attempted to solicit murder from Mac and myself.  And I believe

14  he later testified that at no time did he ever believe that

15  that was going to happen.

16  Q.  So it was all just a game?

17  A.  No.  I think it was an attempt to implicate Mac or myself.

18  Q.  So you think that the federal agencies were setting you up?

19  A.  It wasn't federal.

20  Q.  It was state?

21  A.  Mh-hm.

22  Q.  Okay.  So you think the state was trying to set you up?

23  A.  Yeah.  But being as someone put -- I don't know if it was

24  valid paperwork or not, but in my mailbox, pertaining to this

25  person, which I gave to them.

1    Q.  But that would have something to do with an intimidation

2    charge; is that accurate?

3    A.  I don't know.

4    Q.  So you really -- you were charged with crimes and you're

5    not aware of why you were charged with crimes?

6    A.  My first plea offer was 63 years, and my lawyer recommended

7    I didn't read that.

8    Q.  Sixty-three years, is that what you said?

9    A.  Mh-hm.

10   Q.  And you ended up getting two years and five months'

11   probation?

12   A.  Yes.

13   Q.  Now, when you were a member of the Devils Diciples in

14   Tucson for a while before this Heather Ford rape and this

15   Box Canyon incident, you told the grand jury that you were

16   involved, the clubhouse was involved in raising money for

17   cerebral palsy?

18   A.  On two occasions.

19   Q.  On two occasions.  And that you actually had raffles for

20   that?

21   A.  Yes.

22   Q.  You sold tickets to members?

23   A.  To everybody.

24   Q.  And to the public?

25   A.  Mh-hm.

2:11-cr-20066-RHC-MKM  Doc # 241  Filed 12/30/14  Pg 243 of 287  Pg ID 6741
JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - CROSS BY MS. STOUT

243

1  Q.  To raise money for the club and for --

2  A.  Cerebral palsy.

3  Q.  -- cerebral palsy?

4  A.  Mh-hm.

5  Q.  And you indicated to the grand jury that a citizen actually

6  won a raffle at one point?

7  A.  There was -- the whole time I was in there, there were four

8  raffles that they -- twice a citizen won and twice a Devils

9  Diciple won.

10  Q.  Okay.  And a citizen won a motorcycle at one point?

11  A.  Twice.

12  Q.  Twice they won a motorcycle.

13      MS. STOUT:  Thank you, Mr. Higgins.

14      May I have one moment, your Honor?

15      THE COURT:  Yes.

16      MS. STOUT:  Thanks.

17      (Brief pause.)

18      MS. STOUT:  Thank you very much.

19      THE COURT:  Any additional cross-examination?

20      Any redirect examination?

21      MS. MOHSIN:  There is, your Honor, but I have to

22  confer with counsel for a moment.

23      THE COURT:  Go ahead.

24      (Brief pause.)

25      THE COURT:  More discussion?

```
 1              MS. MOHSIN:  Just one moment, your Honor.
 2              THE COURT:  All right.
 3           (Brief pause.)
 4                     REDIRECT EXAMINATION
 5  BY MS. MOHSIN:
 6  Q.  Mr. Higgins.
 7  A.  Yes.
 8  Q.  You were asked questions on cross-examination about some
 9  statements that you made before the grand jury.  Have you read
10  that grand jury transcript before you came here today?
11  A.  I don't think in any entirety.
12  Q.  Did you read any of it?
13  A.  Yes.
14  Q.  What portion did you read?
15  A.  I couldn't even tell you right now.
16  Q.  When did you read it?
17  A.  A couple days ago maybe.
18              MS. STOUT:  Objection to the -- I object to the
19  relevance.  She conducted the grand jury.  I mean --
20              THE COURT:  No.  The question is what -- is not what
21  happened at the grand jury.  The question is witness
22  preparation.  He was asked on a number of occasions about prior
23  testimony.
24              Overruled.  Continue.
25  BY MS. MOHSIN:
```

1   Q.  Sir, were you asked questions about the grand jury

2   testimony or did you read the testimony yourself?

3   A.  I just read it.

4   Q.  All right.  How much of it did you read?

5   A.  I can't tell you that right now offhand.

6   Q.  All right.  I want to direct your attention to some

7   questions you were asked on cross-examination about things

8   being different across the nation.  Do you remember those

9   questions asked by the attorney?

10  A.  Yes.

11  Q.  And do you remember being asked questions about whether you

12  testified in the grand jury about things being different in

13  California and Arizona and Michigan?

14  A.  I remember her asking me that.  Yes.

15  Q.  And do you remember being asked in the grand jury

16  specifically about the taxation policies of the Devils

17  Diciples, as opposed to everything?

18  A.  Yes.

19  Q.  I'm going to show you what -- page 86 of your grand jury

20  testimony, and I'm going to ask you to read some of the

21  questions and see if that refreshes your memory about what that

22  discussion was about.

23          MS. STOUT:  He didn't say he didn't remember anything,

24  your Honor.

25          THE COURT:  I agree.  The witness hasn't said his

1    memory is exhausted about that topic.

2            MS. MOHSIN:  Yes, your Honor.

3    BY MS. MOHSIN:

4    Q.  Do you remember the question that was asked of you?

5    A.  Are you speaking of the funeral fund?

6    Q.  I'm talking about taxes in particular, tax issues, whether

7    you're selling drugs or you're doing something for the club,

8    and you're going to get taxed about it.  Do you remember that?

9            MS. STOUT:  This is beyond the scope of cross.  I

10   didn't ask anything about taxation.

11           MS. MOHSIN:  That's the point, your Honor.

12           THE WITNESS:  I really don't --

13           THE COURT:  It's overruled.  It is within the scope of

14   cross.

15   BY MS. MOHSIN:

16   Q.  Do you recall those questions?

17   A.  I'm not sure.  I really am not.

18   Q.  I would like to show you your grand jury testimony --

19   A.  All right.

20   Q.  -- to refresh your memory regarding that series of

21   questions.  Would that help you?

22   A.  Maybe.

23   Q.  I'm going to show you page 86, sir.

24   A.  Yeah, I won't argue with that.  But I'm not stating it as

25   a fact right there.

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - REDIRECT BY MS. MOHSIN

247

1    Q.  Rather than talking about what you've read, I'm going to

2    ask you some questions about it.

3    A.  All right.

4    Q.  When you were -- do you have a recollection now of the

5    conversation or the discussion that took place in the grand

6    jury several years ago?

7    A.  Yes.

8    Q.  And when you testified on cross-examination that things

9    were different in different chapters of the Devils Diciples --

10            MS. STOUT:  I'm going to object.  Maybe we had better

11   have a side bar.  You don't want a speaking objection, I

12   realize that.

13            THE COURT:  Well, I think I've already -- is this the

14   same objection as previous or a different basis?

15            MS. STOUT:  The testimony -- I'm sorry.

16            THE COURT:  A different basis for the objection?

17            MS. STOUT:  She's misconstruing the testimony that he

18   gave.  I asked him if there's differences.  He acknowledged

19   that there was.  Now she wants to direct it into a specific

20   little cubbyhole and that she wants it to fit in and that's

21   just not fair or right.  If she wants to ask him about

22   differences in taxation, that's fine, but he said there's

23   differences among the clubs, period.

24            THE COURT:  And that's the topic that's being explored

25   now in that --

UNITED STATES vs. SUTHERLAND, et al - 11-20921; 11-20066

```
 1              MS. STOUT:  Very well.

 2              THE COURT:  To me, that is not objectionable.  It

 3    is -- it's reasonably within the scope of redirecting on those

 4    matters raised in cross.

 5              Go ahead.  The objection is overruled.

 6    BY MS. MOHSIN:

 7    Q.  Were you asked questions specifically about taxation within

 8    the Devils Diciples as it relates to the sale of drugs?

 9    A.  Yes.

10    Q.  And were you asked specifically about kicking back money to

11    someone like Fat Dog in the club?

12    A.  Yes.  And I believe I said that I had heard that, but I

13    knew of nothing specific.

14    Q.  And were -- when you talk about differences in the club,

15    and you testified about that in the grand jury --

16    A.  Right.

17    Q.  -- was that, that response related to the question about

18    taxation as opposed to differences generally in the club about

19    everything else?

20    A.  What I just read that you handed me, I agree with what I

21    said right there.

22    Q.  But the question I'm asking, sir, is:  Was that a focused

23    question, the answer that you provided at that time?

24              Whether you agree with it today is a different

25    question.  What I'm asking you now, sir, is when you testified,
```

1    you were asked on cross-examination --

2    A.  Right.  Right.

3    Q.  -- you said once there were differences between chapters,

4    right?

5    A.  Yes.

6    Q.  Bylaws being different --

7    A.  Right.  Right.

8    Q.  -- and different policies and things like that.

9          And you were asked whether you testified about that on

10   cross-examination about the grand jury.

11         MS. STOUT:  That wasn't what my question was.  I never

12   said bylaws were different.

13         THE COURT:  The jury will remember sufficiently what

14   the questions were.

15         THE WITNESS:  Yeah.

16         THE COURT:  This is proper subject matter for redirect

17   examination, once again.  Overruled.

18         Continue.

19   BY MS. MOHSIN:

20   Q.  I am asking you, sir, about the context of your response to

21   the grand jury.

22   A.  What I just read --

23         THE COURT:  And the question is?

24         THE WITNESS:  You're asking me about what you just

25   gave me to read?

BY MS. MOHSIN:

Q.  I'm asking you, when you were asked that question in the grand jury, was there a different context?

A.  I don't think so.

Q.  All right.  What was your understanding as it relates to the Devils Diciples and taxation?

A.  I -- just what I said to the grand jury.  I've heard of that.  I have no personal knowledge of that.

Q.  All right.  And so when you were talking about differences, were you talking about, in that context, in the grand jury. I'm not asking what your opinion is about the larger question.

A.  In many, in many context.  Like, like you said, some had different bylaws.  They are just different.

Q.  All right.  Now, I want to direct your attention to the next series of questions.

You were asked questions about a communication that you had with a corrections officer in Arizona.  Did you know that that conversation was recorded?

A.  No, I did not.

Q.  And what was the purpose of meeting with the corrections officer?

A.  To try to get some help for Angel.

Q.  Your wife?

A.  Yes.

Q.  And was the purpose of that meeting to report threats that

```
 1    had been made to her?

 2    A.  Yes.

 3    Q.  Did you provide him with any sort of a letter that you had

 4    received?

 5    A.  Yes, I did.

 6    Q.  And the conversation that you had with him, there were

 7    questions about it in cross-examination about the length of the

 8    conversation.  Was it a particularly long conversation, do you

 9    recall?

10    A.  Twenty minutes maybe, I'm guessing.  Something like that.

11    Q.  And was he talking to you about things, like specific

12    things?  What was the purpose of that, that lengthy

13    conversation, however long it was?

14    A.  He was going to try to get help for Angel, is what he was

15    going to do.

16    Q.  And, and so during the course of that conversation, did you

17    just have a casual conversation with him?

18    A.  I felt a lot better.  I -- he did a real good job of

19    getting information out of me.

20    Q.  All right.  And did you talk about stuff, just general

21    stuff --

22    A.  Yeah.

23    Q.  -- as well as specific stuff?

24            Was it a casual conversation or was it a police

25    interview of some kind?
```

JURY TRIAL, VOLUME XXV - 12/8/2014
CHARLES HIGGINS - REDIRECT BY MS. MOHSIN

1    A.  No, it wasn't -- it did not seem at all like that.  I

2    thought it was off the record.

3    Q.  Now, finally, I just want to talk about some of the

4    statements that you made about the travel between the Tucson

5    clubhouse inside of the truck when you stopped for gas and then

6    later in the Box Canyon.

7         You were asked questions about whether you had stuck

8    your hands out or anything at the gas station.  When you were

9    at the gas station, were your hands free or were they still

10   tied?

11   A.  No, they weren't free.

12   Q.  And you indicated that the others in the, in the back, some

13   were conscious, some were not.

14   A.  Yeah.

15   Q.  Was anyone speaking?

16   A.  I was not going to leave them, either.

17   Q.  Was anyone talking in this car ride?

18   A.  Just Panhead.

19   Q.  Just Panhead?  Was he talking to you?

20   A.  Yes.

21   Q.  All right.  And after the car ride was finished and you

22   went into the canyon, and you testified about the distance that

23   you fell or -- do you have any idea of exactly how far it was?

24   A.  It's a long way.  I couldn't -- I'm not -- it took me a

25   long time to climb out.

1   Q.  So rather than a distance, would the time it took you be a

2   more accurate description of how far you fell?

3   A.  Yes.

4   Q.  All right.  And how long did it take you?

5   A.  Fifteen, 20 minutes, 25 minutes.  It was really, really

6   steep.

7   Q.  All right.  Now, sir, you indicated you had suffered a

8   number of different injuries; is that a fair statement?

9   A.  Yeah.

10  Q.  You didn't go to the doctor again after the hospital?

11  A.  No.

12  Q.  How long before you were able to walk without pain in your

13  ribs?

14  A.  I'd say it was about two years until I was able to work a

15  full day.

16  Q.  Work a full day?

17  A.  Yeah.

18          MS. MOHSIN:  Okay.  Thank you.

19          MR. SABBOTA:  Your Honor, I have a couple questions

20  based on the tax.

21          THE COURT:  Well, I think it's Ms. Stout's call.  Is

22  there any suggested recross-examination?  Any new matters that

23  you suggest, in other words, that were raised?

24          MS. STOUT:  Sure.  Yes, your Honor.

25          THE COURT:  What was the new matter?

1          MS. STOUT:  The tax.

2          THE COURT:  I'm sorry?

3          MS. STOUT:  The whole issue of tax was not raised on

4   direct.  And I think the answer from the witness ended up being

5   that there are differences, just like I elicited.

6          THE COURT:  If you want to ask a few directed

7   questions in that regard, Ms. Stout, you may proceed.

8          MS. STOUT:  Thank you, sir.

9                         RECROSS-EXAMINATION

10  BY MS. STOUT:

11  Q.  I think, sir, that you indicated on redirect exam that you

12  knew nothing about the -- any sort of tax?

13  A.  I believe what I said, since I just got done reading that,

14  was I had heard that there was differences; I just had no

15  personal knowledge of that.  Isn't that not what I said?

16  Q.  Okay.  So you had no knowledge of it?

17  A.  Other than --

18  Q.  Personal knowledge?

19  A.  Right.  Correct.

20  Q.  Rumor?

21  A.  You got it.

22  Q.  No personal knowledge?

23  A.  You got it.

24  Q.  And you never had any personal dealings, either, with

25  Fat Dog --

```
 1  A.  No.

 2  Q.  -- did you?

 3  A.  No, I did not.

 4        MS. STOUT:  Thank you, sir.

 5        THE WITNESS:  You're welcome.

 6        THE COURT:  The witness may step down.

 7        Witness excused.

 8    (Witness excused, 3:53 p.m.)

 9        THE COURT:  And next?

10        MR. STRAUS:  Your Honor, at this time the United

11  States would call Kenneth Dean Johnson.

12        Oh, your Honor, I think we need a break.

13        THE COURT:  Is this that --

14        MR. STRAUS:  Yes.

15        THE COURT:  -- unscheduled or pre-scheduled recess?

16        A 10-minute recess in the jury room, ladies and

17  gentlemen, 10-minute recess, and we will resume.

18        We were working on the extended recess for the earlier

19  afternoon recess, by the way.  Let this be ten minutes and

20  nothing more.

21    (Jury out, 3:54 p.m.)

22        THE COURT:  All right.  The jury is absent.  And you

23  may be seated.

24        Let me just expand very briefly on the 403 findings in

25  which I limited the cross-examination on the psychiatric, the
```

1    alleged or possible decades earlier statement made to the

2    previous witness, Mr. Higgins, and related to him in a

3    conversation, perhaps, with a correction's officer.

4            The point is that I found that the substance of the

5    intended examination was not particularly relevant to matters

6    at issue here, including matters of credibility.

7            And I found, secondly, and intended to say that to

8    the extent that there is any relevant matter within those areas

9    of inquiry, the danger of confusion and of compounding the

10   confusion with additional questions, additional inquiry about

11   what was meant at each layer of the earlier statements

12   substantially outweighed, in terms of the potential for

13   confusion and essentially distracting the jury from the

14   centrally important issues here, that that danger substantially

15   outweighed whatever minimal probative value may have been

16   found.

17           We'll take a 10-minute recess or less to clean up the

18   jury box (sic) and no one else leaves the room.  This is not a

19   break for anybody but the jury.

20           MS. STOUT:  Thank you.

21       (Recess taken, 3:56 p.m. – 4:15 p.m.)

22           THE CLERK:  All rise.  Court is back in session.

23           THE COURT:  We're ready for the jury, the last witness

24   in the day.  I think we'll go to 4:45, counsel, get some

25   additional work done today, but no later.

```
 1          (Jury in, 4:15 p.m.)

 2              THE COURT:  All right.  The jury has assembled.

 3  Others may be seated.  The Court recognizes the presence of all

 4  defendants and attorneys.

 5              And your next witness, Mr. Straus.

 6              MS. MOHSIN:  Your Honor, at this time the United

 7  States calls Kenneth Dean Johnson.

 8              THE COURT:  Mr. Johnson, raise your right hand,

 9  please.

10      (Witness is sworn.)

11              THE COURT:  Sit up here in this chair, sir.  And scoot

12  your chair up as far as you comfortably can, and put the

13  microphone as close to you as it will fit, reasonably close.

14              All right.  Go ahead, Mr. Straus.

15              MR. STRAUS:  Thank you, sir.

16                        KENNETH DEAN JOHNSON

17      called as a witness at 4:16 p.m. testified as follows:

18                        DIRECT EXAMINATION

19  BY MR. STRAUS:

20  Q.  Sir, could you state your name and spell your last name for

21  the record, please?

22  A.  Kenneth Dean Johnson, J-O-H-N-S-O-N.

23  Q.  And do you go by the name Dean Johnson?

24  A.  Yes, sir.

25  Q.  Sir, how old are you?
```

1   A.  Fifty-four.

2   Q.  And what do you do for a living?

3   A.  I'm an inventory supervisor.

4   Q.  Okay.  Did there come a point in time where you lived in

5   Arizona?

6   A.  Yes, sir.

7   Q.  When approximately was that?

8   A.  Back in, I guess, '97.  I was there the first time from

9   '93 to '95 and then '97 to 2003.

10  Q.  Okay.  Let me -- before I go any further, let me ask you

11  this:  What is your educational level?

12  A.  High school dropout.

13  Q.  Okay.

14  A.  I have a GED.

15  Q.  Okay.  Let me direct your attention to 1997.  What part of

16  Arizona did you live in?

17  A.  Tucson.

18  Q.  And at that point in time, were you a motorcycle

19  enthusiast?

20  A.  Yes, sir, I was.

21  Q.  And during the course of your living out in Tucson, did

22  there come a point in time where you met members of any

23  motorcycle clubs?

24  A.  Yes, sir.

25  Q.  And what motorcycle club members did you meet?

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

259

1  A.  Devils Diciples.

2  Q.  And how did that, how did that occur?

3  A.  They were shooting a movie out in Mescal, Arizona, and I

4  met Doc, and he introduced me to Devils Diciples.

5  Q.  Okay.  So the jury knows, were you part of that movie in

6  some way?

7  A.  Yes.  I was an extra.

8  Q.  Okay.  Extra, meaning one of these background actors?

9  A.  Yes, sir.

10  Q.  And do you remember what year that was?

11  A.  I believe that was in '93.

12  Q.  Okay.

13  A.  Or '94.

14  Q.  And that was the first time you lived out in Arizona?

15  A.  Yes, sir.

16  Q.  You've got to speak up.

17  A.  Yes, sir.

18  Q.  And you met Doc.  Did that develop into a friendship?

19  A.  Yes, sir.

20  Q.  And did that continue over time into the second period of

21  time that you lived in Arizona?

22  A.  Yes, sir.

23  Q.  And through your association with Doc, did you meet other

24  members of the Devils Diciples?

25  A.  Yes, sir.

1    Q.  And who, offhand, if you can remember?

2    A.  I met Riggs, Cuz, Mexican John.  I'm sure I met a few of

3    them, I just don't remember their names.

4    Q.  And did there come a point in time where you joined the

5    Devils Diciples?

6    A.  Yes, sir.

7    Q.  And what year was that?

8    A.  I believe it was '97 or '98.

9    Q.  And how did that occur?  Did you ask or were you invited?

10   Or why don't you explain that to the jury.

11   A.  It was pretty much wining and dining at first.  Everything

12   looked good.  The brotherhood looked good.  Drugs looked good.

13   Women looked good.  And then riding the motorcycle was really

14   looked good.

15   Q.  So when you say wining and dining, others are wining and

16   dining you?

17   A.  I got to go to parties and other Diciples parties and liked

18   what I saw.

19   Q.  You mentioned the term "brotherhood."  What do you mean by

20   that?

21   A.  I thought it was a brotherhood.  I mean, it was supposed to

22   be a family, where you don't steal from your brother, you don't

23   rip off your family, and that just wasn't the case.

24   Q.  Okay.  You somehow learned later that was not the case?

25   A.  Yes, sir.

1  Q.  All right.  So 1999 -- 1998, I believe you said, you joined
2  the Devils Diciples?
3  A.  I believe so.
4  Q.  And did you have to prospect before you became a member?
5  A.  Yes, sir.
6  Q.  How long were you a prospect?
7  A.  I believe six months, maybe.
8  Q.  Okay.  Did you have a sponsor?
9  A.  Yes, I did.
10  Q.  Who was your sponsor?
11  A.  Sweeper.
12  Q.  Sweeper?
13  A.  Mh-hm.
14  Q.  And can you just briefly describe for the jury what, what
15  your prospecting period was like?
16  A.  Watching the motorcycles when we went to clubs, helping
17  with security, tending the bar, helping move other Diciples.
18  Pretty much a gopher, doing what they want you to do.
19  Q.  Okay.  That gopher status, was that a little different than
20  what you had been advertised during the wine-and-dine period
21  that you described?
22  A.  From what I understand, I had it easy as a prospect.  I
23  heard they were a lot rougher on other ones.
24  Q.  Okay.
25  A.  It wasn't what I expected, though.

1   Q.  All right.  And so then you become a, a patched member of

2   the Devils Diciples?

3   A.  Yes.

4   Q.  Did you receive any kind of patches as part of that

5   process?

6   A.  Yes.

7   Q.  Center wheel, upper, lower rocker, the whole bit?

8   A.  Yes.

9   Q.  And at that time, who was the -- were there, were there

10  officers of this particular chapter?

11  A.  Riggs was the boss.

12  Q.  Okay.  To the extent I didn't ask you, you lived in Tucson.

13  Was this the Tucson chapter?

14  A.  Yes.

15  Q.  And were there any other officers that you can remember at

16  this time?

17  A.  I don't remember who was in -- who was the warlord or

18  nothing back then, no.

19  Q.  How many members were part of the Tucson chapter?

20  A.  I'm thinking five or six, maybe.  Seven, maybe.

21  Q.  Okay.  And you had a motorcycle at this point?

22  A.  Yes, I did.

23  Q.  What kind of motorcycle did you have?

24  A.  I had a -- when I first joined, I had a Sportster.  And

25  then in 2000 I got an American Iron Horse.

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1    Q.  And for those of us in the courtroom who don't know what

2    an American Iron Horse, that is kind of a -- should I say,

3    imitation Harley Davidson, American-looking motorcycle?

4    A.  It's an S&S motor.  It's a, like a custom bike, I guess you

5    could say.

6    Q.  All aftermarket parts?

7    A.  Yeah.  I guess so, yeah.

8    Q.  Who were the -- when you joined, who were some of the other

9    members of the chapter?

10   A.  Cuz was there, Mexican John, Doc, Huevos.  I don't remember

11   the others' names.  I'm sure if you remind me, I'll know the

12   names.

13   Q.  Were there dues that you had to pay at that point in time?

14   A.  Yes.

15   Q.  What were the dues?

16   A.  $70 a month.

17   Q.  Okay.  Did there come a point in time after you joined that

18   chapter that you became an officer or some kind of titleholder?

19   A.  Yes.

20   Q.  What, what titles did you hold within the chapter?

21   A.  I was treasurer and warlord.

22   Q.  Okay.  Which came first?

23   A.  Treasurer.

24   Q.  And what did that entail?

25   A.  Collecting the dues, collecting the money from benefits we

```
 1   had, paying some of the bills, if we had any.

 2   Q.  Okay.  And what were some of the bills you had to pay?

 3   A.  Rent.

 4   Q.  Do you know who you were paying rent to?

 5   A.  Cuz.

 6   Q.  Okay.  Did he own that property?

 7   A.  I believe so.

 8   Q.  Okay.  And was everybody kicking in, in terms of dues?

 9   A.  No.

10   Q.  Okay.  You say that pretty emphatically.

11   A.  Half of them didn't pay shit.  Excuse my language.  Didn't

12   pay nothing.

13   Q.  Okay.  Were you employed during this period of time?

14   A.  Yes, sir.

15   Q.  And was there equal or unequal kick-in of proceeds into the

16   club?

17   A.  Pretty much unequal.  The one that had jobs, paid; the ones

18   that didn't, didn't.

19   Q.  All right.  How long you were a member of the Devils

20   Diciples?

21   A.  Probably almost five years.

22   Q.  Okay.  Now, during that five years, did some other members

23   begin to join the club after you joined the club?

24   A.  Yes.

25   Q.  Let me throw some names at you:  Johnnie Old School?
```

```
 1    A.  Yes.

 2    Q.  Did he join after you?

 3    A.  Yes.

 4    Q.  Golf Clubs?

 5    A.  Yes.

 6    Q.  How about Panhead Mike?

 7    A.  Yes.

 8    Q.  Any others that you can remember?

 9    A.  Two Dogs.

10    Q.  Two Dogs.

11          Now, can you -- was this chapter, in your opinion,

12    beyond the, the wining -- the lack of brotherhood that you

13    talked about earlier, was there also a lack of cohesiveness

14    within the chapter; if you know what that means?

15    A.  Yes, sir, there was.

16    Q.  Why don't you tell the jury about that.

17    A.  One of the bylaws was you will have a Harley Davidson when

18    you join this club.  I think three out of the four others

19    didn't.

20    Q.  Three of the four new members?

21    A.  Did not have Harleys.  And the boss didn't even ride.

22    Q.  Who was the boss?

23    A.  Riggs.

24    Q.  Okay.  He was not a rider?

25    A.  He might have had a bike, but I never seen him ride the
```

1   whole time I was there.

2   Q.  Okay.  And that was definitely a requirement of the Devils

3   Diciples, you had to have a Harley or a --

4   A.  I thought it was.

5   Q.  Okay.  And like you said, you had one, right?

6   A.  Yes.

7   Q.  Any other issues that arose within the club?

8   A.  Seemed to be like two different factions in my chapter.

9   Q.  Okay.  Why -- how so?

10  A.  It was like me, Riggs and -- I mean me, Cuz, and Huevos

11  were, I guess, the better ones as far as following the rules,

12  doing what we got to do.  And the other ones did their own

13  thing, smoking dope through the bowl and -- or do the glass,

14  smoking methamphetamines and shooting needles and you weren't

15  supposed to do that.

16  Q.  You said quite a mouthful here.  Let me break it down.

17         Are there any rules on drug use within the Devils

18  Diciples?

19  A.  Yes, there is.

20  Q.  What are those rules?

21  A.  You don't smoke out of a bowl for methamphetamine.  You

22  don't use needles.

23  Q.  Okay.  Why is that, for, for those of us who don't

24  understand the significance of that?

25  A.  I'm just thinking keeping your senses, maybe.  I don't

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

 1   know.  I mean --

 2   Q.  Are those more addictive delivery --

 3   A.  Yes.

 4   Q.  -- devices for drugs?

 5   A.  I'm sure they are.

 6   Q.  And did you see that going on in the club?

 7   A.  Yes.

 8   Q.  And with whom?

 9   A.  Well, I knew for a fact that Riggs' old lady used a needle

10   and that he knew it.

11   Q.  When you say old lady, are you talking about girlfriend or

12   wife or --

13   A.  Girlfriend.  I know Two Dog -- I've heard, well, I heard he

14   was smoking methamphetamine through a bowl.  I never witnessed

15   this stuff, I just heard it.

16   Q.  Okay.  And let's -- just so the jury is clear, let's talk

17   about your own drug use.  Had you ever used methamphetamines in

18   your life?

19   A.  When I joined the Diciples, yeah.

20   Q.  Had you ever used methamphetamines before you joined the

21   Devils Diciples?

22   A.  No.

23   Q.  Okay.  How often were you using methamphetamines while you

24   were a member of the Devils Diciples?

25   A.  Quite a bit.  Probably on a daily basis.

JURY TRIAL, VOLUME XXV – 12/8/2014
KENNETH DEAN JOHNSON – DIRECT BY MR. STRAUS

1   Q.  Would you characterize that as an addiction?

2   A.  It was definitely a mental one.

3   Q.  And who were you getting your drugs from?

4   A.  Two Dogs, most of the time.

5   Q.  Okay.  And do you know where Two Dogs was getting his

6   methamphetamines?

7   A.  No.

8   Q.  Was there anything else going on in the club or in the

9   clubhouse regarding drugs that, at least to your knowledge or

10  belief, was a no-no?

11       Was there any kind of sales of drugs within the

12  clubhouse?

13  A.  There probably was, yes.

14  Q.  Do you know for a fact there was?

15  A.  Yes.

16  Q.  Okay.  And do you know whether or not there was any drug

17  production or drug manufacturing going on, either within the

18  clubhouse or the clubhouse property?

19  A.  Not as far as none of the clubhouse property, no.

20  Q.  Okay.  Did you ever, did you ever become aware of Riggs or

21  anyone else making drugs?

22  A.  I had heard he was, yes.

23  Q.  Okay.  So when you talk about your faction, I think you

24  said the good faction and the other faction, what was -- I

25  guess the corollary is, what was bad about that faction beyond

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1   what you've told us?

2   A.  It wasn't no brotherhood there.  I mean, you're not

3   supposed to steal from your brother or take your brother's

4   property, disrespect your brother.  They did it all.

5   Q.  Okay.

6   A.  They did it all.

7   Q.  Now, were you -- during your five years with the Devils

8   Diciples, were you physically limited to Tucson or did you have

9   occasion to travel to other chapters within the United States?

10  A.  I went to the other chapters, yes.

11  Q.  What other chapters did you go to?

12  A.  Went to Alabama a couple times and Detroit.

13  Q.  How many times did you go to Detroit?

14  A.  I believe once.

15  Q.  Okay.  During the time that you were a member, who was the

16  national president, if you knew?

17  A.  Fat Dog.

18  Q.  Do you know who the other national officers were during

19  your tenure?

20  A.  No.

21  Q.  All right.  Not much contact with Detroit?

22  A.  Not hardly at all.

23  Q.  Okay.  What about California?  Did you, over time, did you

24  learn -- meet some of the members from California?

25  A.  Yeah.  I went to California a couple times, too.

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1    Q.  Okay.  And did members of California Devils Diciples, did

2    they come visit the Tucson chapter?

3    A.  Yes.

4    Q.  And who are some of the members that you met from

5    California?

6    A.  Little John.  I don't remember their names.

7    Q.  All right.  Did you ever meet someone named Holiday?

8    A.  Yes.  Holiday, yes.

9    Q.  Any others that you can remember?

10   A.  I might know them by face, but I don't remember their

11   names.

12   Q.  All right.  Now, while you're a member, what was the --

13   what was the relationship with the Devils Diciples in Tucson

14   with other motorcycle clubs?

15   A.  Pretty good, I guess you'd say.

16   Q.  Okay.  And were there other motorcycle clubs in the area

17   of, of Tucson or Arizona, generally?

18   A.  Yes.

19   Q.  Like whom?

20   A.  Hells Angels.

21   Q.  Okay.  And do you know whether or not the Devils Diciples

22   enjoyed a relationship with the Hells Angels at all?

23   A.  We used to go to their function, they'd come to ours.

24   Q.  Did you ever meet any of the Hells Angels that would come

25   by?

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1   A.  Yeah.

2   Q.  Any ones in particular?

3   A.  I don't remember their names, it's been so long ago.

4   Q.  Did you meet any of their officers, presidents,

5   vice-presidents?

6   A.  I might have.

7   Q.  All right.  Now, let me, let me direct your attention to --

8   did you ever, did you ever meet or become aware of a woman by

9   the name of Heather Ford?

10  A.  I think I met her once.

11  Q.  Okay.  And when approximately was that?

12  A.  I guess in 2003.  I can't tell you what month.

13  Q.  Okay.  And there was actually an incident with Heather

14  Ford, correct?

15  A.  Yes.

16  Q.  And you remember that time frame in 2003?

17  A.  I guess it was around March or April.

18  Q.  Okay.  And was it before March or April of 2003 or after

19  March/April 2003 that you met Heather Ford?

20  A.  Should have been before.  Probably March, I think.

21  Q.  Okay.  And how did you meet her?

22  A.  Panhead Mike introduced her to me.

23  Q.  Okay.  And what was Panhead Mike's relationship with her?

24  A.  He was letting her stay at his house.

25  Q.  Were they boyfriend/girlfriend or anything like that?

1   A.  I don't think -- I think he was just letting her stay at

2   his house.

3   Q.  Okay.  At the time you met her, did you know whether or not

4   she had any association with any other motorcycle clubs?

5   A.  When I first met her, no.

6   Q.  Okay.  Did there come a point in time where you learned

7   about an incident involving her and other members of the Devils

8   Diciples?

9   A.  Yes.

10  Q.  How did you learn about that?

11  A.  I got a phone call from Panhead Mike.

12  Q.  And where were you at the time?

13  A.  Florida.

14  Q.  And what did Panhead Mike tell you?

15  A.  He told me that some -- that girl Heather had taken some

16  stuff from his house.  So he told -- I don't know who he told,

17  but they went out to his house, got her and took her to the

18  clubhouse and then proceeded, I guess, to torture her while

19  she was there.

20  Q.  Okay.  And do you know, do you remember the phone call?

21  A.  Sort of.  It's been a while.

22  Q.  Okay.  Do you remember time-wise how soon after that

23  incident this occurred?  Did it occur the same day or --

24  A.  That, I can't tell you.

25  Q.  Okay.

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1   A.  I know he was nervous when he called me.

2   Q.  Okay.  And why was he nervous?

3   A.  He was probably scared.  I don't know.

4   Q.  Okay.  And did he articulate or tell you why he was scared?

5   A.  He didn't say anything on the phone, no.

6   Q.  Okay.  What was it in his conversation with you that led

7   you to believe he was scared?

8   A.  He just said, I don't know what happened.  They took it too

9   far.  I don't know what they did.  They were just kind of

10  panicked.

11  Q.  Okay.  After this phone call, did you return from Florida?

12  A.  Yes.

13  Q.  Were you on business or --

14  A.  Seeing my grandparents.

15  Q.  And when you came back, did you learn more about what had

16  happened at that incident?

17  A.  Yes.

18  Q.  What did you learn?

19  A.  I heard that they went out to his house, got her.  A couple

20  girls went out there and got her.

21  Q.  Okay.  Let me just stop you there.  Are you hearing this

22  from other members of the Devils Diciples?

23  A.  Yes.

24  Q.  All right.  Tell the jury what you heard.

25  A.  I heard that they went out to -- a couple girls went out

1    to Panhead's Mike house, got the girl, took her kids somewhere

2    else.  Brought that girl, Heather, to the clubhouse.  They made

3    her get buck naked, tortured her, and then dropped her off at

4    Mac's house.

5    Q.  Okay.  Mac, did he have a -- did he have a club name?

6    A.  Mac Tonight, I think.

7    Q.  Okay.  Now, did there come a point in time after you heard

8    about this incident where you learned about an association she

9    had with other motorcycle clubs?

10   A.  Yes.

11   Q.  What was that association?

12   A.  That she was Nick's Hells Angels' old lady.

13   Q.  Okay.  And when do you think you learned about this?

14   A.  I don't remember.  A week or two.

15   Q.  Okay.  So in that time frame, what is -- did you -- when

16   you heard about it, was there any significance attached to that

17   information or was it just no big deal?

18   A.  At the time, I thought it was no big deal.

19   Q.  Okay.  And what about the other folks, the other people,

20   Devils Diciples that you are talking about?  Were they

21   concerned about that?

22   A.  They didn't seem to be.

23   Q.  All right.  Now, did that change over time, to your

24   knowledge, that concern or lack of concern?

25   A.  Well, it wasn't much that long after that, that they came

1   down and took care of the Tucson chapter, so.

2   Q.  Okay.  They being whom?

3   A.  Out-of-town Diciples.

4   Q.  And were you there for that event?

5   A.  Yes, I was.

6   Q.  Tell the jury what, what you remember.

7   A.  Standing there on a Sunday and a bunch of out-of-town

8   Diciples came in, all wanting to --

9   Q.  You're standing where?

10  A.  Outside at first.

11  Q.  Outside the clubhouse?

12  A.  Yes.  And then they all come in and then we all go inside.

13  And then all hell breaks loose.

14  Q.  Okay.  Let me, let me stop you there.  I'll slow you down a

15  little bit.

16          This is a Sunday, and you're at the Tucson Devils

17  Diciples clubhouse?

18  A.  Yes.

19  Q.  What time of day is it?

20  A.  I don't remember.  One, two, three in the afternoon.

21  Q.  Okay.  It's not nighttime?

22  A.  Not yet, no.

23  Q.  And why are you there?

24  A.  Had church every Sunday.

25  Q.  Okay.  So you assume you're just going to -- you're being

JURY TRIAL, VOLUME XXV - 12/8/2014
KENNETH DEAN JOHNSON - DIRECT BY MR. STRAUS

1   there for church?

2   A.   Just, yeah, weekly meeting, yeah.

3   Q.   And you said a bunch of other people showed up?

4   A.   (Nodding head.)

5   Q.   In your mind, was that expected or unexpected?

6   A.   It was unexpected.

7   Q.   Okay.  And who, who were the other folks that showed up?

8   A.   I remember seeing Holiday and Little John.  A lot of them,

9   I didn't even know.  And they just came in the clubhouse and

10  started thumping on people.

11  Q.   Okay.  Were they, were they out-of-state people?

12  A.   Yes.

13  Q.   Were they all Devils Diciples members?

14  A.   Pretty sure.

15  Q.   Were they wearing their colors?

16  A.   I think so.

17  Q.   Okay.  Is that the normal thing when you show up for

18  church, you wear colors?

19  A.   Yes.

20  Q.   Are you familiar with the term called "nomad"?

21  A.   Yeah.

22  Q.   Do you know what a nomad is?

23  A.   Yeah.

24  Q.   Tell the jury what a nomad is.

25  A.   I guess it's like an elite Devils Diciple, from what I

1   understand.

2   Q.  Elite in what sense?

3   A.  I don't know how they -- how they pick them.  I have no

4   idea how they choose a nomad.

5   Q.  Okay.  Do they have a good reputation, bad reputation?

6   A.  They ride a lot of miles, from what I understand.

7   Q.  Do they have any other reputation in terms of force,

8   physical force?

9           MR. PITTS:  Judge, I think he said -- I think the

10  answer to the earlier question --

11          THE COURT:  What's the objection?

12          MR. PITTS:  Lack of foundation.  He said he doesn't

13  know about the nomads.

14          THE COURT:  Thank you.  Overruled.

15          Proceed.

16          THE WITNESS:  Rephrase your question again, please.

17  BY MR. STRAUS:

18  Q.  Certainly.

19          You had -- let me lay a foundation.

20          During your five years with the Devils Diciples, you

21  interacted with not only members of the Tucson chapter, but

22  other chapters, correct?

23  A.  Yes.

24  Q.  And you also met people that were termed -- were called

25  nomads, correct?

1    A.  Yes.

2    Q.  They were members of the Devils Diciples?

3    A.  Yes.

4    Q.  And through the course of your membership with the Devils

5    Diciples, you're interacting with other Devils Diciples,

6    presumably interacting with nomads.  Did you come to learn of

7    the reputation of nomads?

8    A.  Like I said before, I guess they were supposed to be like

9    the elite, meaner part of the Devils Diciples or something, I

10   guess.

11   Q.  Okay.  Did they have any other role that you know of?

12   A.  No.

13   Q.  Okay.  On the day that you were talking about when the

14   out-of-state people showed up, were there any nomads there?

15   A.  Yes.

16   Q.  Do you remember who -- any of those nomads?

17   A.  Bean was there, but he lived there, so.

18   Q.  Okay.  Did Bean go by any other name?

19   A.  String Bean.

20   Q.  Okay.  Any other nomads that you remember?

21   A.  I don't remember their names, no.

22   Q.  Okay.  So how many people -- you're outside the clubhouse,

23   correct, when everybody starts showing up?

24   A.  Yes.

25   Q.  How many people -- how many Devils Diciples ends up showing

1   up?

2   A.   I'm thinking 15 or 20.

3   Q.   Okay.  And do they show up on bikes --

4   A.   Cars and trucks.

5   Q.   -- cars?  Or both?

6   A.   Cars and trucks.

7   Q.   Okay.  No bikes?

8   A.   I don't remember any bikes, no.

9   Q.   All right.  Is that unusual?

10  A.   Yeah.  Now that I look back on it, yeah.

11  Q.   Are you supposed to ride your motorcycle to a church

12  meeting?

13  A.   No.  You don't have to.

14  Q.   Okay.  But this was unusual in the sense of people driving

15  trucks and cars?

16  A.   Just coming in, period.

17  Q.   All right.  And did you have any interaction with any of

18  these Devils Diciples, the out-of-state, like, hey, why are you

19  guys here, anything like that?

20  A.   They walked -- I just said, hey, what's up?  They walked in

21  and walked right past me.

22  Q.   Okay.  Any interaction when you said, what's up?

23  A.   No.  What are you doing?  Just walked right past me.

24  Q.   So what did you do after that?  Greet -- is that normal?

25  Aren't you supposed to greet someone?

1   A.  Usually, yeah.

2   Q.  Is there, is there a certain protocol for Devils Diciples

3   when they see another Devils Diciples?

4   A.  If you don't know them, you're supposed to say, I'm

5   so-and-so from Tucson Devils Diciples, and prospect, whatever

6   you are at the time.

7   Q.  Okay.  And did that occur on that particular day?

8   A.  No.

9   Q.  All right.  So you, I think you said that you went into the

10  clubhouse?

11  A.  Yes.

12  Q.  And why did you go into the clubhouse?

13  A.  They called us all in there.

14  Q.  All right.  And what do you see when you get into the

15  clubhouse?

16  A.  It wasn't but a second and every -- all hell just broke

17  loose.  I heard a -- I heard a gun go off.  Somebody said, hit

18  the ground.  I hit the ground.

19  Q.  And were you -- when you say, "all hell broke loose," what,

20  what physically are you hearing and seeing?

21  A.  Other Diciples beating up Diciples that aren't from my

22  chapter.

23  Q.  Okay.  And who was involved in the beating up, if you could

24  see?

25  A.  Who got beaten?

1  Q.  Yes.

2  A.  From what I remember, it was Riggs, Golf Club, Johnnie Old

3  School, Two Dogs, I think Panhead.

4  Q.  Panhead Mike?

5  A.  Yeah.

6  Q.  Were you beaten at all?

7  A.  No.  No.  I was on the ground, and that's when I realized

8  nobody is hitting on me, so I got up and went outside.

9  Q.  Okay.  How long do you think you were in the clubhouse, how

10  many minutes?

11  A.  Two, three minutes.

12  Q.  All right.  What's going through your mind at this point?

13  A.  What's going on?  I had no clue what was going on.

14  Q.  Okay.  Is this something, is this something out of the

15  ordinary or is this something you would have expected?

16  A.  I've never witnessed or seen anything like that before in

17  my life.

18  Q.  All right.  At this moment in time, do you -- I take it you

19  later learn why this occurs, correct?

20  A.  Yes.

21  Q.  At this point in time when you walk out of the clubhouse,

22  do you have any idea why this is occurring?

23  A.  I don't have a clue.

24  Q.  Okay.  Had you heard any inkling of this occurring?

25  A.  Not a clue.

1    Q.  All right.  So you leave the clubhouse.  What do you do?

2    A.  I'm standing out in the courtyard.

3    Q.  How long do you stand out in the courtyard?

4    A.  Probably about 10, 15 minutes.

5    Q.  What are you doing?

6    A.  Wondering what's going on.

7    Q.  Okay.  Is there, is there anything going through your mind

8    about getting out of there or --

9    A.  Oh, yeah.

10   Q.  -- calling the police or doing something?

11   A.  Wasn't calling no police, but getting out of there was one

12   of the things, yeah.

13   Q.  Okay.  You say that pretty emphatically.  Why wouldn't you

14   call the police?

15   A.  I'd get killed.

16   Q.  All right.  So after this about 10, 15 minutes, what do you

17   do then?

18   A.  I see Panhead Mike's truck going out the driveway.  And

19   then I later learned out they took them all out to the desert

20   and dropped them off.

21   Q.  Okay.  What kind of truck did Panhead Mike have?

22   A.  A big yellow one, is all I can tell you.  I don't know what

23   kind it was.

24   Q.  A fancy one?

25   A.  I guess a custom one, yeah.

1  Q.  All right.  Did you ever go back into the clubhouse that

2  night after that?

3  A.  Not that night, no.

4  Q.  Okay.  You see the truck leave.  Do you have any

5  interaction with anybody?

6  A.  No.

7  Q.  Did you see anyone hitting on anyone when you were in the

8  clubhouse?

9  A.  I did see Holiday trying to restrain Two Dogs.  I didn't

10  see him hitting him, I saw him trying to restrain him.

11  Q.  All right.  And when you were outside, did you see any, any

12  hitting going on?

13  A.  I didn't see any hitting, but I saw him escorting Golf Club

14  into the clubhouse.

15  Q.  Who did you see escorting?

16  A.  I don't remember.

17  Q.  All right.  Golf Club was outside of the clubhouse when

18  this began?

19  A.  He was in his room, I believe.

20  Q.  All right.  Now, at this point in time, were you -- where

21  were you living?  Were you living on the property?

22  A.  No.  I had my own house.

23  Q.  Okay.  So were there any women on the property at this

24  point in time?

25  A.  I think there was Riggs' girlfriend Angel and her daughter.

284

1  Q.  During this incident, did you see them at all?

2  A.  I saw them walking up the driveway, I believe.

3  Q.  Walking up the driveway or down?

4  A.  Down, out of the driveway.

5  Q.  Okay.  And I take it at some point in time you leave?

6  A.  Yes.

7  Q.  Did you -- while you were there, before you left, did you

8  ask anybody what was going on?

9  A.  There was nobody left.

10  Q.  All right.  So you're one of the few people left?

11  A.  Yes.

12  Q.  What about the out-of-towners, did they leave?

13  A.  They were gone, yes.

14        MR. STRAUS:  Judge, this is probably a logical time.

15        THE COURT:  Very good.  That's fine.

16        MR. STRAUS:  In a sense.

17        THE COURT:  Thank you.  You can prepare in a moment to

18  leave.  A couple of comments for the jury before we do leave.

19        You can have a seat, Mr. Straus.

20        The matter will recess until tomorrow morning at

21  9:00 a.m. on our regular schedule, a full day schedule

22  tomorrow.

23        We're looking at the last several days, the last few

24  days of testimony from the Government witnesses, I am informed

25  this week, perhaps next week.  And the case is, from the

```
 1    Government's perspective, we've been told, pretty likely to
 2    be winding up.
 3             There's some other things that will happen following
 4    that with the possible presentation of additional witnesses.
 5    There are a number of administrative things that are going
 6    to -- that are going to involve delays in -- for any in-court
 7    business.  So at the end of a trial, it's normal that the
 8    ordinary schedule of nine in the morning until break time and
 9    so forth, we don't want to adhere to because we have other
10    administrative things, legal matters that have to be discussed
11    with the attorneys.  It's not witness presentation for the
12    jury.  So you may be waiting some of the time that you were
13    today for various reasons.
14             We'll try to keep that to a minimum and try to
15    schedule times to do that when you're actually not even
16    necessarily here in the courthouse.
17             In the meanwhile, thank you for the -- on behalf of
18    the Court and all of the attorneys and others who have received
19    the special holiday greetings that you've provided to us.
20             I want to say a word about that.  We're going to put
21    all of that away tomorrow.  It was, it was delightful and it
22    was fun.  I want you to remember, however, since we have
23    attorneys involved in receiving these holiday greetings -- and
24    some of them may have children or grandchildren that can use
25    these or even others, if you're going to be bringing more
```

```
 1   along, more holiday greetings of that kind.  But you -- I will

 2   remind you, though, through all of the goodwill that is

 3   expressed in that regard, you are and you will remain utterly

 4   independent from the attorneys and the positions that they

 5   represent.

 6           You are an independent body.  You're independent from

 7   the defense attorneys and the defense generally.  You are

 8   independent from the Government.  Independent even from the

 9   Court.  You are the fact-finders here, and you shouldn't, even

10   with the goodwill that's expressed during the holiday season,

11   quite frankly, you shouldn't lose track of that.  And I trust

12   that you will not.  I trust that you will maintain your

13   complete independence here, independence of mind and attitude

14   throughout.

15           Thank you for that, ladies and gentlemen.  You're

16   recessed until tomorrow morning.

17           COURT REPORTER:  All rise.

18       (Jury out, 4:47 p.m.)

19           THE COURT:  Does the Government need any record?

20           Does the defense need a record?

21           Okay.  We'll see you tomorrow.

22           COURT REPORTER:  Court is adjourned.

23       (Proceedings concluded, 4:47 p.m.)

24

25
```

1                    *              *              *

2

3                    CERTIFICATE OF REPORTER

4

5          As a Federal Official Court Reporter for the United

6    States District Court, appointed pursuant to provisions

7    of Title 28, United States Code, Section 753, I do hereby

8    certify that the foregoing is a correct transcript of

9    the proceedings in the above-entitled cause on the date

10   hereinbefore set forth.

11

12

13                         Dated this 9th day of December, 2014.

14

15                         s/ Christin E. Russell
                           Christin E. Russell
16                         RMR, CRR, FCRR, CSR
                           Federal Official Court Reporter
17

18                         s/ Rene L. Twedt
                           Rene L. Twedt
19                         CSR-2907, RPR, RMR, CRR
                           Federal Official Court Reporter
20

21

22

23

24

25