```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                  Plaintiff,         Case No. 11-20129
                                       Case No. 11-20066
 5      -v-

 6   SCOTT WILLIAM SUTHERLAND, D-1,
     PATRICK MICHAEL MCKEOUN, D-4,
 7   JEFF GARVIN SMITH, D-5/D-1,
     PAUL ANTHONY DARRAH, D-6/D-2,
 8   CARY DALE VANDIVER, D-7/D-5,
     VINCENT WITORT, D-8,
 9   DAVID RANDY DROZDOWSKI, D-17,

10                  Defendants.
     _____/
11
                EXCERPT OF JURY TRIAL, VOLUME XXXIV
12               (Closing Argument of Ms. Mohsin)
              BEFORE THE HONORABLE ROBERT H. CLELAND
13               United States District Judge
            Theodore Levin United States Courthouse
14               231 West Lafayette Boulevard
                     Detroit, Michigan
15               Tuesday, January 20, 2015
     APPEARANCES:
16
     FOR THE PLAINTIFF:   SAIMA MOHSIN
17                        ERIC STRAUS
                          U.S. Attorney's Office
18                        211 W. Fort Street, Suite 2000
                          Detroit, MI  48226
19
                          JEROME MAIATICO
20                        United States Department of Justice
                          1301 New York Avenue, NW
21                        Washington, DC 20005

22   FOR THE DEFENDANT:   CRAIG A. DALY
                          (Sutherland, D-1)
23                        615 Ford Building
                          Suite 820
24                        Detroit, MI 48226

25
```

```
 1    APPEARANCES:              (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7

 8                          PATRICIA A. MACERONI
                            (Darrah, D-6/D-2)
 9                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
10
                            MARK A. SATAWA
11                          (Vandiver, D-7/D-5)
                            3000 Town Center, Suite 1800
12                          Southfield, MI 48075

13                          KIMBERLY W. STOUT
                            (Witort, D-8)
14                          370 East Maple Road, Third Floor
                            Birmingham, MI 48009
15
                            BYRON H. PITTS
16                          535 Griswold, Suite 1630
                            Detroit, MI 48226-4218
17
                            PHILLIP D. COMORSKI
18                          535 Griswold
                            2632 Buhl Building
19                          Detroit, MI 48226

20                          RYAN H. MACHASIC
                            (Drozdowski, D-17)
21                          134 Market Street
                            Mount Clemens, MI 48043
22

23          To Obtain a Certified Transcript Contact:
                         Christin E. Russell
24          RMR, FCRR, CRR, CSR - (248) 420-2720
             Proceedings produced by mechanical stenography.
25        Transcript produced by computer-aided Transcription.
```

```
 1                         I N D E X

 2
     JURY TRIAL, VOLUME XXXIV:                    PAGE
 3
     Closing Argument by Ms. Mohsin                   4
 4

 5

 6

 7                       E X H I B I T S

 8     (None Offered.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     CERTIFICATE OF REPORTER                        44
24

25
```

JURY TRIAL, VOLUME XXXIV:                    PAGE
Closing Argument by Ms. Mohsin                   4

CERTIFICATE OF REPORTER                        44

```
 1   Detroit, Michigan

 2   January 20, 2015

 3   3:45 p.m.

 4                *              *              *

 5        MS. MOHSIN:  Well, good afternoon, ladies and

 6   gentlemen.  It's been a long couple of months, probably more

 7   than a couple of months.  You, over time, have gotten to know

 8   the parties, the participants, the witnesses, and a number of

 9   people that have come and gone through this courtroom and

10   you've sat here silently throughout, occasionally chuckling or

11   making a comment here and there, but for the most part

12   silently.

13        It is very common for attorneys on behalf of the

14   Government and on behalf of the defense to thank jurors for the

15   service that they provide by coming here every day and

16   listening to the evidence and doing their jobs and their duty

17   as jurors to find the evidence, apply it to the law, and render

18   a fair and just verdict.  But I think you've guys have gone

19   above and beyond that.  So it is a great honor for me to thank

20   you for your participation and put you into the next phase of

21   this trial, the end of this trial.

22        So formally, on behalf of the United States, myself,

23   my co-counsel, and the team, thank you for your participation,

24   your listening skills, and all the things that you've done to

25   be here on time every single day.
```

1          It is my job now, ladies and gentlemen, to try and

2    take four months of testimony and evidence, and in a short

3    period of time, condense it in a manner that helps you when you

4    go back into that jury room to assess the information that

5    you've received, determine whether or not you find that

6    information to be credible, apply it as facts, find what the

7    facts are, apply it to the law as the judge has just instructed

8    you, and to render a fair and just verdict.  And so I'm going

9    to try to do that, I'm going to endeavor to do that a little

10   bit today, and then for a little while tomorrow.  So let me

11   begin and do just that.

12         The first thing I want to tell you is that at the

13   beginning of this trial, you were told that you were going to

14   become experts on outlaw motorcycle clubs.  I think it's safe

15   to say that that may very well have happened over the course of

16   the last few months.  And I'm going to ask you to call upon the

17   hours and hours of testimony of the number of different people

18   that you saw come in the courtroom in answering many of the

19   questions that are going to come up during the course of both

20   my conversation with you, as well as what the attorneys will

21   say to you as far as what elements have been proven and how

22   they've been proven.

23         Just by way of counting numbers, we had over 60

24   witnesses testify in this case.  Twenty-two of those

25   individuals were either former members, or I think two of them

1    had been prospects.  Another 11 were what's called "old

2    ladies."  We had seven associates or hang-arounds.  You are all

3    familiar with those terms by now.  Seven citizens and 13 law

4    enforcement personnel.  So that's sort of the tally.  And now

5    we've got to assimilate those 60 witnesses' testimony, condense

6    it down in a way that makes sense.  Let's begin.

7            The slide that you see in front of you on the screen

8    shows which defendants are at -- on trial here today.  You're

9    familiar with their names.  You're familiar with their

10   nicknames.

11           What I've done is I've created a chart that really

12   lists which counts apply to which defendants.  You have this in

13   the form of the indictment.  You've been provided this in

14   connection with the jury instructions that have been delivered

15   to you earlier by the Court.  But this kind of just sums it up

16   so that it's easy to see with respect to part 1.  And I'm going

17   to devote some time to all of the charges in both parts.

18           As you can see, all of the defendants are charged in

19   Count 1, the RICO conspiracy.  All of the defendants are

20   charged in Count 3, the drug conspiracy.  And then various

21   defendants are charged in various other offenses.

22           Just to note, one of the terms that was used both in

23   the instructions, and that I will use as well, is the

24   "conspiracy" term versus the "substantive offense" term.  A

25   "conspiracy" has been described to you a lot.  "Substantive

```
 1   offense" is really just something that's not the agreement.

 2   It's the actual offense itself.  In other words, if someone is

 3   charged, as in a moment I'll tell you, with being a felon in

 4   possession of ammunition, there's no talk about agreement.

 5   It's the actual possession of that ammunition that's at issue.

 6   So we call those "substantive offenses."

 7           There's a lot of conspiracy and substantive offense

 8   interrelationships in this case.  So as we go through this

 9   process, sort of keep that in your mind.

10           Moving to the next slide.

11           You'll see that this is part 2.  Again, it's a

12   conspiracy count and then two substantive counts.  Part 2

13   relates only to three defendants:  Smith, Darrah and Vandiver.

14   And again, as we go through, I'm going to be highlighting these

15   names for you, but I wanted to put it in a chart just to make

16   it a little bit clearer.

17           One of the things that the Court handed out to you

18   earlier today is a document that's entitled "Overt Acts."  And

19   it has a little note at the top, "Insert after page 13, part 1,

20   Count 1 of the redacted consolidated indictment."  These are

21   overt acts that relate to Count 1, the RICO conspiracy.

22           Now, the judge has gone to -- through the instructions

23   with you and has told you that overt acts are not required for

24   Count 1.  And so these are not required overt acts.  However,

25   what they do do is they provide you with a non-exhaustive, in
```

other words, incomplete list of certain things that happened,
markers in time. So for instance, the very first thing that's
listed on this document, "In furtherance of the conspiracy and
to effect the objects thereof, the defendants and their
co-conspirators committed and caused to be committed the
following overt acts, among others, in the Eastern District of
Michigan and elsewhere." And then it begins to list things.

The very first one that's listed is August 14th, 1993,
and it talks about William Bartell, a/k/a "Stumpy," involved in
the murder of Charles Isler in the Cadillac clubhouse. That's
sort of the first event that's listed on this document.

You've heard testimony about stuff that happened
before 1993, and you will also have heard stuff that happened
after the last overt act that's listed here. You will also
have heard a number of things in between. But when you go back
in that jury room and you're trying to place things perhaps in
chronological order in your assessment of how to look at this
case, hopefully this document will be of some assistance to you
to provide you with that sort of time map sort of a thing.

So again, this is something that's not -- the
Government is not required to prove any of these overt acts.
It's really just being provided to help you in the process of
trying to get through so much information. And if I didn't say
it before, it is in chronological order.

And the last thing I think on here, just to make it

1   perfectly clear that's listed on here anyway, is January 18th

2   of 2012, and it relates to the items that were seized from

3   David Drozdowski's residence in Fair Haven, Michigan.

4        I want to point out, too, that during the course of

5   reviewing this document, you may come across individuals that

6   are referenced by the phrase "person," and then a letter, like

7   "person A" or "person B."  And a key to that is provided at the

8   end to help you understand who those individuals are.

9        Now, there is a term, again, "overt acts" and then

10  there's a term "racketeering acts."  And I think that there's

11  been a lot of discussion about that in the jury instructions,

12  but I don't want you to get confused.

13        Overt acts can be legal or illegal.  They can be

14  anything that's done in furtherance of some activity.  And all

15  of the instructions are very specific about which charges

16  require overt acts and which don't.  There's really only two

17  counts that require overt acts, but nevertheless "overt acts"

18  really means to move something forward, move the ball forward

19  toward meeting the object of the conspiracy.

20        So if I had an agreement to do something with someone,

21  let's say it was a bank robbery, for example, and I agreed

22  with, you know, another individual that I was going to commit a

23  bank robbery.  We sat down, we talked about it, we agreed we're

24  going to go on Tuesday, we're going to go into this bank, and

25  before we do that, I think we should go check the bank out, we

```
 1    should case the joint and see what it looks like, what's the
 2    security like, you know, is this something we want to do.
 3              Physically going to see a bank, looking in a window
 4    perhaps, doing that sort of thing is perfectly legal activity.
 5    However, it could be considered an overt act that was done to
 6    promote and further that activity being that bank robbery.  So
 7    that's an "overt act."  Okay?
 8              A "racketeering act" is something different.  A
 9    "racketeering act," those are specified.  And when you look at
10    the instructions, you will see, as the judge was telling you,
11    racketeering act number one, racketeering act number two, he
12    was sort of labeling them.  I don't think they were included in
13    the instructions.  But as he was going through them, he was
14    telling you, you know, here is obstruction of justice, and here
15    is witness tampering, and here is controlled substances.  And
16    he was talking about those things and numbering them in a
17    certain way.
18              What I think you need to understand from that is those
19    are the types of activities at issue here.  So when I talk
20    about, or anyone talks about a "racketeering act," we're
21    talking about one of the specified types of activities that the
22    Court has been talking to you about in the instructions, and
23    that you have a copy of.  So don't get confused.  Keep that
24    separate in your mind, an "overt act" from a "racketeering
25    act."  Okay?
```

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN                                    11

1          Now, one of the things that we had talked about -- or

2     that I had mentioned to you earlier was that your job is to

3     find what the facts are, apply it to the law that the judge has

4     given to you, and render a fair and just verdict in this case.

5          And in order for you to do that, there are going to be

6     certain tools that you're going to need, certain instructions

7     that have already been provided to you.  And one of the main

8     instructions that's been given to you is to use your common

9     sense and good judgment.

10         All of you come here with a vast variety of

11    experiences in reading people, looking for truth.  It doesn't

12    matter if you have seen an infomercial about some miracle diet

13    pill or whether you have had some experience with children and

14    you're trying to figure out who stole the cookie from the

15    cookie jar.  We all come in here with experience in determining

16    who is telling the truth and who is not.  And of course, one of

17    the things we look at is their -- is demeanor, the way the

18    person speaks, the way the person answers questions.

19         Some of the things the judge told you about already,

20    whether they are evasive, whether they are straightforward,

21    whether their story makes sense, those are all things that you

22    have had the opportunity to sit and observe with each one of

23    the 60 people that was put on the witness stand here during the

24    course of this trial.  So you need to think about all of those

25    things when you're assessing the person's credibility.  Common

```
 1    sense is also going to play a huge part in that assessment.

 2          And then one other thing you're going to have to think

 3    about, because some, not all, but some of the witnesses that

 4    the Government put on were witnesses who had entered into some

 5    sort of an agreement with the Government.  Whether the

 6    agreement was for a reduction of sentence, or a different type

 7    of an offense, those were the types of witnesses that the Court

 8    has instructed you to look at with more care and caution.  And

 9    that is entirely appropriate because, ladies and gentlemen,

10    when you're going through the testimony of those witnesses, you

11    already know that they have a very specific motive; and that

12    whatever that motive might be, you have to determine whether

13    you believe them standing alone, or whether their testimony has

14    been corroborated through the testimony of other witnesses,

15    through the testimony of evidence, and through the totality of

16    the entire case.

17          One of the things the instructions says is don't pay

18    attention to their testimony standing alone; in other words, it

19    should be corroborated.  Right?  Perhaps you'll believe it even

20    if it isn't corroborated, but pay close attention to it.  And

21    that's entirely appropriate.

22          I submit to you, ladies and gentlemen, that each of

23    the witnesses that you've heard from in this witness box that

24    was provided with some sort of an agreement or some sort of a

25    benefit, their testimony does not stand alone.  Their testimony
```

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

1   was supported by 59 other people, slews of physical evidence,

2   wiretap calls, surveillances, audio recordings, you name it.

3   We've put a huge plethora of evidence before you from which you

4   can draw to determine whether or not you believe what each

5   witness told you.

6        And I would encourage you, as you go through this

7   process of assessing the testimony of those individuals, weigh

8   it, compare it, and come to your own conclusion.  And I further

9   submit to you, ladies and gentlemen, that when you do that, you

10  will see that their testimony doesn't stand alone.  So take

11  that into account when you're making that assessment.

12        One of the things that I just told you in the center

13  of the witnesses that the Government has put on, or the

14  evidence that the Government put -- has put on, are people who

15  are what I would say are insiders.  People who were actually

16  patched, full-patched members of the Devils Diciples.  Some for

17  a period of months; others, for a period of many, many, many

18  years.  And those witnesses, a variety of ages and experience

19  levels coming from different states, came in and talked to you

20  about their experience with the Devils Diciples as insiders.

21        Surrounding that circle are what's called associates,

22  old ladies, prospects or hang-arounds.  It's hard to say "old

23  ladies."  But old ladies, prospects and hang-arounds.  You're

24  familiar with those terms.  But those are folks that sort of

25  hover on the fringes of those insiders.  Those are individuals

```
 1    that, one could argue, based again on the testimony that you've
 2    heard and the evidence that you've seen, they come and go
 3    within this enterprise.  They are involved in certain
 4    activities.  They are exposed to certain activities.  They see
 5    certain things.  They hear certain things.  And so they are
 6    closest to that inner circle or that surrounds this
 7    organization, the Devils Diciples Motorcycle Club.  And you
 8    heard from a fair variety of those folks.
 9          The next circle are citizens.  They are one step
10    removed.  They might attend parties.  They may come and fix the
11    plumbing; I don't know if that happened.  I'm saying there's
12    somebody else that's not connected to this enterprise
13    necessarily.  They are farther removed.  And then finally, law
14    enforcement is at the outer edge of this circle.
15          Nevertheless, you have heard from witnesses and
16    individuals in all four categories.  And so you do have a
17    fairly full toolbox from which to draw when you go back in that
18    jury room and start weighing and assessing and determining what
19    you believe and what you don't believe.
20          Now, the Judge gave you instructions.  I'm going to
21    begin with the last one, which is Count 37, because it's the
22    easier one from the point of view of explanation.  It's kind of
23    out of order and I'm going to be going out of order here, but
24    I'm hoping that there's a method to this madness.
25          So there are three elements.  The Court has already
```

1    instructed you as to these three elements.  And, ladies and

2    gentlemen, I submit to you that two of those elements are off

3    the table.  They have already been agreed upon and the parties

4    have said we stipulate in S-16 and S-17 as to the first and the

5    third elements.  The first element being that the defendant is

6    a convicted felon.  We're talking about David Drozdowski.  And

7    there is a stipulation in which that the parties agree that

8    that fact has been proved to you.

9         The third element is the ammunition at issue, traveled

10   in interstate commerce before the defendant possessed it.  That

11   is the corrected stipulation S-16, which we also signed, along

12   with the defense.  The parties agreed to it.  So I submit to

13   you, based upon these two stipulations, you can find that the

14   Government has proved beyond a reasonable doubt that the first

15   and third elements have been met.

16        So really, what's the issue?  Whether or not the

17   defendant, after his felony conviction, he possessed the

18   specified ammunition.  So that's really the only issue, I

19   submit to you, ladies and gentlemen, that you need to assess

20   when making a determination whether or not the Government has

21   met its burden of proving to you that essential element beyond

22   a reasonable doubt.

23        How do we do that?  All right.  One way, one factor

24   that you can take into consideration in determining whether or

25   not the defendant possessed this firearm is what's contained in

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN                              16

 1    this photograph right here.  You've heard testimony from Lori

 2    Maday.  I believe she took that photograph -- if not, it came

 3    from her camera -- in which the defendant David Drozdowski, who

 4    is pictured with the bandana in the center of that photograph

 5    and is pointing to, and the testimony was real firearms --

 6    towards the person in the camera.  That's something that you

 7    can take into account.

 8            Second, the ammunition at issue here, ladies and

 9    gentlemen, was found inside of his trailer that he shared with

10    Lori Maday.  There was ammunition in a closet, like a

11    linen-type closet.  And there was also ammunition on a display

12    case in the living room.

13            Remember what the Judge told you about possession.

14    There is possession that's actual possession, and then there is

15    constructive possession.  Something that we have constructive

16    possession over, we can control that item even if we're not

17    actually possessing it.  Just like I did with this firearm.

18    You don't have to buy it to possess it, right?  It could be

19    something that you possess with someone else.

20            I submit to you, ladies and gentlemen, that the

21    evidence has shown and proved beyond a reasonable doubt that

22    the ammunition at issue here was possessed by David Drozdowski

23    and his girlfriend inside of the residence that they shared,

24    both the rifle ammunition and the shotgun shells.  And that

25    element -- that charge has been proved to you beyond a

 1    reasonable doubt.

 2          And this is really how it works.  You go through each

 3    count, you look at the elements, you read the instructions

 4    about the various definitions that might apply, and then you

 5    talk about and determine what facts, if any, support each of

 6    the various elements.

 7          Moving on, we've talked a lot about conspiracy.  And

 8    just so that we're clear, once again, the gambling conspiracy

 9    and the conspiracy to suborn perjury and obstruction of

10    justice, and that's the one that relates to Victor Castano and

11    Keith McFadden and Stella Herron, those are the two that

12    require an overt act.

13          The overt acts are alleged in the indictment.  You

14    guys have a copy of that indictment.  There are a number of

15    overt acts that are contained within each of those two counts.

16    We only have to prove one conspirator did one in furtherance of

17    the conspiracy.  Okay?  And I'm going to get to those

18    specifically.

19          Next slide.

20          Now, I want to talk with you about RICO.  Very early

21    on, this morning, the judge gave you instructions as to the

22    RICO charge.  The RICO charge, the substantive RICO charge, is

23    not charged in this case.  In other words, substantive RICO is

24    not charged.  It's a conspiracy to commit this crime.  It's an

25    agreement to commit this crime.  But you can't understand that

1    agreement if you don't understand the substantive charge.

2         So what I'm going to do is I'm going to talk with you

3    about each of these various elements.  It is going to be

4    important as I go through my closing with you to keep in mind

5    that the Government proves way more than it's required to

6    prove.  I'm going to say it again.  We often prove, and it's

7    the Government's contention in this case, we have proved way

8    more than the law requires us to prove.  It's a heavy burden

9    that the Government bears to prove each and every element of

10   each charged offense beyond a reasonable doubt.  We don't shirk

11   our burden.  We carry our burden.  But don't hold us to a

12   higher burden is all I'm saying.  Look at the elements; apply

13   them to the law.

14        So one of the ways in which a conspiracy can be proved

15   is with evidence that the objects of the conspiracy actually

16   occurred.  Right?  Some of the best evidence that we have that

17   someone agreed to do something is when that thing actually

18   happens.  So once again, we're only required to prove the

19   agreement.  But sometimes the best evidence of that is the

20   results actually occurred.  So I'm going to try to keep that

21   distinction for you, but keep that in your mind.  Five elements

22   of substantive RICO.  And the conspiracy is also factored into

23   the instructions that are listed on this screen.

24        What are those?  There has to be an enterprise.  There

25   has to be an interstate commerce component.  There has to be --

1  a conspirator has to be associated with the enterprise.  A

2  conspirator has to conduct or participate in the conduct of the

3  affairs of the enterprise.  And a conspirator has to

4  participate in the conduct of the affairs of the enterprise

5  through a pattern of racketeering activity.  Now, it reads a

6  little differently than what I just said to you because of that

7  conspiracy umbrella, agreement umbrella, but that's really what

8  we're talking about here, those five things.

9          The evidence that was presented through nearly all the

10  witnesses related to one or more of those elements, whether it

11  was evidence about the way in which the enterprise was created

12  or how it functioned or what the purpose of it, or the

13  longevity of it, all of those various factors, whether there

14  was evidence presented about interstate commerce, how people

15  were associated with the enterprise, who conducted or

16  participated in the affairs in the enterprise, what the affairs

17  of the enterprise were, and what the pattern of racketeering

18  activity was.  So let's go through each one in a little bit

19  more depth.

20          The first element is the enterprise.  An enterprise is

21  a group of individuals associated in fact, associated together

22  for a common purpose.  And there are three structural features.

23  We just talked about them very briefly.  There has to be a

24  purpose, there have to be relationships among those associated

25  with the enterprise, and there has to be longevity sufficient

 1    to permit the associates to pursue the enterprise's goals or

 2    purpose.

 3           Here, the Government contends that the enterprise is

 4    the Devils Diciples Motorcycle Club; that this is an enterprise

 5    that is comprised of a group of individuals who are, in fact,

 6    associated, in fact, and they function together as a continuing

 7    unit for the common purpose of achieving the objectives of the

 8    enterprise.

 9           So, what evidence do we have that the Devils Diciples

10    Motorcycle Club met those three requirements?  Let's talk a

11    little bit about structure.  You've heard testimony about the

12    fact that there are chapters all over the country; that there

13    are state chapters, that there are local chapters, and that

14    they span, you know, in various areas across the nation.  In

15    fact, there may have been some evidence about other chapters

16    that are outside of the country as well.

17           I want to talk to you about the structure within each

18    chapter.  There is a structure within the, within the chapters

19    that exist.  There are various roles that various individuals

20    play within each chapter, within each state and, of course,

21    nationally.  There are people that are known as bar stewards

22    and there are warlords and there are enforcers and treasurers

23    and vice presidents and presidents.  And those designations

24    have specific roles that they play.

25           You've heard testimony from a number of witnesses who

 1   talked about "black eyes," giving black eyes, right?  That was

 2   a job that was typically reserved for the enforcer or the

 3   warlord.  Those two terms sometimes being synonymous and

 4   sometimes not being synonymous, but certainly being related in

 5   their job description, for lack of a better term.

 6          You've heard about road captains, who are supposed to

 7   help the caravan of motorcycles or vehicles go from one

 8   location to another on a run.  That's their job.  Warlords take

 9   care of security.  Chapter presidents, they give the orders.

10   Treasurers take in monies and pay various bills that are due,

11   whether it's the heating bill or the mortgage or whatever it

12   is.  So this is an enterprise that's comprised of a rigid

13   structure.  There is a local structure, there is a state

14   structure, and then, of course, the national structure.

15          And of the defendants that are on trial here today,

16   you have the national president, Jeff Garvin Smith, also known

17   as "Fat Dog."  You have the national vice president, Paul

18   Darrah, also known as "Pauli."  And you have the national --

19   one national warlord, Cary Dale Vandiver, also known as "Gun

20   Control."  So those are some of the individuals and some of the

21   roles that they have.

22          One of the jobs that the national president has is

23   to -- that he is -- one of his jobs is to be responsible for

24   the overall management of the Devils Diciples Motorcycle Club,

25   its members and chapters, including giving final approval over

1   activities that generally affect this organization, this

2   enterprise.

3          And I think that the evidence, ladies and gentlemen,

4   that you've seen and heard shows how much control Fat Dog

5   exerted over members of this enterprise.  There have been

6   telephone communications, there have been -- there has been

7   witness testimony, all about some things that Fat Dog would

8   require them to report to him about or information that he

9   wanted to know about so that he could effect it.

10         Something pops in my head which I think really

11  exemplifies the amount of information control that this

12  individual, Fat Dog, this national president, exerted.

13         You may recall the testimony of Michael Mastromatteo,

14  also known as "Iron Mike."  In his testimony, he talked about

15  being in New Mexico, I believe it was, with David Roberts.  And

16  they had just -- he had just engaged in a drug transaction with

17  Sleepy.  You guys remember Sleepy.  There's a lot of talk about

18  Sleepy.  He was the Arizona brother who later had some issues,

19  and was, you know, involved in drug trafficking with Iron Mike

20  for a period of years.

21         Well, when "Iron Mike," or Michael Mastromatteo, is in

22  New Mexico, he goes into a hotel room.  When he gets in the

23  hotel room, he later finds out that police are there.  He's not

24  sure who it is.  They put guns to his neck, and he can't

25  breathe.  You remember that whole thing.  He didn't tell Fat

 1    Dog about it and he got in trouble.

 2         You may remember him telling you when he testified

 3    that his failure to tell Fat Dog about this activity, in Fat

 4    Dog's view, could have jeopardized the Devils Diciples'

 5    enterprise, because the leadership needs to know what its

 6    members are doing.  They need to know who has been arrested.

 7         According to Iron Mike, how does -- how can Fat Dog

 8    coordinate these activities if he doesn't know that one of his

 9    guys is in New Mexico getting pulled over by the police or

10    being stopped by the police and searched by the police.  It's

11    an important piece of information.  Iron Mike got in trouble

12    for not sharing it with the national president.  So that's an

13    example of how the national president exerts his control in

14    this enterprise.

15         Now, staying on topic with some of the other members

16    and some of the other roles, you've heard a lot of testimony

17    from various individuals who, at one time or another, fit into

18    one of these categories, whether they were warlords or chapter

19    presidents or what have you.  They talked about both their

20    participation in the activities, as well as the roles that they

21    played during the course of their membership in the enterprise.

22         One of the individuals that was mentioned as a western

23    boss was Little John.  You may recall hearing about an

24    individual by the name of Little John being a western boss.

25    Later in the presentation, I'm going to show you and talk to

1   you a little bit more about who Little John was.

2          But some of the other chapter presidents whose names

3   were, were presented to you included Cuz and Riggs as being

4   chapter presidents in Arizona.  Johnny Rotten as someone who

5   had been a chapter president in California.  Gary Nelson and

6   Danny Burby had been chapter presidents at the Blue Water

7   clubhouse.  Billy Wadd, who had been a chapter president at the

8   west side clubhouse.  Charles Myatt, or "Snot," and John

9   Pizzuti, both who had been in leadership positions in the Utica

10  chapter.  Magoo, who Jeff Arnold told you was the chapter

11  president for the Decatur chapter for that period of time when

12  the Decatur chapter was in existence.  And Big Ron, who was the

13  chapter president of Anniston.  And there were many, many

14  others.

15         As for the defendants on trial here, you've also heard

16  a lot of testimony about Scott Sutherland and what role he

17  played when he was a member of the Devils Diciples Motorcycle

18  Club.  And we're going to talk about Scott Sutherland again

19  later in the presentation.  But you've heard testimony that he

20  was an enforcer.  He was a warlord/enforcer type, I think.  But

21  that same role:  Protection of the enterprise, wearing

22  firearms, providing security, guarding the national vice

23  president, those type of duties were among the duties that

24  Scott Sutherland performed in his role as an enforcer for the

25  Devils Diciples.

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

1        Now, other evidence that's been presented to you with

2   respect to the existence of the enterprise includes the fact

3   that these folks, in addition to having this organization of

4   leadership, and chapters and clubhouses, there's a requirement

5   to follow the bylaws and to abide by those bylaws, attend

6   church, and failure to attend church can result in fines or

7   black eyes.  Pay dues.  Give physical punishment, receive

8   physical punishment.  Take motorcycles from people who leave

9   the club against their will.  Obtain life insurance policies.

10  Pay into a funeral fund.  And also, to, to provide and pitch

11  and kick in monies that they earn through various activities,

12  illegal activities, kick that money into the club.  Whether

13  it's money, or drugs or what have you, there was a requirement,

14  an expectation, a demand that these individuals that were

15  members of this enterprise kick in for the benefit of the rest

16  of the club, kick in for brothers who needed, you know, a hand

17  with either money or with, with drugs.

18        One of the other things the Government is required to

19  prove is what the purposes were for this particular enterprise.

20  Some of the purposes that the Government has proved to you

21  beyond a reasonable doubt include that this was an organization

22  that was all about drugs, getting drugs, distributing drugs,

23  making money off of drugs.

24        And nobody is contending that these guys were rich and

25  that they made a lot of money.  I think there's been ample

1   evidence about the fact this was not a particularly lucrative

2   enterprise for most of the individuals that were involved.  It

3   certainly was lucrative for several of those individuals.  But

4   the evidence has been shown to you, ladies and gentlemen, that

5   drug trafficking, drug use, drug sales, all of that is within

6   the fabric of this organization.

7           If you recall the testimony of Billy Wadd when he was

8   talking about the first time that he used meth, he was with

9   then national vice president Spike, who said to him, you're not

10  -- I'm sorry.  Wrong quote.  "If you're going to roll with me,

11  if you're going to be a Devils Diciple, this is what Devils

12  Diciples do," referring to meth.  So the first time he used

13  meth, that's what he was told:  This is what Devils Diciples

14  do.  You.

15          Heard testimony from the Highwaymen guys that were up

16  here, Anthony Clark, also known as "Mad Anthony"; Gerald

17  Peters, also known as "Byrd," that their drug of choice was

18  cocaine, but the Devils Diciples, it was meth.

19          Now, ladies and gentlemen, of the various witnesses

20  that you've heard from in this case, over 20, over 20 of them

21  testified that the very first time that they tried meth was

22  with the Devils Diciples members.  It was provided to them by a

23  member of the Devils Diciples.

24          Drugs and this club went hand in hand.  Selling drugs

25  at runs, at parties, at the bar, at the clubhouse, inviting

     1   citizens to come into the bar at the clubhouse, to come to

     2   their parties, to buy raffle tickets, to come and, and

     3   participate in all of their activities, drugs was an incentive.

     4   Drugs was a lure.  Drugs was how they drew people in.  And

     5   drugs is what they used to keep this organization going,

     6   financially and otherwise.  People came to these parties to get

     7   drugs.  They came to these parties to get drugs.

     8          In order to get drugs, they either had to make them or

     9   they had to get them from somewhere, and then they made money

    10   on them.  And I think, ladies and gentlemen, that of the 60

    11   witnesses who testified here, there is ample evidence that that

    12   is what the purpose of this enterprise was, or at least one of

    13   them.

    14          Other purposes was to enrich themselves, not just from

    15   the drug activities but from gambling, theft and other types of

    16   illegal activities.  Gambling, slot machines, we've had a lot

    17   of evidence about slot machines.  We're going to talk a little

    18   bit more about that when we talk about conspiracy and, and the

    19   gambling activity.

    20          But fundamentally, these are machines that are placed

    21   in clubhouses all across the United States where the Devils

    22   Diciples have a chapter.  Citizens, again, encouraged to come

    23   to their parties, encouraged to come to their bars:  Come in,

    24   have a drink, buy a drink.  Here is some meth.  Buy some meth.

    25   Here is a gambling machine, put your money in.  And when the

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

1 money would go into these machines, the money would be

2 distributed among the guy who took care of the machines and the

3 rest of the club.  And that money was used, again, to keep this

4 club going.

5    Nobody claims that this club made millions and

6 millions of dollars off this activity.  Nobody makes that

7 assertion here, ladies and gentlemen.  But what is clear is

8 that these activities provided the fuel to keep this lifestyle

9 going.  This is how they lived.  And I think the evidence has

10 supported that.

11    Another aspect of, or another purpose that this

12 enterprise has was to enforce their authority through

13 discipline and to protect and promote and enhance their

14 authority with their reputation for violence through threats,

15 intimidation, weapons and a cultivation for being a violent and

16 powerful club.  That was an important purpose here.  And a lot

17 of the acts that they committed, particularly those acts that

18 involved violence, were directed towards that particular

19 purpose.

20    They got to protect themselves.  They are the Devils

21 Diciples.  They wear a certain patch.  Okay?  You can't allow

22 people to disrespect that patch.  Whether they are women,

23 whether they are guys who are wearing rock band jackets, what

24 have you.  Individuals that display any sort of a challenge or

25 disrespect to the territory, the power or the authority of this

club is going to be dealt with.  And so to promote that

purpose, to promote that goal, a number of acts of violence

were engaged in by members of this organization, by members of

this enterprise.  And I'm going to talk a little bit more about

that with some specificity later.

They had, they had another purpose, and that was to

maintain territory.  You heard a lot of testimony from a number

of people about how important that territory was to them.  You

can't allow another club to impinge, infringe on your

territory.

And similarly, when you take a little foray into an

area you're not supposed to go into, let's say the west side of

Detroit where the Highwaymen, as you heard testimony from both

the Highwaymen and Billy Wadd and some others -- if this club

took a foray into the territory that belonged to another club

or set of clubs, they might meet some resistance.

Remember the Jokers coming in and the conflict that

ensued between the Jokers, the Devils Diciples, and the

Highwaymen that resulted again in acts of violence, firearms

being discharged.

And finally, protect the organization.  Protect the

organization.  Protect the organization from the law, from the

Feds.  Okay?  That was a very important purpose.  A lot of

criminal activity was centered around this particular purpose.

"The Feds are watching.  Be sharp."

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

30

1        The Feds are watching, be sharp.  So those were some
2   of the -- yeah, we're right there.  Sorry.  I tend to get ahead
3   of myself.  Sorry.
4        So, "the Feds are watching," you know, this is
5   something that was very, very important.  Lie if you have to.
6   Whatever it takes.  We're going to intimidate witnesses.  We're
7   going to root out snitches.  We're going to do whatever it
8   takes.  We're going to fabricate, you know, testimony or what
9   have you, all with the goal of protecting this enterprise,
10  protecting the enterprise from law enforcement.
11       So those are the purposes that the Government contends
12  we have proved to you beyond a reasonable doubt.
13       And ladies and gentlemen, I want to move now to the
14  second -- well, I guess I missed my two slides.  Okay.  Let's
15  go back because I want to see what I missed.
16       Okay.  So one of the things that in order to become a
17  member, we all know some people have to prospect.  Others,
18  don't have to prospect.  Right?  That seemed to be something
19  that you heard testimony about, I didn't have to prospect.  I
20  got to come into this club without having to be a prospect.
21  Right?
22       Membership in the club is a coveted item for people
23  within this world.  Okay?  In order to become a member, you may
24  have to become a prospect.  In order to become a prospect,
25  there apparently is a prospect agreement.  And the agreement

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

1  that, ladies and gentlemen, you heard testimony about, Special

2  Agent Fleming and other law enforcement personnel seized this

3  agreement and typed similar agreements from various locations

4  within the Devils Diciples' search warrants that were

5  conducted.  And in this agreement, it talks about what you need

6  as a prospect.

7          Some of them have been highlighted for you.

8  Prospect's sponsor will be responsible for the prospect, show

9  him the ropes.  Prospect will respect and answer to all patch

10  holders.  Prospect must have 100 percent full-patched vote.

11  Prospect will not attend old or new business discussions or

12  meetings.  And if a prospect leaves the club, a minimum of $100

13  fine is imposed.  Reason for leaving and punishment is left up

14  to the discretion of the chapter.

15          By the way, there's no mention of the motorcycle

16  having to stay with the club in the prospect agreement.  And

17  that's, again, another subject we're going to talk about later.

18          But while we have that agreement up, here are some of

19  the rules that apply to a prospect.  It's a coveted thing to

20  become a full-patched member within the outlaw motorcycle club

21  community.  Many of the witnesses that got up on that witness

22  stand had been proud members of the Devils Diciples.  They were

23  very, very proud of their membership in that organization, in

24  that criminal enterprise.

25          What else did I miss?

 1            That's what a full-patched member looks like.  I
 2   talked to you about some of the various chapters.  That's just
 3   a display of some of the photos that you have seen during the
 4   course of the trial of individuals at various locations.
 5            Next slide, please.
 6            This placard was on the wall of the Mount Clemens
 7   clubhouse, the one on Gratiot, We talked a lot about it.  That
 8   was the mother chapter, the headquarters of the Devils Diciples
 9   Motorcycle Club.  And this, this phrase, "One for all, all for
10   one, Forever, Together, Wherever" and "I believe," some
11   iteration of those three phrases are found littered throughout
12   letters that individuals have written, documents that have been
13   seized, on the colors themselves.  But what it really
14   represents is the motto, if you will, of this particular
15   organization, and that is "One for all, all for one, Forever,
16   Together, Wherever"; and "I believe."  Again, common purpose.
17            I'm going to move on now to the second element, which
18   is interstate activities, economic activities in interstate
19   commerce.  This one is a pretty straightforward one, ladies and
20   gentlemen.  The instructions are very, very clear.  Here are
21   some of the ways in which the Government, I submit to you has
22   proved this element to you beyond a reasonable doubt.
23            You have heard testimony about all of the activities
24   that are referenced on this particular screen.  And this one is
25   cut off, so I direct you to the larger screen.  That one is not

1    complete.

2          Drug activity.  There has been a tremendous amount of

3    drug activity and testimony about drug activity between

4    Arizona, California, Michigan, Ohio, Indiana, Alabama, and

5    elsewhere.  People who have been driving drugs across the

6    country, people who have been bringing ephedrine or precursor

7    pills, specifically Karen Casey talked about the fact that she

8    would obtain those pills from a warehouse.  She would put them

9    in, inside of gallon Ziploc bags and she would mail the pills

10   from Ohio to, all the way out to California, where those pills

11   would then be turned into methamphetamine in pound quantities.

12   And that those drugs would then be put on her body, taped

13   around her body.  And she would physically transport them via

14   airplane back into Ohio.

15         You heard testimony that Billy Wadd went to

16   California, met with Holiday.  Received a package of

17   methamphetamine, put that methamphetamine in his wallet, got on

18   an airplane, took something to calm his nerves, woke up in

19   Michigan and handed that methamphetamine over to Spike.

20         You heard testimony from Iron Mike that he traveled

21   from Michigan all the way down to Arizona, and perhaps to New

22   Mexico and other places as well.  On the way there, he would

23   take money, get drugs, bring the drugs and transport them back.

24         You heard testimony from others, and some will come

25   into my mind in a second as I'm talking to you.  But you heard

1   testimony from so many of these folks that talked about their

2   various trips between states.

3        Jennifer Cicola, she told you that she traveled with

4   Pauli Darrah and she traveled with Sonny from Michigan all the

5   way down to Ohio to see Lightning.  Lightning gave them a bag

6   full of meth.  They drove it back up to Michigan.  They gave it

7   to Detroit Red.  These are some of the instances, and there are

8   many, many more.  When you go back into the jury room, you may

9   recall through your own recollection, perhaps your notes and

10  your own recollection talking about this, the number of times

11  that drugs were transported by members of this enterprise, and

12  associates, members and associates, to various locations across

13  the country.

14       The same is true for precursor chemicals.  You may

15  recall testimony about Gun Control transporting red phosphorus,

16  that precursor chemical, inside of the side-view or rearview

17  mirror of the vehicle and driving it from California to

18  Michigan.  And then he and Gadget took that red phosphorus and

19  drove it to Alabama, all for the purposes of making meth.

20       So there's been ample testimony, ladies and gentlemen,

21  about each of these various categories, money orders going back

22  and forth, cash going back and forth, shipments, mailings and

23  things of that nature.  I submit to you that, ladies and

24  gentlemen, this element has been amply proved to you beyond a

25  reasonable doubt.

1     Moving on to element 3, the third element that the

2   Government must establish beyond a reasonable doubt is that a

3   conspirator, and it could include the defendant but it need

4   not, was either employed by or associated with the enterprise.

5   And really, "associate" means to join often in a loose

6   relationship with a partner, a fellow worker, a colleague, a

7   friend, a companion or an ally.

8     When you join with members of the enterprise to aid or

9   further the activities of the enterprise or you conduct

10   business with or through the enterprise, you are associated

11   with the enterprise.

12     Why is this important?  Why do we care about this?  We

13   care about this, ladies and gentlemen, because just because you

14   are not a member of the Devils Diciples Motorcycle Club does

15   not mean that you are not associated with the enterprise and

16   involved in the RICO activities.  Just because you're not a

17   member does not mean that you're not associated with or not in

18   violation of the RICO statute.

19     So the enterprise is the Devils Diciples Motorcycle

20   Club.  And people who are members of that enterprise and who

21   conspire and agree and meet all of these requirements that we

22   are going through right now, those individuals, I submit to

23   you, ladies and gentlemen, if we have proved that to you beyond

24   a reasonable doubt, then they are in violation of the RICO

25   statute and the conspiracy to commit RICO.

2:11-cr-20066-RHC-MKM   Doc # 251   Filed 02/03/15   Pg 36 of 44   Pg ID 8799
EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

36

1           But there are other individuals who, as I've just

2   described, can also be associated.  You need not only be a

3   member in order to be associated with the enterprise.

4           The fourth element, ladies and gentlemen, is to

5   conduct or participate in the conduct of the affairs of the

6   enterprise.  The defendant has to agree that a co-conspirator

7   would conduct or participate in the conduct of the affairs of

8   the enterprise.  It's one or the other.  We don't have to prove

9   both.  Okay?  If you participate, that's all we need to show.

10  If the person did not actually participate and they conducted,

11  then we have to show other things.  But we don't have that

12  situation here.

13          All the members and all of the defendants on trial

14  here actually participated in the activities of the affairs of

15  the enterprise.  The evidence has shown to you beyond a

16  reasonable doubt through the testimony of the witnesses and all

17  the physical evidence that we've presented to you that they

18  all, each of them participated.

19          However, even if they had not, if they conducted the

20  affairs of the enterprise, we would have met our burden with

21  respect to this particular element of the RICO conspiracy

22  charge.

23          How?  Because if you don't personally participate, the

24  law says that an enterprise is operated not just by upper

25  management, but by low-level participants in the enterprise who

2:11-cr-20066-RHC-MKM   Doc # 251   Filed 02/03/15   Pg 37 of 44   Pg ID 8800
EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

37

```
 1    are under the direction of upper management.

 2            So, to give an example, someone who gives the orders

 3    but doesn't dirty their hands in the various activities is as

 4    equally guilty as the guy who is doing the stuff, the

 5    lower-rung participant.  It's a common enough idea.  All of

 6    you, I am sure, are familiar with that idea.  And so that's

 7    really what the genesis of that, that portion of it is.  But

 8    you need not be concerned about that in this instance, because

 9    I submit to you they all participated in this particular case,

10    and the evidence will show that.

11            The fifth element that the Government must prove is

12    that a conspirator would engage in a pattern of racketeering

13    activity.  Now, we get to that racketeering act thing again.

14    We need two racketeering acts within ten years of each other,

15    okay?  Ten years of the prior one.  And then there are three

16    components to this particular element.

17            One, that the defendant agreed that the -- that a

18    conspirator did or would intentionally commit or cause or aid

19    and abet in the commission of two or more of the racketeering

20    acts.  Those were the long list of offenses.  Some were state

21    law offenses, murder, extortion, kidnapping, yada, yada.  The

22    rest of them were federal offenses, obstruction of justice.

23    The judge went through all of those with you.

24            If you find that two, any two racketeering acts were

25    committed or would have been committed -- we'll talk about that
```

1    a little bit later -- but were committed or would have been

2    committed, we've satisfied this element.

3            So, two instances of drug trafficking, two instances

4    of the manufacture of drugs works.  That's enough.  One

5    instance of the manufacture of drugs, one instance of the

6    distribution of drugs.  Enough.  Obstruction of justice,

7    witness tampering.  Enough.  You get it.  That's all we need to

8    prove with respect to the two acts, as long as the time period

9    is complied with.

10           And again, when you read those instructions, hopefully

11   this makes more sense to you.  We only need to prove two.

12   Again, we have a heavy burden.  We often prove more than what

13   we need to prove.  Don't hold us to that higher burden.  Don't

14   go back there and start arguing over ten of the racketeering

15   acts when we need only have proved two beyond a reasonable

16   doubt.  Hold us to our burden but just our burden.

17           There has to be a nexus to the enterprise, and the

18   activity has to be related.  The judge talked about it, about

19   that at great length.  And I think that the best way to explain

20   that is when we start going through the various racketeering

21   acts, and criminal acts that we've put proof on, you're going

22   to be able to see whether an activity was related or not,

23   whether there was a nexus or not.  We're not talking about

24   completely unrelated events that have nothing to do with the

25   Devils Diciples.

1        What would be an example of that?  Let's say that

2   someone went out and committed a crime that was not anywhere

3   near this.  Let's say that somebody went out and committed a

4   crime that had nothing to do with this enterprise whatsoever,

5   its members, its purposes, its goals, and wasn't involving this

6   at all.  And the Government could not prove that it was related

7   to this enterprise.  That's what we're talking about.  We

8   haven't put any of that type of evidence on, ladies and

9   gentlemen, I submit to you, and so you need not worry about

10  that.

11       But as I go through the various racketeering acts, I'm

12  going to spend a little time and show you how it was related to

13  the enterprise.  So that particular component, you're going to

14  see that more and more as we talk more in specifics.

15       And three, racketeering activity has to extend over a

16  substantial period of time, or pose a threat of continued

17  criminal activity.  We have both here.  The indictment talks

18  about activities that this enterprise was engaged in from the

19  early 1990s, up and through the date of the indictment, which

20  was June of 2012.  So the, the time period that this enterprise

21  has been in existence satisfies the longevity requirement.

22       In addition, the testimony that you heard,

23  particularly from Special Agent Fleming about some of the more

24  recent activities, the meth manufacturing that was going on in

25  June of 2012, for instance, the assault that occurred at the

EXCERPT OF JURY TRIAL, VOLUME XXXIV – 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

40

1     New York New York bar with Mr. McClure, for instance, those

2     type of activities show that this activity would have continued

3     but for the indictment in this case.  So we've satisfied both

4     of those particular prongs.  We need only satisfy one.  But

5     that's really what that talks about.

6             So finally, ladies and gentlemen, how does this all

7     relate to the essence of the RICO conspiracy?  The Judge has

8     instructed you that, again, even though racketeer --

9     racketeering acts, we have evidence that they occurred, it's

10    the agreement to commit them that matters.  It is the agreement

11    that really is at issue here.

12            Your Honor, I think this may be a good place to stop

13    before I go into another area.

14            THE COURT:  That will be fine.  The timing is suitable

15    and you can have a seat.

16            MS. MOHSIN:  Thank you, Judge.

17            THE COURT:  You will prepare to put your materials

18    away, ladies and gentlemen, in the jury room overnight.  And

19    we'll go on the ordinary full-day schedule tomorrow as we did

20    today.  We will begin at nine a.m. tomorrow morning.  There's

21    nothing pending, nothing holding us up.  And Ms. Mohsin will

22    conclude her comments over the next -- over the morning hours,

23    I would imagine.  And then we'll recess on an as-needed basis,

24    one mid-morning recess, a noon recess and afternoon recess.

25            We'll begin to hear the closings of the defendants'

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN                    41

1    attorneys tomorrow as well, I am reasonably sure, and

2    continuing on then the following day as well, and concluding

3    then, eventually getting into deliberations, I would imagine,

4    near -- at or near the end of the week.

5          So we can recess now.  Put the matter off your minds.

6    Don't try to fill in the blanks in the meanwhile.  Get a good

7    night's sleep.  We'll see you tomorrow for the commencement of

8    court at nine a.m., and you may rise and leave.

9          Thank you.

10      (Jury out, 4:38 p.m.)

11      THE COURT:  All right.  The jury is absent and you may

12   be seated.  The matter is ready for recess.

13        Mr. Satawa, though, had pointed out something that he

14   wanted to suggest in the way of a correction for instructions.

15        I'd ask you to discuss that with government counsel,

16   Mr. Maiatico -- Mr. Satawa, and see if there's a stipulation

17   available to do whatever re-instruction or correction might be

18   suggested by you.  The possibility of agreement needs to be

19   explored.  And there's plenty of time, it seems to me, to do

20   that this afternoon or tomorrow.  So if there's an agreement,

21   I'll certainly correct whatever is necessary.  And if there's

22   not, I would at least like to have the Government's thinking on

23   whatever it is that you need to suggest before we get into it

24   in-depth.

25        Is there anything else for the record then for the

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

42

1    Government before we recess?

2        MS. MOHSIN:  Judge, I don't know if you were going to

3    handle the issue with the juror?

4        THE COURT:  Yes.  What I'm going to do is basically

5    she's not going to show up tomorrow.  We're going to contact

6    her by phone.  And she's -- without, in other words, revealing

7    the arranged absence or the reason for it, so forth, and thus

8    not to start the dominoes falling over.

9        MS. MOHSIN:  Yes.

10       THE COURT:  I don't want to encourage, unknowingly,

11   other jurors trying to get themselves in the same position to

12   leave early.  And we don't, we don't want that.  We want a

13   full complement, more than full complement through the end of

14   discussions.  So we have her contact number.  And my case

15   manager is going to call her.  I'll speak with her, I'll thank

16   her.  I'll express the thanks of all of the attorneys on both

17   sides for her service and just ask her to not be in touch with

18   any of the deliberating jurors, in other words, the same kind

19   of cautions that I gave to the other excused jurors.

20       If you would like me to do that on the record, I can

21   have my court reporter recording those things if anybody would

22   wish to have that done.  I'd be happy to do it.  I don't think

23   that it's necessary, but if anybody thinks differently, please

24   speak up.

25       Anybody on the Government's side?

EXCERPT OF JURY TRIAL, VOLUME XXXIV - 1/20/2015
CLOSING ARGUMENT BY MS. MOHSIN

43

```
 1            MS. MOHSIN:  No, your Honor.

 2            MS. STOUT:  No, your Honor.

 3            THE COURT:  Does anyone on the defense side want that

 4   done on the record particularly?

 5            MR. SABBOTA:  No, your Honor.

 6            MS. MACERONI:  No, your Honor.

 7            THE COURT:  Okay.  So I'll handle it in a gentle

 8   manner.  And again, I'll express the thanks of all the

 9   attorneys here for her diligence and her attention.

10            With nothing else to handle on the record?

11            All right.  There's nothing else, then.  We shall

12   recess this case.  I have another case to take up.  So you can

13   please absent yourselves.

14        (Recess taken, 4:41 p.m.)

15

16                          *      *      *

17

18

19

20

21

22

23

24

25
```

1

2                        **CERTIFICATE OF REPORTER**

3

4          As a Federal Official Court Reporter for the United

5   States District Court, appointed pursuant to provisions

6   of Title 28, United States Code, Section 753, I do hereby

7   certify that the foregoing is a correct transcript of

8   the proceedings in the above-entitled cause on the date

9   hereinbefore set forth.

10

11

12                        Dated this 21st day of January, 2015.

13

14                        ___s/ Christin E. Russell_____
                          Christin E. Russell
15                        RMR, CRR, FCRR, CSR
                          Federal Official Court Reporter.
16

17

18

19

20

21

22

23

24

25